UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

_____
                                   )
AMERICAN TRUCKING ASSOCIATIONS,    )
INC.; CUMBERLAND FARMS, INC.;      )
M&M TRANSPORT SERVICES, INC.; and  )
NEW ENGLAND MOTOR FREIGHT, INC.,   )
                                   )
     Plaintiffs,                   )
                                   )
          v.                       )   C.A. No. 18-378-WES
                                   )
PETER ALVITI, JR., in his official )
capacity as Director of the Rhode  )
Island Department of Transportation;)
and RHODE ISLAND TURNPIKE AND      )
BRIDGE AUTHORITY,                  )
                                   )
     Defendants.                   )
_____)

## OPINION AND ORDER

WILLIAM E. SMITH, Chief Judge.

Before the Court is Defendants' Motion to Dismiss ("Defendants' Motion"), ECF No. 21, to which Plaintiffs have objected, ECF No. 23. For the following reasons, Defendants' Motion is granted.

I.  Factual Background

In 2016, the Rhode Island General Assembly passed the Rhode Island Bridge Replacement, Reconstruction, and Maintenance Fund Act of 2016 ("RhodeWorks Act"), R.I. Gen. Laws § 42-13.1-1 et seq., to redress the fact that 23 percent of Rhode Island bridges are "classified as structurally deficient" and the sources of revenue on which the state had historically relied to fund its

transportation infrastructure are insufficient to fund the necessary maintenance and improvements to those bridges. See R.I. Gen. Laws § 42-13.1-2(2)-(7). The General Assembly found that large commercial trucks "cause in excess of seventy percent (70%) of the damage" to Rhode Island's roads and bridges but contributed "less than twenty percent (20%) of the state's total annual revenues to fund transportation infrastructure." R.I. Gen. Laws § 42-13.1-2(8). The General Assembly also found that, even after making several changes to the state's funding strategy, there still existed a "funding gap between the revenue needed to maintain all bridges in structurally sound and good condition and the annual amounts generated by current dedicated revenue sources." R.I. Gen. Laws § 42-13.1-2(7).

To fill this funding gap, the General Assembly passed the RhodeWorks Act, which authorized RIDOT to collect tolls exclusively from "large commercial trucks" and expressly prohibited RIDOT from collecting similar tolls from any other type of vehicle, including "passenger cars." R.I. Gen. Laws § 42-13.1-4, -5. Under the Act, the Rhode Island Department of Transportation ("RIDOT") is vested with the power to determine the locations and amounts of the tolls, while the Rhode Island Turnpike and Bridge Authority ("RITBA") collects the tolls and deposits the revenues into a special account, called the "Rhode Island bridge replacement, reconstruction, and maintenance fund" ("RI Bridge

Fund"), that can be used only to fund the "replacement, reconstruction, maintenance, and operation of Rhode Island bridges"; surplus revenues "shall not revert to the general fund but shall remain" in this special account. R.I. Gen. Laws §§ 42-13.1-4, -9; see also RITBA's Mot. Intervene 1, ECF No. 16. The Act imposes a $20.00 daily limit on the amount of tolls that a truck making a "border-to-border through trip" using I-95 may be charged. R.I. Gen. Laws § 42-13.1-4(c). In contrast, the Act imposes a $40.00 daily limit on the amount of tolls that a truck making other trips may be charged. R.I. Gen. Laws § 42-13.1-4(d).

The first toll facilities became active in June 2018 and, at the time the Complaint was filed, tolls were being collected at two locations in southwestern Rhode Island on I-95. Compl. ¶¶ 61-62. Plaintiffs—various trucking, transport, and freight companies—filed a Complaint in July 2018 asking this Court to declare the tolls unconstitutional and to enjoin their collection. Compl. ¶¶ 1, 13. Plaintiffs contend that the tolling regime violates the Commerce Clause of the U.S. Constitution because (1) it intends to discriminate in favor of in-state, and against out-of-state entities; (2) it has the practical effect of discriminating against trucks traveling in interstate commerce; and (3) it imposes excessive costs on interstate vehicles as it is not a fair approximation of the payers' uses of the tolled facilities. Compl. ¶¶ 5-7; see U.S. Const. art. I, § 8, cl. 3.

