## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| AMERICAN TRUCKING ASSOCIATIONS, INC.; CUMBERLAND FARMS, INC.; M&M TRANSPORT SERVICES, INC.; and NEW ENGLAND MOTOR FREIGHT, INC.<br><br>*Plaintiffs*,<br><br>v.<br><br>PETER ALVITI, JR., in his official capacity as Director of the Rhode Island Department of Transportation,<br><br>*Defendant*. | Civil Action No. 1:18-cv-00378-WES-PAS<br><br>CHIEF JUDGE WILLIAM E. SMITH<br><br>WES |

---

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
## AND MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

---

Charles Rothfeld (pro hac vice)
Evan M. Tager (pro hac vice)
Colleen Campbell (pro hac vice)
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101
Telephone: (202) 263-3000

Gerald C. DeMaria
James Ruggieri
Higgins, Cavanagh & Cooney
10 Dorrance Street
Suite 400
Providence, RI 02903-3907
(401) 272-3500

*Counsel for Plaintiffs*

March 12, 2020

1

# <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ................................................................................................ 1

STATEMENT ..................................................................................................... 2

ARGUMENT ...................................................................................................... 7

I.      PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS. ................................... 8

      A.      The RhodeWorks Tolls Discriminate Against Interstate Commerce. ................... 9

            1.      Rhode Island officials intended the RhodeWorks tolls to discriminate against interstate commerce. ................................... 9

            2.      The RhodeWorks tolls have a discriminatory impact on interstate commerce. .............................................................. 14

      B.      The RhodeWorks Tolls Are Not Based On A Fair Approximation Of Use And Are Excessive In Relation To The Benefits Conferred. .............................. 17

            1.      The RhodeWorks charge is grossly disproportionate to the payers' use of and benefit from the tolled facilities. ........................... 18

            2.      RhodeWorks' impermissible effect cannot be justified on the theory that large trucks cause a disproportionate share of wear and tear on Rhode Island's bridges. ............................................ 19

      C.      The Constitutional Defects In The RhodeWorks Tolls Mandate Invalidation Of The Toll Regime. ...................................................... 21

II.     ABSENT A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE INJURY. ............................................................................ 22

III.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR ISSUANCE OF A PRELIMINARY INJUNCTION. ................................................ 24

CONCLUSION ................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Trucking Ass'ns, Inc. v. Scheiner,*
  483 U.S. 266 (1987)............................................................................. *passim*

*Am. Trucking Ass'ns, Inc. v. Sec'y of Admin.,*
  613 N.E.2d 95 (Mass. 1993) ...............................................................15, 18

*American Trucking Ass'ns, Inc. v. Alviti,*
  944 F.3d (1st Cir. 2019)..........................................................................2, 7

*Ardito v. City of Providence,*
  263 F. Supp. 2d 358 (D.R.I. 2003)..........................................................7, 8

*Bacchus Imports, Ltd. v. Dias,*
  468 U.S. 263 (1984)................................................................................9, 14

*Bank One v. Guttau,*
  190 F.3d 844 (8th Cir. 1999) .....................................................................25

*Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.,*
  567 F.3d 79 (2d Cir. 2009)...........................................................................18

*Bruns v. Mayhew,*
  750 F.3d 61 (1st Cir. 2014) ...........................................................................7

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
  520 U.S. 564 (1997)......................................................................................21

*Cohen v. R.I. Tpk. & Bridge Auth.,*
  775 F. Supp. 2d 439 (D.R.I. 2011)...............................................9, 18, 19, 21

*Comptroller of the Treasury of Md. v. Wynne,*
  135 S. Ct. 1787 (2015)..................................................................................16

*Dean Milk Co. v. Madison,*
  340 U.S. 349 (1951).........................................................................................9

*Doe v. Trustees of Boston Coll.,*
  942 F.3d 527 (1st Cir. 2019) ...........................................................................7

*Doran v. Massachusetts Turnpike Authority,*
  348 F.3d 315 (1st Cir. 2003)..........................................................................17

*Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines,*
    405 U.S. 707 (1972)...........................................................................................18, 19

*Feinerman v. Bernardi,*
    558 F. Supp. 2d 36 (D.D.C. 2008) ....................................................................23

*Gonzalez-Droz v. Gonzalez-Colon,*
    573 F.3d 75 (1st Cir. 2009) ............................................................................7, 22

*Haley v. Town of Lincoln,*
    611 A.2d 845 (R.I. 1992) ...................................................................................23

*HCC Specialty Underwriters, Inc. v. Woodbury,*
    289 F. Supp.3d 303 (D.N.H. 2018) ....................................................................22

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S 333 (1977)........................................................................................9, 22

*J.R. v. Gloria,*
    593 F.3d 73 (1st Cir. 2010) ................................................................................23

*Kentucky v. Graham,*
    473 U.S. 159 (1985)...........................................................................................23

*Kuzniar v. Keach,*
    709 A.2d 1050 (R.I. 1998) .................................................................................23

*Laird v. Chrysler Corp.,*
    460 A.2d 425 (R.I. 1983) ...................................................................................22

*Marrapese v. Rhode Island,*
    500 F. Supp. 1207 (D.R.I. 1980).......................................................................22

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) .............................................................................25

*Minnesota v. Clover Leaf Creamery Co.,*
    449 U.S. 456 (1981)...........................................................................................13

*Miss. Power & Light Co. v. United Gas Pipe Line Co.,*
    760 F.2d 618 (5th Cir. 1985) .............................................................................24

*Nalco Co. v. EPA,*
    786 F. Supp.2d 177 (D.D.C. 2011).....................................................................23

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.,*
    287 F.3d 1 (1st Cir. 2002)..................................................................................22

*New Energy Co. of Ind. v. Limbach*,
   486 U.S. 269 (1988) ............................................................................................8

*Nw. Airlines, Inc. v. Cnty. of Kent*,
   510 U.S. 355 (1994) .......................................................................................8, 18

*Okla. Tax Comm'n v. Jefferson Lines, Inc.*,
   514 U.S. 175 (1995) ..........................................................................................16

*Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*,
   511 U.S. 93 (1994) ..............................................................................................9

*Philip Morris USA Inc. v. Scott*,
   561 U.S. 1301 (2010) .........................................................................................23

*R.I. Homeless Advocacy Project v. City of Cranston*,
   2017 WL 3327573 (D.R.I. Aug. 3, 2017) ....................................................7, 8, 25

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,
   102 F.3d 12 (1st Cir. 1996) ...............................................................................23

*Sammartano v. First Jud. Dist. Ct.*,
   303 F.3d 959 (9th Cir. 2002) .............................................................................25

*Selevan v. N.Y. Thruway Auth.*,
   584 F.3d 82 (2d Cir. 2009) ................................................................................18

*Serono Labs., Inc. v. Shalala*,
   158 F.3d 1313 (D.C. Cir. 1998) .........................................................................24