Defendants — Peter Alviti, in his official capacity as the Director of RIDOT, and RITBA[1] — have moved to dismiss on three grounds. First, they argue that the tolls constitute "a tax under State law" as described in the Tax Injunction Act ("TIA") and, therefore, the Court lacks subject matter jurisdiction to enjoin the "assessment, levy or collection" of those tolls. 28 U.S.C. § 1341; Defs.' Mot. to Dismiss ("Defs.' Mot.") 7-25, ECF No. 21. Second, even if the tolls are not "taxes" under the TIA, they argue that principles of comity and federalism nonetheless require the Court to decline to exercise its jurisdiction. Defs.' Mot. 25-30. Third, Defendants argue that the Eleventh Amendment protects them from suit. Defs.' Mot. 30-38.

II. Discussion

A. Tax Injunction Act

The TIA provides: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The parties do not dispute that Rhode Island state courts offer a "plain, speedy and efficient remedy" for Plaintiffs' Commerce Clause claims. Therefore, the only question before the Court is whether the RhodeWorks tolls constitute "a tax" under the TIA.

---

[1] The Court granted RITBA's Motion to Intervene as a defendant (ECF No. 16) on August 17, 2018.

The question presents a close call, one which pits the actual language of the TIA and the context surrounding its enactment in the 1930s against several more modern decisions of the First Circuit that attempt to distinguish between fees and taxes. "The Supreme Court has not addressed the precise issue in dispute here, the means of defining a 'tax' for purposes of the Tax Injunction Act." See Am. Landfill, Inc. v. Stark/Tuscarawas/Wayne Joint Solid Waste Mgmt. Dist., 166 F.3d 835, 838 (6th Cir. 1999). It has, however, differentiated between a "tax" and a "toll" in other situations, most notably in its opinion in Sands v. Manistee River Imp. Co., 8 S.Ct. 113 (1887). In that case, a Michigan law allowed private corporations to clean up and improve sections of the Manistee River and then charge tolls to recoup the costs of that clean up. The improvements had to be approved by the governor and the attorney general; the toll amounts had to be set by an administrative agency and could only be imposed upon the improved section of the river based on the distance traveled; and the use of the improved area had to remain open to all travelers, subject to their payment of the tolls. Sands used the improved section of river to transport his logs downstream but failed to pay the requisite tolls, leading the plaintiff, Manistee River Import Co., to sue for the payment of the delinquent tolls.

In his defense, Sands argued that the imposition of tolls, "without notice to the parties interested, or affording them any

5

opportunity of contesting the validity or propriety of such tolls," amounted to a deprivation of property without due process in violation of the Fourteenth Amendment. Id. at 114-15; U.S. Const. amend. XIV. Sands further argued that the Michigan statute allowing for the imposition of tolls violated the Contracts Clause because a 1787 ordinance provided that navigable waters in the territory of Michigan would be forever free from taxes, imposts, and duties. According to Sands, the ordinance functioned as a contract between the federal government and the citizens of the territory and the imposition of tolls on the Manistee River amounted to a "tax" in violation of that contract. Sands, 8 S. Ct. at 115.

The Court first held that the tolls did not violate the Due Process Clause because a toll did not constitute a taking of property "any more than there is a taking of property from a traveler in requiring him to pay for his lodgings in a public inn . . . The tolls exacted from the defendant are merely compensation for benefits conferred, by which the floating of his logs down the stream was facilitated." Id. It further found that it was impossible to give Sands, or any other citizen "who may have occasion to use the stream," notice or opportunity to "present their views upon the tolls to be charged" because "[s]uch parties cannot be known in advance." Id. at 116.

6

In expounding on why imposing a "toll" did not constitute a deprivation of property without due process, the Court distinguished tolls from taxes, observing that:

> There is no analogy between the imposition of taxes and the levying of tolls for improvement of highways; and any attempt to justify or condemn proceedings in the one case, by reference to those in the other, must be misleading. Taxes are levied for the support of government, and their amount is regulated by its necessities. Tolls are the compensation for the use of another's property, or of improvements made by him; and their amount is determined by the cost of the property, or of the improvements, and considerations of the return which such values or expenditures should yield.

Id. at 115.