*Shurtleff v. City of Boston*,
   928 F.3d 166 (1st Cir. 2019) ...............................................................................7

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*,
   139 S. Ct. 2449 (2019) ...................................................................................8, 17

*Trailer Marine Transp. Corp. v. Rivera Vazquez*,
   977 F.2d 1 (1st Cir. 1992) ........................................................................ *passim*

*U.S. Chamber of Commerce v. Edmondson*,
   594 F.3d 742 (10th Cir. 2010) ...............................................................23, 24, 25

*United States v. New York*,
   708 F.2d 92 (2d Cir. 1983) ................................................................................23

*Utah Licensed Beverage Ass'n v. Leavitt*,
   256 F.3d 1061 (10th Cir. 2001) .........................................................................25

*Vaqueria Tres Monjitas, Inc. v. Irizarry*,
    587 F.3d 464 (1st Cir. 2009) ................................................................8, 24

*West Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994) ....................................................................8, 13, 14

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58 (1989) ..................................................................................23

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .....................................................................................7

**Statutes**

42 U.S.C. § 1983 ................................................................................................23

R.I. Gen. Laws 42-13.1-4(a) ..............................................................................3

R.I. Gen. Laws 42-13.1-4(c) ..............................................................................4

R.I. Gen. Laws 42-13.1-4(d) ..............................................................................4

R.I. Gen. Laws 42-13.1-4.5(b) ...........................................................................3

R.I. Gen. Laws 42-13.1-5 ...................................................................................3

R.I. Gen. Laws § 9-31-1 ...................................................................................22

**Other Authorities**

Fed. R.Civ. P. 65(a) ............................................................................................1

Patrick Anderson, *R.I. House passes Raimondo's truck-toll plan*, THE
    PROVIDENCE JOURNAL (Feb. 11, 2016) ..............................................12

## INTRODUCTION

Plaintiffs are businesses that operate trucks in interstate commerce and the national trade association that represents the interests of truckers. They seek a preliminary (and ultimately permanent) injunction pursuant to Federal Rule of Civil Procedure 65(a) prohibiting Defendant Peter Alviti, Jr., in his official capacity as Director of the Rhode Island Department of Transportation, from collecting truck tolls imposed by Rhode Island as part of its "RhodeWorks" program. These tolls violate the U.S. Constitution's Commerce Clause for several reasons. First, Rhode Island expressly designed the tolls to discriminate against interstate commerce, structuring them so that they would fall disproportionately on out-of-state and interstate truckers, while sparing in-state users of the tolled facilities. Second, the tolls discriminate against interstate commerce in their practical operation, as state officials intended and as a study conducted by the State itself confirms. And third, the tolls depart from the constitutional requirements that user fees fairly approximate use of the tolled facility and not be excessive in light of the benefits conferred.

A preliminary injunction against collection of these manifestly unconstitutional tolls is warranted. To begin, Plaintiffs are likely to succeed on the merits of their Commerce Clause challenge; both the U.S. Supreme Court and the First Circuit have invalidated charges that, in their material respects, are identical to the RhodeWorks tolls. Moreover, absent an injunction, Plaintiffs will suffer irreparable injury: Rhode Island is now collecting the tolls, and the State's sovereign immunity will preclude Plaintiffs from recovering the amounts paid even if they prevail in their constitutional challenge. Finally, an injunction is supported by the balance of equities and the public interest; although the tolls will impose very substantial costs on truckers so long as they are in operation, Rhode Island—which considered, but chose not to use,

constitutional means of funding road maintenance and construction—has no legitimate interest in the enforcement of illegal charges.

Immediately after Plaintiffs initiated this suit, the State moved to dismiss the action for lack of jurisdiction under the Tax Injunction Act.[1] This Court granted that motion, but the First Circuit reversed, holding that the "text, purpose, and our own precedent" establish that the RhodeWorks tolls are user fees rather than taxes within the meaning of the TIA. *American Trucking Ass'ns, Inc. v. Alviti* ("*Alviti*"), 944 F.3d 45, 56 (1st Cir. 2019). The Court of Appeals denied the State's petition for rehearing en banc on March 2, 2020, issued the mandate on March 9, 2020, and has now returned the case to this Court for resolution of the merits. As the first step in that process, the Court should preliminarily enjoin collection of the RhodeWorks tolls.

Counsel for Plaintiffs request oral argument on this Motion.

## STATEMENT

1. The RhodeWorks tolls challenged here have been established by Rhode Island to finance the repair and maintenance of the State's bridges. *See Alviti*, 944 F.3d at 47. Those tolls are collected exclusively from users of the tolled facilities; like most tolls, the RhodeWorks charges are a form of user fee and will be dedicated to maintenance of the facilities over which the toll payers travel. *Id*. But the RhodeWorks charges differ from ordinary highway tolls in at least two respects, both of which have the effect of placing disproportionate burdens on out-of-state and interstate truckers—as Rhode Island officials intended.

---

[1]     The Rhode Island Turnpike and Bridge Authority ("RITBA') intervened in the action to support Director Alviti. We refer to both Defendants collectively as "the State."

**First**, the tolls "shall be collected on large commercial trucks only and shall not be collected on any other vehicle." R.I. Gen. Laws 42-13.1-4(a).[2] Thus, the RhodeWorks legislation specifically prohibits the imposition of tolls on automobiles, buses, single-unit trucks, and all other vehicles. It states that the Rhode Island Department of Transportation ("RIDOT") "is expressly prohibited from collecting tolls hereunder on other vehicles [than large commercial trucks], herein defined to include motorcycles, passenger cars, and all other vehicles classed one through seven (7) pursuant to the Federal Highway Administration (FHWA) vehicle classification schedule." R.I. Gen. Laws 42-13.1-5. The law then further insulates automobiles from tolling, providing that "[n]o act authorizing tolls on passenger vehicles pursuant to this chapter shall take effect until it has been approved by the majority of those electors voting in a statewide referendum." R.I. Gen. Laws 42-13.1-4(a). This is so even though, according to RIDOT's own estimates, the trucks subject to RhodeWorks tolls make up only a tiny fraction—substantially fewer than 3%—of the vehicles using the tolled facilities. *See* Compl. ¶¶ 46-49. In contrast, other States impose tolls on all vehicles that use state highways.