The Court also rejected Sands' Contracts Clause argument. It primarily relied on the fact that the U.S. Constitution preempted all existing laws, including the 1787 ordinance at issue, and that Michigan assented to this preemption when it became a state in 1837. Id. at 116. However, it took the opportunity to opine that, even in the absence of preemption, there was a distinction between "taxes" and "compensation for improvements," which would defeat the Contracts Clause claim. Id. at 117 ("'By the terms [']tax, impost and duty,['] mentioned in the ordinance, is meant a charge for the use of the government, <u>not compensation for improvements</u>.'") (quoting Huse v. Glover, 119 U.S. 543, 549 (1886)) (emphasis added).

In the years between the publication of Sands and the enactment of the TIA, a number of state courts similarly concluded that "tolls" and "taxes" were mutually exclusive. See, e.g., Ruler v. York County, 139 A. 136 (Pa. 1927) (holding that "[t]olls on highways are not taxes") (citing Sands, 123 U.S. at 294); Masters v. Duval County, 154 So. 172 (Fla. 1934) (holding that "[t]olls are not taxes" under the Florida Constitution because "tolls are collected from every one who uses the bridge as a passageway whether a resident or a nonresident of the taxing unit . . . while taxes may be levied upon residents or upon property having its situs in the taxing unit") (citing Sands, 123 U.S. at 294); People ex rel. Curren v. Schommer, 63 N.E.2d 744, 747 (Ill. 1945) (concluding that "[t]here appears to be a clear cut and definite distinction between the legal conception of tolls and taxes" and explaining the difference between the two by reference to Sands); In re Opinions of the Justices, 120 A. 629, 630 (N.H. 1923) (holding that the legislature, which was constitutionally precluded from assessing certain taxes, was within its authority to impose tolls for use of state highways because "[t]here is no analogy between the imposition of taxes and the levying of tolls for improvement of highways") (quoting Sands, 123 U.S. at 294).

Additionally, a treatise on the Law of Taxation, published approximately a decade before the TIA was enacted, differentiated between tolls and taxes as follows:

8

> A 'toll' is a sum of money for the use of something, generally applied to the consideration which is paid for the use of a road, bridge or the like, of a public nature. The term <u>toll</u>, in its application to the law of taxation, is nearly obsolete. It was formerly applied to duties on imports and exports; but tolls, as now understood, are applied most exclusively to charges for permission to pass over a bridge, road or ferry owned by the person imposing them. <u>Tolls are not taxes</u>. A tax is a demand of sovereignty; a toll is a demand of proprietorship.

Thomas A. Cooley, The Law of Taxation 77 (Clark A. Nichols ed., 4th ed. 1924) (emphasis added) (internal citations omitted).

Although neither <u>Sands</u>, nor the subsequent state court cases, nor the Cooley treatise, purport to analyze the meaning of the term "tax" as it is used in the TIA, these authorities nonetheless provide compelling evidence that, at the time Congress enacted the TIA in 1937, it would have understood "taxes" and "tolls" to be mutually exclusive concepts. "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979); <u>see also</u> <u>Astoria Fed. Sav. & Loan Ass'n v. Solimino</u>, 501 U.S. 104, 108 (1991) ("[W]here a common-law principle is well established . . . courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident.") (quotation omitted).

9

Defendants naturally disagree. They argue that there was not a clear distinction between "taxes" and "tolls" prior to the enactment of the TIA, as evidenced by the fact that some cases, published immediately before and after the TIA was enacted, described certain toll-like exactions as "taxes."

First, Defendants contend that, in several cases decided in the years immediately before and after the enactment of the TIA, the Supreme Court used the term "tax" to discuss certain tolls similar to the tolls here. See Defs.' Reply 3, ECF No. 25. However, in all the cases to which Defendants cite, the challenged exactions were called "taxes" in the enabling legislation and the Court's analysis did not appear to turn on the difference between "taxes" and "tolls." See generally Interstate Busses Corp. v. Blodgett, 276 U.S. 245 (1928) (addressing a Commerce Clause challenge to a Connecticut statute imposing a one-cent-per-mile "excise tax" on vehicles traveling interstate); Continental Baking Co. v. Woodring, 286 U.S. 352 (1932) (addressing various constitutional challenges to a Kansas statute imposing a variety of obligations and classifications on vehicles traveling interstate, including a "tax of five-tenths mill per gross ton mile"); Dixie Ohio Exp. Co. v. State Rev. Comm'n of Ga., 306 U.S. 72 (1939) (addressing a Commerce Clause challenge to the "Georgia Maintenance Tax Act"). Defendants' point is that the Court chose to describe these so-called "tolls" as taxes because that was what

10

they really were, not because that is what the legislatures chose to call them. The point is a fair one inasmuch as the Court could have found the fees to be tolls regardless of the label. But these cases do little to undermine the fundamental distinction between tolls and taxes found by the Court in the Sands case.