**Second**, the State imposed what amount to modified flat charges for the privilege of using the tolled facilities. To accomplish this, the legislation "limit[s] the assessment of tolls upon the same individual large commercial truck … to once per toll facility per day in each direction." R.I. Gen. Laws 42-13.1-4.5(b). It further provides that "the total amount of tolls imposed upon the same individual large commercial truck … for making a border-to-border through trip on Route 95 Connecticut to Route 95 Massachusetts, or the reverse, shall not exceed

---

[2]     Under Rhode Island law, "[l]arge commercial truck[s]" are defined "pursuant to the Federal Highway Administration (FHWA) vehicle classification schedule as any vehicle within Class 8—single trailer, three (3) or four (4) axles up to and including Class 13—seven (7) or more axle multitrailer trucks, as such classification may be revised from time to time by the FHWA." R.I. Gen. Laws 42-13.1-3(4). These trucks are customarily used to transport large volumes of freight over long distances.

twenty dollars ($20.00)." R.I. Gen. Laws 42-13.1-4(c). And the statute also specifies that "the daily maximum amount of the tolls collected upon the same individual, large commercial truck … shall not exceed forty dollars ($40.00)." R.I. Gen. Laws 42-13.1-4(d). This is so "no matter how many tolls a tractor trailer goes through." Rhode Island Department of Transportation, *The RhodeWorks Tolling Program*, http://www.ridot.net/tolling/. As a consequence, a truck that passes through a given RhodeWorks toll gantry once in a day will pay exactly the same amount as one that passes through the gantry 50 times that day. And once a truck reaches the $40 daily toll limit, it may travel limitless additional mileage in Rhode Island on that day without any additional charge.

2. Rhode Island officials adopted the RhodeWorks tolls with the intent of discriminating against out-of-state and interstate users of the tolled facilities by obligating them to pay a disproportionate share of the expense of maintaining Rhode Island's bridges, and the tolls in fact will have that effect.

State officials chose to finance RhodeWorks through truck tolls with the express goal of "shift[ing] a segment of the cost of the RhodeWorks project onto semi-tractor trailer trucks that pass through the state without stopping." Compl., ¶ 76 (quoting *The Economic Impact of Rhodeworks: An Accelerated Transportation Restoration Plan,* Regional Economics Models, Inc. (Oct. 7, 2015)). Governor Gina Raimondo therefore candidly stated that "[t]he reason I prefer the tolling proposal is because the majority of the burden is on out-of-state truckers and out-of-state companies who are using—and I would say abusing—our roads." *Id*. ¶ 80 (quoting Patrick Anderson & Katherine Gregg, *Raimondo: Plan shifts burden off R.I.,* Providence Journal (Oct. 29, 2015)). Other state officials, including Rhode Island House Speaker Nicholas Mattiello, likewise emphasized repeatedly that the RhodeWorks tolls were structured so that "a

lot of the burden for the repair of our bridges, overpasses and infrastructure is passed on to out-of-state truckers." *Id.* (quoting Mary McDonald, *Improved business climate positions R.I. for growth,* PROVIDENCE BUSINESS NEWS (Dec. 23, 2015)); *see id.* ¶¶ 81-83. Indeed, specifically to accentuate that effect and "make [RhodeWorks] less burdensome for local Rhode Island companies," Governor Raimondo and the Rhode Island Legislature modified the RhodeWorks program to exempt from tolling single-unit trucks that are more likely than tractor-trailers to be operated by local businesses and to confine their operations to local or intrastate commerce. *See id.* ¶¶ 91-94 (quoting Jennifer Bogdan, *Raimondo Wiling to Tweak Plan for Trucking Tolls,* PROVIDENCE JOURNAL (May 30, 2015)).

In addition, state officials designed the RhodeWorks toll caps specifically so as to impose a disproportionately heavy burden on out-of-state and interstate truckers. As a general matter, flat fees for the use of a state's roads have the inevitable effect of imposing a lower effective per-mile charge on intrastate than on interstate users. *See Am. Trucking Ass'ns, Inc. v. Scheiner*, 483 U.S. 266, 284 n.16 (1987); *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 11 (1st Cir. 1992). Rhode Island officials were aware of that discriminatory impact when they designed the RhodeWorks scheme. A RIDOT study conducted prior to the enactment of the RhodeWorks legislation confirmed that the RhodeWorks caps would have just that effect, finding that a neutral tolling system would result in Rhode Island-plated trucks paying approximately 45% of the tolls, with their out-of-state competitors paying approximately 55%; in contrast, the study found that the toll caps would place a disproportionately high toll burden on out-of-state vehicles, resulting in "about 60 percent of truck tolls [being] charged to out of state trucks, while about 40 percent would be [charged to] Rhode Island [trucks]." Compl. ¶ 85 (quoting CDM Smith, *Truck Traffic Count Summary Report* 1-4 (Oct. 2015)).

And that disparity, in fact, was the goal of Rhode Island officials, who repeatedly supported the RhodeWorks program precisely because a disproportionate share of the tolls would come from out-of-state payers, with the disparity benefiting in-state businesses. *See* Compl. ¶ 87 (quoting Ian Smith, *On 52-21 Vote, RI House Approves Truck Toll Plan,* Rhode Island Public Radio (Feb 10, 2016)) (Rhode Island House Speaker Nicholas Mattiello: "People should know that 60 percent of the money [for tolls] is going to come from out of state."); *id.* (quoting Patrick Anderson, *R.I. House passes Raimondo's truck-toll plan,* THE PROVIDENCE JOURNAL (Feb. 11, 2016)) (Rep. Stephen Ucci: "The tolling relies on 60 percent revenue from out of state trucks who would have never paid to come through this state."); *id.* ¶ 88 (quoting Rhode Island House Committee on Finance, Testimony of Peter Alviti, Jr., Director of RIDOT (June 2, 2015), available at http://ritv.devosvideo.com/show?video=rt3pd 2wz&apg=aa4b5830) (RIDOT Director Alviti, describing the toll caps: "That's part of the mitigation that we put in place. That local businesses[,] they benefit.").

3. These discriminatory RhodeWorks tolls have a significant impact on interstate commerce. As of March 2020, tolls have gone into effect at six locations on I-95.[3] Ultimately, there will be a total of 12 RhodeWorks tolling locations on I-95, I-195, I-295, U.S. Route 6, and Rhode Island Route 146. All of these roads are major highways that connect Rhode Island with other States and that are used to transport goods into, out of, and through Rhode Island; I-95 is the major north-south highway on the East Coast and is the principal roadway used by Rhode Island's through, inbound, and outbound truck traffic. Compl. ¶¶ 21-36. Trucks are vital to this

---

[3]      Location 1 is on I-95 between Hopkinton and Richmond, Rhode Island, with a toll of $3.25; Location 2 is on I-95 at Exeter, Rhode Island, with a toll of $3.50; Location 3 is on I-95 between Toll Gate Road and Centerville Road Bridge, Rhode Island, with a toll of $6.25; Location 9 is on I-295 at Cumberland, Rhode Island, with a toll of $7.50; Location 11 is on Route 146 at Lincoln, Rhode Island, with a toll of $3.50; and Location 13 is on Route 6 at Providence, Rhode Island, with a toll of $5.00.

commerce, moving approximately 70% of total annual freight tonnage in the United States and almost 90% of the freight value on Rhode Island's highways. *Id*. ¶¶ 38-40. Almost 90% of truck traffic in Rhode Island is interstate in character. *Id*. ¶ 42. Thus, as the First Circuit noted when resolving the TIA appeal in this case, "[h]ighway and bridge tolls are very likely to affect interstate commerce directly in a way that many classic taxes do not." *Alviti*, 944 F.3d at 53.