Second, Defendants contend that, to determine whether an exaction is a "tax" within the meaning of the TIA (as opposed to the pre-TIA landscape discussed above), the Court must engage in the three-pronged test set forth in San Juan Cellular Telephone Co. v. Pub. Serv. Comm'n of P.R., 967 F.2d 683 (1st Cir. 1992). That test weighs the characteristics of the challenged assessment to determine whether it is more akin to a "tax" or a "regulatory fee."[2] San Juan Cellular, 967 F.2d at 685.

In San Juan Cellular, the First Circuit laid out a spectrum of government-imposed assessments, placing the "classic tax" at one end and the "classic fee" at the other:

> The classic 'tax' is imposed by a legislature upon many, or all, citizens[,] [and] raises money, contributed to a general fund, and spent for the benefit of the entire community . . . The classic 'regulatory fee' is imposed by an agency upon those subject to its regulation . . . [to] serve regulatory purposes directly by . . . deliberately discouraging particular conduct by making it more expensive . . . [o]r . . . indirectly by . . . raising money placed

---

[2] A regulatory fee, for purposes of this analysis, is roughly the same thing as a toll in the sense that it is a fee that has certain specific characteristics that distinguish it from what we commonly think of as a tax.

11

> in a special fund to help defray the agency's
> regulation-related expenses.

Id. at 685. To determine whether an exaction constitutes a "tax" or a "regulatory fee," the court laid out three factors for consideration: (1) the nature of the entity imposing the exaction; (2) the scope of the population subject to the exaction; and (3) whether the revenues from the exaction are expended for general public purposes, of a sort often financed by a general tax, or whether the revenues provide more narrow benefits to regulated individuals and entities and serve to defray the agency's cost of regulation. Id. at 686. Although none of these factors is dispositive, in close cases, the First Circuit has instructed courts to "emphasize the revenue's ultimate use, asking whether it provides a general benefit to the public, of a sort often financed by a general tax, or whether it provides more narrow benefits to regulated companies or defrays the agency's costs of regulation." Id. at 685.

The first factor — the nature of the entity imposing the charge — clearly favors finding the RhodeWorks tolls to be fees or tolls, and not taxes. The toll amounts and locations are set by RIDOT, a government agency, and not by the General Assembly itself. See Bidart Bros. v. California Apple Comm'n, 73 F.3d 925, 931 (9th Cir. 1996) ("An assessment imposed directly by the legislature is

more likely to be a tax than an assessment imposed by an administrative agency.").[3]

Likewise, the second factor — the nature of the population subject to the charge — also cuts in favor of finding the tolls to be akin to fees and not taxes. The tolls are imposed upon a narrow class of payors (large commercial trucks) which, by RIDOT's own estimates, makes up only 2.5 percent of weekday traffic and 0.8 percent of weekend traffic. Bidart, 73 F.3d at 931 ("An assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class."). However, "an assessment upon a narrow class of parties can still be characterized as a tax under the TIA" if it serves a revenue-raising purpose that benefits the community as a whole. Id. (citing Wright v. McClain, 835 F.2d 143, 145 (6th Cir. 1987) (finding assessments imposed only upon parolees to be "a tax" under the TIA because the funds were used for purposes that "related directly to the general welfare of the citizens of Tennessee")).

---

[3] However, RIDOT does contract with the State Tax Division to collect delinquent tolls and, therefore, the collections-process includes at least one tax-specific actor. See 28 U.S.C. § 1341 ("The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law . . . .") (emphasis added); Defs.' Reply 23, Ex. A – Memorandum of Understanding Between Rhode Island Division of Taxation and RIDOT. This Court may consider extrinsic evidence, such as the Memorandum of Understanding, in determining whether it has jurisdiction. See Ins. Brokers West, Inc. v. Liquid Outcome, LLC, 241 F. Supp. 3d 339, 342-43 (D.R.I. 2017).