## ARGUMENT

The standard governing a request for a preliminary injunction is settled and familiar: "To obtain a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Bruns v. Mayhew*, 750 F.3d 61, 65 (1st Cir. 2014) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also*, *e.g.*, *Shurtleff v. City of Boston*, 928 F.3d 166, 171 (1st Cir. 2019); *R.I. Homeless Advocacy Project v. City of Cranston*, 2017 WL 3327573, at *1 (D.R.I. Aug. 3, 2017); *Ardito v. City of Providence*, 263 F. Supp. 2d 358, 365-66 (D.R.I. 2003). Of these considerations, the First Circuit "ha[s] recognized the first two factors, likelihood of success and irreparable harm, as 'the most important' in the calculus." *Bruns*, 750 F.3d at 65 (quoting *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009)); *see also Doe v. Trustees of Boston Coll.*, 942 F.3d 527, 533 (1st Cir. 2019) ("The showing of a likelihood of success on the merits is the most important of the four preliminary injunction factors."). When this standard is satisfied, courts in the First Circuit and this District will not hesitate to issue a preliminary

injunction.[4] Here, all four of the relevant considerations decisively favor the grant of an injunction.

## I.      PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS.

At the outset, Plaintiffs are likely to prevail on the merits of this litigation because the RhodeWorks tolls are inconsistent with the requirements of the Commerce Clause. Here, too, the governing standards are settled. As a general matter, the so-called dormant aspect of the Commerce Clause "prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors" (*New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)) or that "unduly restrict interstate commerce." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019). *See, e.g.*, *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192-93 (1994); *Trailer Marine*, 977 F.2d at 10 (Commerce Clause scrutiny of state legislation reflects "the importance of a national interest in a unified economy" and "the lack of power of affected non-residents of the state to protect themselves through the state's political process"). As the Supreme Court recently emphasized, "'[t]his "negative" aspect of the Commerce Clause' prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tennessee Wine & Spirits Retailers*, 139 S. Ct. at 2459 (citation omitted). In particular, a user fee—such as a highway toll—is constitutionally permissible under the Commerce Clause only "if it (1) is based on some fair approximation of use of the facilities [for which the fee is paid], (2) is not excessive in relation to the benefits conferred [on the user], and (3) does not discriminate against interstate commerce." *Nw. Airlines, Inc. v. Cnty. of Kent*, 510 U.S. 355, 369 (1994). The RhodeWorks tolls fail ***each*** element of this test.

---

[4]      *See, e.g.*, *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 486–87 (1st Cir. 2009); *R.I. Homeless Advocacy Project*, 2017 WL 3327573, at *1 (granting temporary restraining order); *Ardito*, 263 F. Supp. 2d at 365 (granting preliminary injunction).

## A.     The RhodeWorks Tolls Discriminate Against Interstate Commerce.

"Because the presence of discrimination … swiftly dispose[s] of" the question whether a statute violates the dormant Commerce Clause (*Cohen v. R.I. Tpk. & Bridge Auth.*, 775 F. Supp. 2d 439, 446 (D.R.I. 2011)), we begin with that consideration. "A finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose … or discriminatory effect." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984). In this context, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. If a restriction on commerce is discriminatory, it is virtually *per se* invalid." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994). Here, the RhodeWorks program discriminates against interstate commerce in **both** purpose **and** effect.

### 1.     Rhode Island officials intended the RhodeWorks tolls to discriminate against interstate commerce.

So far as Rhode Island's purpose is concerned, this case presents one of "'the rare instances where a state artlessly disclose[d] an avowed purpose to discriminate against interstate [commerce].'" *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S 333, 350 (1977) (quoting *Dean Milk Co. v. Madison*, 340 U.S. 349, 354 (1951)). Here, "we need not guess at the legislature's motivation" (*Bacchus*, 468 U.S. at 271): The state officials responsible for enactment of the RhodeWorks scheme were candid about their intent to place the bulk of the burden for maintaining Rhode Island's bridges on out-of-state entities while sparing local users of those facilities from that burden—with the explicit goal of exporting the state tax burden to out-of-state payers. This intent is readily apparent in several aspects of the RhodeWorks system.

***First***, the intent to burden out-of-staters so as to favor in-state residents accounts for the basic structure of the RhodeWorks system. In determining how to pay for bridge maintenance

and repair, the State considered an approach that would have relied partially on gasoline and diesel-fuel-tax increases, "which are borne primarily by Rhode Island businesses and consumers." Compl. ¶ 74. But it instead chose to derive ***all*** of the RhodeWorks revenue from tolls that were purposely designed to fall largely on "semi-tractor trailer trucks that pass through the state without stopping. That is, these trucks' trips originate at an out of state location and terminate at an out of state location and simply use Rhode Island's roads as a conduit for making the trip." *Id*. ¶ 76 (quoting Christopher Judson, *The Economic Impact of RhodeWorks:  An Accelerated Transportation Restoration Plan,* Regional Economics Model, Inc. (Oct. 7, 2015)).

Rhode Island's Governor made no attempt to hide the motivation for this choice, explaining:

> "The reason I prefer the tolling proposal is because the majority of the burden is on out-of-state truckers and out-of-state companies who are using—and I would say abusing—our roads. … I don't like putting the burden squarely on the people and businesses of Rhode Island. … If you increase the diesel tax, it's every fisherman, every restaurant, every dry cleaner that delivers, every florist that delivers …. It really hits every Rhode Island business."

Cplt. ¶ 80 (quoting Patrick Anderson & Katherine Gregg, *Raimondo: Plan shifts burden off R.I.,* THE PROVIDENCE JOURNAL (Oct. 29, 2015) (statement of Governor Gina Raimondo). Governor Raimondo's spokeswoman reiterated this intent to shift costs to out-of-state users, stating: "The Governor has made it very clear she does not want to put the burden on the backs of Rhode Island families .... A significant share of the revenue will be raised from out-of-state users." *Id*. ¶ 81 (quoting Katherine Gregg, *Three experts split over truck toll proposal,* THE PROVIDENCE JOURNAL A10 (Nov. 8, 2015)). Other state officials responsible for devising and implementing the RhodeWorks program were equally frank about the intent to favor Rhode Island residents and businesses over out-of-state users of Rhode Island's bridges. *See id*. ¶ 80 (quoting Mary McDonald, *Improved business climate positions R.I. for growth,* PROVIDENCE BUSINESS NEWS

(Dec. 23, 2015)) (Rhode Island House Speaker Nicholas Mattiello: under RhodeWorks, "a lot of the burden for the repair of our bridges, overpasses and infrastructure is passed on to out-of-state truckers"; "[a] lot of the cost gets shifted to out-of-state truckers"); *id.* ¶ 83 (quoting Jim Hummel, *Taking a Toll,* THE HUMMEL REPORT (Mar. 19, 2018)) (RIDOT Director Peter Alviti, Jr.: "the majority of tolls that are going to be paid here are from out of state trucks").