But see GenOn Mid-Atlantic, LLC v. Montgomery Cty., Md., 650 F.3d 1021, 1022 (4th Cir. 2011) (finding an "excise tax" to be a "fee," despite that it was projected to raise between $11.7 and $17.6 million annually, which would be deposited directly into the general fund, because the class of payors (a single energy plant) was too narrow to qualify as a "tax" under the TIA).

The third factor — whether the revenue is used for general public purposes that benefit the community as a whole, or for more limited regulatory purposes that benefit the regulated group and defray the agency's costs of administration — suggests the tolls are "taxes." Although not referred to as "taxes" in the authorizing legislation, the tolls were enacted with the express intention of raising revenues to cover a longstanding infrastructure "funding gap" and are expected to raise approximately $500 million over ten years. Defs.' Reply 28; R.I. Gen. Laws § 42-13.1-2(7); see Wright, 835 F.2d at 144 ("[T]he label given an assessment by state law is not dispositive of whether the assessment is a 'tax under state law.' Rather, the definition of the term 'tax' is a question of federal law[.]"). Even if, as Plaintiffs argue, this amount constitutes only a small percentage of Rhode Island's overall state budget, these truck "tolls" still serve a critical revenue-raising purpose (transportation infrastructure), that but for their collection, would require the General Assembly to fund through general revenue. See Am.

14

Landfill, Inc. v. Stark/Tuscarawas/ Wayne Joint Solid Waste Mgmt. Dist., 166 F.3d 835, 840 (6th Cir. 1999) ("The [TIA] makes no exception for challenges to taxes which constitute a small portion of a state's revenue sources rather than a large portion."). Additionally, although the revenues from the tolls are deposited into a special account, not the general fund, the <u>purpose</u> for which the funds are used is unquestionably a general public purpose that benefits the community as a whole: Plaintiffs would be hard-pressed to demonstrate that highway construction and bridge maintenance benefit less than the entire community.

The First Circuit has held that "the most salient factor in the decisional mix concerns the destination of the revenues raised by the impost" and that the "revenue's ultimate use" is paramount. San Juan Cellular, 967 F.2d at 685; Cumberland Farms, Inc. v. Tax Assessor, State of Me., 116 F.3d 943, 947 (1st Cir. 1997) (citation omitted); see also Am. Landfill Inc., 166 F.3d at 839-40 (holding that, despite being deposited into a special fund, waste disposal "assessments" were taxes because they were approved by the legislature, were separate from the permitting fees which provided payors with the privilege of operation, and served several public purposes that benefitted the entire community). The use of a special fund here is little more than a budgeting device that is allowing the state to pay for what would otherwise be raised through general revenue taxation through a separate off-budget

15

fee.  The use of the fund does not change the character of the fee.

Moreover, the Supreme Court's holding in Sands and the analysis of San Juan Cellular are not at odds.  The holding in Sands that tolls are not taxes is still good law; and the TIA would not operate to deprive district courts of jurisdiction in a case that challenged the constitutionality of an actual toll.  But for a fee to be a toll – as conceived by Sands and consistent with the San Juan Cellular test – it must have certain characteristics: per Sands, it must be a fee that compensates the owner of something for use of that thing by another – a ferry, a private highway – or to compensate a person for certain improvements to property made by him.  In other words, there is a direct correlation between the fee or toll and the use of the property.  As stated in the Cooley treatise above, it is "a demand of proprietorship" not sovereignty.  In contrast, a tax, as the Court said in Sands and the First Circuit discussed in San Juan Cellular, is essentially a revenue raising device, a demand of the sovereign.  It is often, but not always imposed on a broad class of persons but, more importantly, it supplants other government revenue sources which would be needed to fund necessities like roads and bridges and the like.

Here, the facts are clear that the fees, while dubbed "tolls," are really a highly targeted and sophisticated tax designed to fund infrastructure maintenance and improvements that would

16

otherwise need to be paid for by other forms of tax-generated revenue. As such, the Court is without jurisdiction under the TIA; the federal case must be dismissed and ultimately heard in the courts of Rhode Island.

III. Conclusion

For the above-stated reasons, Defendants' Motion to Dismiss (ECF No. 21) is GRANTED.

IT IS SO ORDERED.

/s/ W. Smith
_____
William E. Smith
Chief Judge
Date: March 19, 2019