**Second**, and of particular importance here, the State gerrymandered application of the truck-toll regime with the avowed intent of further benefiting in-state business interests at the expense of out-of-state carriers and those that operate in interstate commerce. It did so by imposing a set of caps on the RhodeWorks tolls, providing that a given truck will pay only a single daily toll at any one toll gantry, no matter how many times the truck traverses the spot; that a given truck will pay no more than $20 per day for traversing I-95 all the way through the State in either direction; and that the daily total of all tolls collected from a single truck in the State may not exceed $40, no matter how many miles the truck travels in Rhode Island that day. *See* pages 3-4, *supra*. As explained in more detail below, these caps inevitably result in local trucks—those that travel exclusively or principally in-state—paying less per mile (and less per bridge-crossing) than do trucks that travel through Rhode Island as part of an interstate trip. The necessary consequence is that out-of-state and interstate trucks pay a disproportionately high portion of the RhodeWorks tolls.

Rhode Island officials were well aware of this discriminatory effect of the RhodeWorks regime when they set the tolls in place—and they expressly chose that regime **because** of its discriminatory effect. As noted above, the RIDOT study that preceded enactment of the RhodeWorks program confirmed that a neutral tolling system would result in Rhode Island-plated trucks paying approximately 45% of the tolls, with their out-of-state competitors paying

approximately 55%; but the study found that the toll caps would place a disproportionately high toll burden on out-of-state vehicles, resulting in "about 60 percent of truck tolls [being] charged to out of state trucks, while about 40 percent would be [charged to] Rhode Island [trucks]." Compl. ¶ 85 (quoting CDM Smith, *Truck Traffic Count Summary Report 1-4* (Oct. 2015)). And that, in fact, was the goal of Rhode Island officials, who repeatedly and expressly supported the RhodeWorks program because a disproportionate share of the tolls would come from out-of-state payers, with the disparity benefiting in-state businesses. *See id.* ¶ 87 (quoting Ian Smith, *On 51-21 Vote, RI House Approves Truck Toll Plan,* Rhode Island Public Radio (Feb. 10, 2016)) (Rhode Island House Speaker Nicholas Mattiello: "People should know that 60 percent of the money [for tolls] is going to come from out of state."); *id.* (quoting Patrick Anderson, *R.I. House passes Raimondo's truck-toll plan*, THE PROVIDENCE JOURNAL (Feb. 11, 2016) (Rep. Stephen Ucci: "The tolling relies on 60 percent revenue from out of state trucks who would have never paid to come through this state."); *id.* ¶ 88 (quoting Rhode Island House Committee on Finance, Testimony                                                                                      of Peter Alviti, Jr., Director of RIDOT (June 2, 2015), available at http://ritv.devosvideo.com/show? video=rt3pd2wz&apg=aa4b5830) (RIDOT Director Alviti, describing the toll caps: "That's part of the mitigation that we put in place. That local businesses[,] they benefit.").

**Third**, Rhode Island officials made yet another change to the RhodeWorks system with the intent of discriminating against out-of-state carriers and in favor of domestic truckers. As initially proposed, single-unit trucks would have been subject to the RhodeWorks tolls. But in response to opposition by local companies, Governor Raimondo stated in April 2015: "We are willing to sit down with local companies and say, 'Is there a way we can make this less burdensome for local Rhode Island companies?' We're at the table discussing it." Compl. ¶ 92

(quoting Jennifer Bogdan, *Raimondo Wiling to Tweak Plan for Trucking Tolls,* THE PROVIDENCE JOURNAL (May 30, 2015)). This negotiation with local businesses led Governor Raimondo to modify her RhodeWorks proposal to exempt single-unit commercial trucks from tolls before presenting the program to the Rhode Island State House, where it was enacted in this modified form. *Id*. ¶¶ 93, 94. No programmatic reason for exempting these trucks was articulated, and none exists[5]—except that the exempted trucks were more likely to be operated by local businesses and more likely to confine their operations to local or intrastate commerce. Exempting these trucks "ma[d]e this [tolling regime] less burdensome for local Rhode Island companies," shifting the burden to out-of-state truckers and trucks operating interstate.[6] *Id.* ¶ 92.

This case therefore is a textbook example of an important reality that underlies Commerce Clause doctrine. "Nondiscriminatory measures … are generally upheld, in spite of any adverse effects on interstate commerce, in part because '[t]he existence of major in-state interests adversely affected … is a powerful safeguard against legislative abuse.'" *West Lynn Creamery*, 512 U.S. at 200 (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 473 n.17 (1981) (second ellipses added by the Court)). But when those in-state interests are exempted from or otherwise protected against the full impact of the burden, "a State's political processes can no longer be relied upon to prevent legislative abuse, because one of the in-state interests

---

[5]     As noted below (at page 20), single-unit trucks often bear the same (or greater) weight per axle than do tractor-trailers and therefore have the same (or greater) impact on the roads they traverse.

[6]     Other indicia further confirm state officials' intent to benefit local businesses at the expense of out-of-state competitors. As initially proposed, RhodeWorks would have insulated local truckers against the impact of the program's tolls by providing Rhode-Island licensed truckers and shipping companies $13.5 million in tax credits, rebates, and direct grants. Compl. ¶ 95. After this proposal was cut from the legislation in response to concerns that it violated the Commerce Clause (*id*. ¶ 96), state legislators reacted by enacting a substitute relief package that cut state truck-registration fees in an effort to "help the Rhode Island trucking industry weather the onset of truck tolls." *Id*. ¶¶ 98-100 (quoting Patrick Anderson, *Collection of truck registration fees lagging behind projections,* THE PROVIDENCE JOURNAL (May 9, 2017)).

which would otherwise lobby against the tax has been mollified by the [accommodation]." *Id.*
That is exactly what happened in Rhode Island.

Accordingly, "[e]xamination of the State's purpose in this case is sufficient to
demonstrate" that the RhodeWorks tolls run afoul of the Commerce Clause. *Bacchus*, 468 U.S. at
270.

> ### 2.  The RhodeWorks tolls have a discriminatory impact on interstate commerce.

Even if the discriminatory intent of Rhode Island officials had been better concealed, the
discriminatory *effect* of the RhodeWorks regime is manifest—and is independently fatal to the
tolling program. Most obviously, RhodeWorks' system of toll caps makes the scheme function
much like a set of flat daily charges for the privilege of using Rhode Island's bridges and roads.
As noted, a truck will pay only once per day for traveling through a given toll gantry, no matter
how many times it passes that point; it will pay a set, capped amount for traveling the length of I-
95; and it will pay no more than $40 per day, no matter how many miles it drives back and forth
through Rhode Island (or how many toll gantries it passes) that day.

This regime necessarily will have a discriminatory effect on out-of-state and interstate
travelers. Compare two identical trucks that travel the same number of miles and make the same
number of bridge crossings in a day, one doing so exclusively in Rhode Island and the other
passing through Rhode Island as part of an interstate journey. The RhodeWorks toll caps mean
that the local truck will pay for the privilege of using Rhode Island's roads at a lower effective
rate per mile and per bridge-crossing than will the interstate truck. The two trucks will pay the
same amount—i.e., whatever toll amount is charged at a particular gantry or a capped payment
of $40 per day. But for that payment, the local truck will have made greater (perhaps vastly
greater) use of the State's bridges as compared to the truck that is passing through as part of an

interstate trip. The point is not debatable: As the First Circuit has explained when evaluating a materially identical charge, it is "intuitively obvious[] that on average [a] flat tax[] represent[s] a much higher per mile charge on out-of-state trucks than on [in-state] trucks for miles traveled in [the taxing State]." *Trailer Marine*, 977 F.2d at 11. And in fact, Rhode Island has ***itself*** shown, through the RIDOT study of the RhodeWorks toll caps, that the discrimination here is real and substantial in amount.

For this reason, the Supreme Court and the First Circuit—as well as other courts across the Nation (*see Am. Trucking Ass'ns, Inc. v. Sec'y of Admin.*, 613 N.E.2d 95, 101 (Mass. 1993) (citing cases))—have held a variety of similar flat truck charges to violate the Commerce Clause. In *American Trucking Associations, Inc. v. Scheiner*, 483 U.S. 266 (1987), the landmark decision in this area, the Supreme Court invalidated flat annual charges that Pennsylvania imposed on trucks using its roads. In contrast to fuel consumption taxes that "are directly apportioned to the mileage traveled in Pennsylvania," the Court explained, the "inevitable effect" of flat taxes "is to threaten the free movement of commerce by placing a financial barrier around the State," which "has a forbidden effect on interstate commerce because it exerts an inexorable hydraulic pressure on interstate businesses to ply their trade within the State that enacted the measure rather than 'among the several States.'" 483 U.S. at 283, 284, 286-87. And in *Trailer Marine*, the First Circuit applied the *Scheiner* principle to invalidate a flat charge imposed by Puerto Rico on motor vehicles, noting that the fee was "facially neutral" but "clearly discriminatory in impact" because transient trailers (which were shipped into and out of Puerto Rico) "pay[] the same flat fee as local trailers … even though transient trailers are presumptively going to impose far lower costs … [on Puerto Rico] than locally based trailers." 977 F.2d at 10. The First Circuit added that "[s]uch an imbalance in favor of local interests (here local trailers) over similarly situated non-

15

resident interests (transitory trailers) is a proper concern of the Commerce Clause whether or not the market participants are direct business rivals." *Id*. at 11.

In finding discrimination in these circumstances, the courts applied what the Supreme Court has labeled the "internal consistency test," which "'looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate.'" *Comptroller of the Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1802 (2015) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 185 (1995)); *see Scheiner*, 483 U.S. at 284. And here, there can be no doubt that interstate commerce would be disadvantaged if every State adopted a tolling regime like Rhode Island's, allowing trucks to traverse the same toll gantry repeatedly for a single daily charge and capping the daily tolls paid to the tolling State at $40 no matter how many bridges the tolled vehicle crossed or how many miles  it traveled in-state that day.

Under such a scheme, a truck that confines its operation to Rhode Island would pay no more than $40 per day (and perhaps quite a bit less, if it travels back and forth through a limited number of toll gantries that day), no matter how many miles it travels in the State. An identical truck that travels an identical number of miles on the same day, but does so as part of an interstate journey (say, up I-95 from Pennsylvania to Maine, traversing seven States), will pay many times that amount simply because it crossed state lines while making the trip, becoming subject to additional $40 charges in each State it enters. "'[T]he cumulative effect does not result from the mileage or distance traveled, but from the interstate character of the journey. The same mileage in one state would result in only one tax.'" *Scheiner*, 483 U.S. at 284 n.16 (citation omitted). To be sure, the precise amount of the inter- and intra-state differential would turn on the particulars of a given trip (*i.e.*, how many toll gantries the trucks traverse and the toll charged at

16

each individual gantry), but "the inference [of discrimination] is so compelling that only the amount of the discrimination, and not its fact, can be plausibly contested." *Trailer Marine*, 977 F.2d at 10.[7]

And this effect, too, requires invalidation of the RhodeWorks tolls. "That is so because removing trade barriers was a principal reason for adoption of the Constitution." *Tennessee Wine & Spirits Retailers*, 139 S. Ct. at 2460. The Supreme Court has made this point repeatedly, explaining that its "dormant Commerce Clause cases reflect a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Id*. at 2461 (internal quotation marks and citations omitted). The RhodeWorks structure runs afoul of that principle.

**B.      The RhodeWorks Tolls Are Not Based On A Fair Approximation Of Use And Are Excessive In Relation To The Benefits Conferred.**

In addition, and separately, the RhodeWorks tolls fail the *Northwest Airlines* requirements that a user fee be "based on some fair approximation of use of the facilities [for which the fee is

---

[7]      In this respect, the RhodeWorks tolls are decisively different from the Massachusetts toll system that the First Circuit upheld in *Doran v. Massachusetts Turnpike Authority*, 348 F.3d 315 (1st Cir. 2003). There, Massachusetts offered discounts at certain toll plazas to travelers who purchased a transponder sold by the State. *Id*. at 316-17. In holding this system constitutional, the First Circuit found it crucial that "[t]he tolls at issue here … are imposed on a per use basis," distinguishing *Scheiner* and finding the internal consistency test satisfied on that ground. *Id*. at 320-21. In contrast, the Rhode Island tolls are **not** imposed on a per use basis and therefore are not based "'on a relevant measure of actual road use.'" *Id*. at 320 (quoting *Scheiner*, 483 U.S. at 291). The First Circuit also noted that the *Doran* plaintiffs' complaint failed to allege a discriminatory state purpose (*id*. at 321)—another critical distinction from the situation in this case.

paid]" and "not [be] excessive in relation to the benefits conferred." 510 U.S. at 369.[8] Although the State "need not demonstrate that the fee exactly equals the cost of maintenance or the benefits conferred," the charge **must** "'reflect a fair, if imperfect, approximation of the use of the facilities for whose benefit they are imposed.'" *Cohen*, 775 F. Supp. 2d at 449-50 (quoting *Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines*, 405 U.S. 707, 717 (1972)). Here, the tolls cannot satisfy that standard.

### 1. The RhodeWorks charge is grossly disproportionate to the payers' use of and benefit from the tolled facilities.

For one thing, the RhodeWorks toll caps substantially eliminate the connection between the amount paid and the use of the tolled facility. There is no denying this reality: A truck that travels through a given toll gantry 50 times in a day will pay the same amount as one that travels through it once, while the $40 daily cap means that trucks that accumulate vastly different daily mileage on Rhode Island roads will pay identical aggregate tolls. On the face of it, this regime *necessarily* means that "each user" does *not* "pay[] some approximation of his or her fair share of the state's cost for maintaining the [facility]." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 98 (2d Cir. 2009). As the Supreme Court explained in holding that flat truck charges that do not vary with mileage traveled are invalid under the user-fee test, such charges "do not even purport to approximate fairly the cost or value of the use of [the charging State's] roads." *Scheiner*, 483 U.S. at 290. Or, as the Supreme Judicial Court of Massachusetts put it: "[I]t is apparent that [such a] fee does not vary based on any 'proxy for value' obtained from the [State]." *Am. Trucking Ass'ns, Inc. v. Sec'y of Admin.*, 613 N.E.2d at 102.

---

[8]    In this case, these "criteria substantially overlap." *Cohen*, 775 F. Supp. 2d at 447; *see Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Auth.*, 567 F.3d 79, 86 (2d Cir. 2009).

In addition, by imposing the *entire* cost of repairing and maintaining Rhode Island's bridges on a very small subset of the facilities' users, the RhodeWorks scheme guarantees that the operators of tractor-trailers pay a vastly disproportionate share of that cost, which by definition *cannot* be a "fair approximation" of the use of the facilities and *will be* "excessive in relation to the benefits conferred." The overwhelming majority of vehicles that use Rhode Island's bridges—including automobiles and single-unit trucks—pay no tolls at all, even though those vehicles both impose maintenance costs on the State and obtain benefits from use of the tolled facilities. As RIDOT itself has recognized, on an average weekday more than 1,666,000 automobiles and 55,100 single-unit trucks pass through existing and proposed RhodeWorks toll locations, as opposed to only 44,211 tractor trailers. Compl. ¶¶ 46-49. It cannot be the case that the passage of well over a million vehicles other than tractor trailers imposes no cost on the State. Consequently, the differential treatment here does not "'reflect rational distinctions among different classes' of motorists." *Cohen*, 775 F. Supp. 2d at 450 (quoting *Evansville-Vanderburgh*, 405 U.S. at 718-19).

> ### 2. RhodeWorks' impermissible effect cannot be justified on the theory that large trucks cause a disproportionate share of wear and tear on Rhode Island's bridges.

It would be no answer to this point for the State to maintain that large trucks are responsible for such a substantial portion of bridge maintenance costs that imposing the *entirety* of those costs on this subset of users is a "fair approximation" of their use of the facilities. Such a claim would be factually and legally insupportable, for a number of reasons:

a. As a matter of fact, the U.S. Department of Transportation has found that two-thirds of bridge maintenance costs are attributable to passenger vehicles and only 20 percent to combination trucks; and the proportion attributable to combination trucks remains less than one-third even when looking at costs specific to "major bridge rehabilitation." Compl. ¶¶ 115, 116.

This is hardly surprising: as noted above, RIDOT's own figures show that, on any given weekday, more than 1.6 million automobiles and 55,100 single-unit trucks—but only 44,211 tractor trailers (or 2.5% of the vehicular total)—pass through the existing and proposed RhodeWorks toll locations. *Id*. ¶¶ 45-49.

b. Traffic does not significantly affect how quickly a properly designed bridge wears out, unless the traffic greatly exceeds the weight the bridge was designed to handle. Compl. ¶ 113.

c. Single-unit trucks that are exempted from the RhodeWorks tolls—including garbage trucks, construction vehicles, and dump trucks—often bear *more* weight per axle when fully loaded, and therefore cause as much or more damage to roads, than do tractor trailers. Compl. ¶118.

d. Wholly apart from wear and tear caused by vehicular traffic, bridges and roads deteriorate from exposure to the elements. Accordingly, to represent a fair approximation of use and relate reasonably to benefits obtained, a user charge dedicated to bridge and road maintenance would have to distribute the costs of addressing such weather-related maintenance among all users. Compl. ¶¶ 117, 120.

e. Absent the enormous volume of automobile traffic on the tolled facilities, Rhode Island could make do with substantially smaller bridges and roadways, which would be much cheaper than the existing facilities to construct and maintain. Compl. ¶ 117. This, too, is obvious: Much of the cost of bridge maintenance and construction therefore is attributable to automobiles.

Thus, whatever the precise percentages, there can be no doubt that the vehicles exempt from the RhodeWorks tolls bear substantial responsibility for imposing maintenance costs on, and derive substantial benefits from use of, the tolled facilities. Autos (and smaller trucks) therefore must bear a substantial share of Rhode Island's maintenance costs if the RhodeWorks

charges are to fairly approximate use and not be excessive in relation to benefits conferred. Because they do not, on the face of it the RhodeWorks tolls fail the *Northwest Airlines* test.

### C.     The Constitutional Defects In The RhodeWorks Tolls Mandate Invalidation Of The Toll Regime.

Because the RhodeWorks tolls discriminate against interstate commerce and depart from the other *Northwest Airlines* criteria, a finding of unconstitutionality must follow, without any need for proof regarding the precise extent of the constitutional violation. As the Supreme Court has repeatedly explained, "there is no 'de minimis' defense to a charge" of discrimination under the Commerce Clause. *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 n.15 (1997) (citations and internal quotation marks omitted). "Once a state regulation … is found to *discriminate* against interstate commerce, it is presumptively invalid." *Trailer Marine*, 977 F.2d at 11; *see also*, *e.g.*, *Cohen*, 775 F. Supp. 2d at 445 n.6 ("Supreme Court precedent clearly establishes that the *degree* of the alleged violation, no matter how minimal, does not preclude scrutiny under the Commerce Clause.").

Having said that, however, it bears emphasis that the RhodeWorks program's interference with interstate commerce *is* substantial. All agree that the roadways where RhodeWorks tolls are collected are significant corridors for the transport of interstate commerce—I-95 is the principal route for the movement of freight up and down the East Coast—and that the trucks subject to those tolls typically are carrying cargo into, out of, or through Rhode Island as part of an interstate journey. *See* Compl. ¶¶ 20-43. The amounts that Rhode Island is extracting from these instrumentalities of interstate commerce are large; the State estimates that the tolling program will collect $45 million annually. *Id*. ¶ 66. These payments can be expected to affect the routes traveled by trucks, the prices that carriers charge, the availability of certain products, and the amounts paid by consumers in States other than Rhode Island. *Id*. ¶¶ 126-134. And the State has

many other practicable (and constitutional) means of raising revenue for bridge repair and maintenance, including fuel taxes and nondiscriminatory tolls. *Id.* ¶¶ 73, 74; *cf. Hunt*, 432 U.S. at 354; *Trailer Marine*, 977 F.2d at 12.

For all of these reasons, Plaintiffs are likely to succeed on the merits of their constitutional claim—and therefore have satisfied "[t]he first [preliminary injunction] factor, likelihood of success, … '[t]he sine qua non of [the] four-part part inquiry.'" *HCC Specialty Underwriters, Inc. v. Woodbury*, 289 F. Supp.3d 303, 307 (D.N.H. 2018) (quoting *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (bracketed material added by the court).

## II.   ABSENT A PRELIMINARY INJUNCTION, PLAINTIFFS WILL SUFFER IRREPARABLE INJURY.

"[T]he second factor, irreparable harm, also 'constitutes a necessary threshold showing for an award of preliminary injunctive relief'" (*HCC Specialty Underwriters*, 289 F. Supp.3d at 307 (quoting *Gonzalez-Droz*, 573 F.3d at 79))—and also is easily satisfied here. Plaintiffs are being forced to pay unconstitutional tolls to Rhode Island on a daily basis, and the greater the amount of time that passes, the more significant these losses become. Yet it appears that the States' sovereign immunity would preclude recovery of these sums after payment, even if the RhodeWorks tolls ultimately are held unconstitutional.

Although Rhode Island has waived its sovereign immunity by statute as to certain types of claims, the waiver is limited to "actions of tort." R.I. Gen. Laws § 9-31-1; *see generally Marrapese v. Rhode Island*, 500 F. Supp. 1207, 1222-23 (D.R.I. 1980); *Laird v. Chrysler Corp.*, 460 A.2d 425, 427 (R.I. 1983). This case, which challenges statutory imposition of a government fee, does not involve a tort in the ordinary sense. And even as to torts, sovereign immunity is waived in Rhode Island "only if (1) the state entity has a 'special duty' to the plaintiffs, (2) the

state entity has engaged in an 'egregious' alleged act or omission, or (3) the state entity was engaging in the kind of actions that private parties normally perform." *J.R. v. Gloria*, 593 F.3d 73, 81 (1st Cir. 2010); *see Kuzniar v. Keach*, 709 A.2d 1050, 1053 (R.I. 1998). These criteria do not appear to be present here. *See id*. at 1054 (special duty exists only when injured parties had prior contact with government entities responsible for harm); *Haley v. Town of Lincoln*, 611 A.2d 845, 849 (R.I. 1992) (conduct was egregious where State "created circumstances that forced a reasonably prudent person into a position of extreme peril").[9]

In these circumstances, the injury inflicted by the RhodeWorks tolls is not remediable and therefore is irreparable. Although "[n]ormally the mere payment of money is not considered irreparable … that is because money can usually be recovered from the person to whom it is paid." *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers). But "where, as here, the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity, … any loss of income suffered by a plaintiff is irreparable *per se*." *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008); *accord*, *e.g.*, *Philip Morris USA*, 561 U.S. at 1304 (Scalia, J., in chambers); *U.S. Chamber of Commerce v. Edmondson*, 594 F.3d 742, 770-71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury.") (citing cases); *United States v. New York*, 708 F.2d 92, 93-94 (2d Cir. 1983); *Nalco Co. v. EPA*, 786 F. Supp.2d 177, 188 (D.D.C. 2011); *see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12,

---

[9]     In addition, States and state officials sued in their official capacities are not "persons" amenable to suit for monetary relief under 42 U.S.C. § 1983, meaning that a federal forum would not be available for the recovery of damages even if Rhode Island had waived its sovereign immunity. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70-71 (1989). In contrast, a state official may be sued in his or her official capacity for prospective relief under Section 1983 because "'such suits are not treated as actions against the State.'" *Id*. at 71 n.10 (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985)).

18-19 (1st Cir. 1996) ("It is usually enough if the plaintiff shows that its legal remedies are inadequate."); *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 624 (5th Cir. 1985) (injury is irreparable when difficulty of obtaining repayment makes refunds "an inadequate remedy"). This irreparable injury, in the aggregate, will be quite substantial, both for the individual Plaintiffs and for each of the carriers whose interests are represented by ATA: As noted, Rhode Island has predicted that RhodeWorks will collect $45 million in tolls annually. The second preliminary injunction factor therefore cuts strongly in favor of enjoining the RhodeWorks tolls.

## III.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR ISSUANCE OF A PRELIMINARY INJUNCTION.

The remaining criteria—the balance of hardships and public interest—are closely related in this case, and each also supports issuance of an injunction. So far as the relative hardships are concerned, the RhodeWorks tolls impose significant injury on Plaintiffs, both by extracting sums from them directly and by requiring payments that will have more diffuse effects on Plaintiffs' pricing, competitiveness, and routes. On the other hand, Rhode Island has alternative sources of funding bridge repair and maintenance, some of which it considered but chose not to tap so as to export its costs to out-of-staters. In any event, RIDOT "does not have an interest in enforcing a law that is likely constitutionally infirm." *Edmondson*, 594 F.3d at 771; *cf. Vaqueria Tres Monjitas*, 587 F.3d at 486 (enjoining discriminatory Puerto Rico milk marketing scheme that was challenged under the Due Process Clause because "[t]he constitutional rights of plaintiff[s] override" the right of defendants "to continue with a preferential purchase price of raw milk which is prima facie discriminatory").

"The final preliminary injunction factor, the public interest, also offers [Rhode Island] no support because it is inextricably linked with the merits of the case." *Serono Labs., Inc. v.*

*Shalala*, 158 F.3d 1313, 1326 (D.C. Cir. 1998). As courts have recognized, "'the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law.'" *Edmondson*, 594 F.3d at 771 (quoting *Bank One v. Guttau*, 190 F.3d 844, 848 (8th Cir. 1999); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002)) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional); *cf. R.I. Homeless Advocacy Project*, 2017 WL 3327573, at *2 ("the public has a significant interest in local policies that do not infringe individual First Amendment rights").

## CONCLUSION

The Court should grant Plaintiffs' Motion for a Preliminary Injunction.

25

Dated: March 12, 2020

Plaintiffs,

By: /s/ James A. Ruggieri
Gerald C. DeMaria #637
James A. Ruggieri #2828
HIGGINS, CAVANAGH & COONEY, LLP
10 Dorrance Street, Suite 400
Providence, RI 02903
Telephone: (401) 272-3500
Facsimile: (401) 273-8780
Email: gdemaria@hcc-law.com
        jruggieri@hcc-law.com

Charles Rothfield (pro hac vice)
Evan M. Tager (pro hac vice)
Colleen Campbell (Pro Hac Vice)
MAYER BROWN LLP
1999 K. Street, N.W.
Washington, District of Columbia 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
Email: CRothfeld@mayerbrown.com
        ETager@mayerbrown.com
        CCampbell@mayerbrown.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of March, 2020, a true copy of the within document was filed electronically and it is available for viewing and downloading from the ECF system by all counsel of record.

/s/ James A. Ruggieri
James A. Ruggieri

26