```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF RHODE ISLAND
_____
                                    )
AMERICAN TRUCKING ASSOCIATIONS,     )
INC.; CUMBERLAND FARMS, INC.;       )
M&M TRANSPORT SERVICES, INC.; and   )
NEW ENGLAND MOTOR FREIGHT, INC.,    )
                                    )
          Plaintiffs,               )
                                    )
               v.                   )   C.A. No. 18-378-WES
                                    )
PETER ALVITI, JR., in his official  )
capacity as Director of the Rhode   )
Island Department of Transportation;)
and RHODE ISLAND TURNPIKE AND       )
BRIDGE AUTHORITY,                   )
                                    )
          Defendants.               )
_____ )
```

**ORDER**

This pretrial order resolves certain legal and evidentiary questions raised by the parties to narrow the scope of issues in this case. Consequently, for the reasons stated in this Order, Defendants' Motion for Judgment on the Pleadings, ECF No. 41, is DENIED.

I. Background

This case involves a dispute over implementation and collection of highway tolls in Rhode Island. The Court has more fully articulated the facts of this case in <u>American Trucking Associations, Inc. v. Alviti</u>, 377 F. Supp. 3d 125 (D.R.I. 2019). In short, Plaintiffs — various trucking, transport, and freight

companies — have brought a constitutional challenge to the "Rhode Island Bridge Replacement, Reconstruction, and Maintenance Fund Act of 2016" ("RhodeWorks Act"), R.I. General Laws § 42-13.1-1 <u>et. seq</u>.  Plaintiffs allege that the RhodeWorks Act violates the Commerce Clause of the United States Constitution because the statute is discriminatory in purpose and effect, the toll scheme does not fairly approximate the use of the tolled facilities, and the tolls are excessive in relation to the benefit conferred on the user.  <u>See</u> Compl. ¶¶ 3-7, ECF No. 1.

Upon return to this Court after an appeal to the United States Court of Appeals for the First Circuit, <u>see</u> <u>American Trucking Ass'ns, Inc. v. Alviti</u>, 944 F.3d 45 (1st Cir. 2019), Plaintiffs filed a Motion for Preliminary Injunction, <u>see</u> ECF No. 38. Defendants, in turn, filed a Motion for Judgment on the Pleadings, to which Plaintiffs objected.  <u>See</u> Defs.' Mot. J. on Pleadings; Pls.' Opp'n to Defs.' Mot. J. on Pleadings, ECF No. 46.  The Court held a hearing on both motions on May 28, 2020.  During and following that hearing, the Court discussed with the parties the need for further briefing on several issues, including those subjects addressed in this Order.  The Court now makes certain rulings to narrow the issues at hand and aid in focusing the scope of discovery.

II. Discussion

   A. Motion for Judgment on the Pleadings

2

1. Legal Standard

In reviewing a motion for judgment on the pleadings, the Court "accept[s] the non-movant's well-pleaded facts as true and draw[s] all reasonable inferences in the non-movant's favor." Martinez v. Sun Life Assurance Co. of Canada, 948 F.3d 62, 68 (1st Cir. 2020). A court should grant a motion for judgment on the pleadings "only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." Id. (quoting Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006)).

2. Analysis

In short, Defendants argue that Congress has authorized the tolling at issue through the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"), 23 U.S.C. § 129. Defs.' Mot. J. on Pleadings 12-14. Consequently, Defendants contend, the RhodeWorks Act is immune from Commerce Clause scrutiny.[1] Id. at 16. In their supplemental memoranda, Defendants suggest that, at a minimum, Congressional authorization through ISTEA disposes of two prongs of the Commerce Clause analysis – that the tolls must

---

[1] In support of their arguments, Defendants rely on two recent decisions from the Second and Third Circuit Courts of Appeal. See Defs.' Mot. J. on Pleadings 1-2 (citing Owner Operator Indep. Drivers Ass'n v. Pa. Tpk. Comm'n, 934 F.3d 283 (3d Cir. 2019) and Am. Trucking Ass'ns, Inc. v. N.Y. State Thruway Auth., 886 F.3d 238 (2d Cir. 2018)). These cases largely focus on the allocation of toll revenue for purposes other than maintenance of toll facilities.

be "based on some fair approximation of use of the facilities . . . [and] not excessive in relation to the benefits conferred . . . ." Nw. Airlines, Inc. v. Cnty. of Kent, 510 U.S. 355, 369 (1994); see Defs.' Suppl. Mem. Following June 18, 2020 Chambers Conference ("Defs.' Suppl. Mem.") 2, ECF No. 68.

Congress has the power to regulate interstate commerce, and through that authority, it "may 'redefine the distribution of power over interstate commerce' by 'permit[ting] the states to regulate the commerce in a manner which would otherwise not be permissible.'" S.-Cent. Timber Dev., Inc. v. Wunnicke, 467 U.S. 82, 87-88 (1984) (quoting S. Pacific Co. v. Arizona, 325 U.S. 761, 769 (1945)). "When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause." Ne. Bancorp v. Bd. of Governors of Federal Reserve Sys., 472 U.S. 159, 174 (1985). Defendants must meet a significant burden to demonstrate that this principle applies here — congressional consent for the state action must be either "expressly stated" or "made unmistakably clear." New York State Dairy Foods, Inc. v. Ne. Dairy Compact Comm., 198 F.3d 1, 9 (1st Cir. 1999) (internal citations omitted).

After careful review, the Court is unpersuaded by Defendants' broad interpretation of congressional authorization in ISTEA. It is true that Congress in ISTEA expressly authorized a state to allocate toll revenue for purposes other than those related to

4

maintenance of the toll facility. See 23 U.S.C. § 129(a)(3)(v) ("if the public authority certifies annually that the tolled facility is being adequately maintained, [toll revenue may be used for] any other purpose for which Federal funds may be obligated by a State under title [23]."); see also Am. Trucking Ass'ns, Inc. v. New York State Thruway Auth., 886 F.3d 238, 246-47 (2d Cir. 2018). However, this language, along with the other provisions of ISTEA, does not evince an "unmistakably clear" intent by Congress to completely shield state highway tolling activity from Commerce Clause challenges.[2]  For this reason, Defendants' Motion for Judgment on the Pleadings is denied.

As to Defendants' alternative argument, Plaintiffs concede that congressional authorization in ISTEA dispensed of at least one element of the Commerce Clause analysis – the excessiveness prong. Pls.' Suppl. Reply Br. 3-4, ECF No. 70. But as to fair approximation, Plaintiffs contend that this factor is not displaced because it serves a different purpose — while the

---

[2] Defendants also point to the First Circuit's decision in Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1 (1st Cir. 1992), for the proposition that congressional authorization may insulate state action from Commerce Clause scrutiny, even where the state action is discriminatory. Defs.' Reply to Pls.' Suppl. Mem. Following June 18, 2020 Chambers Conference ("Defs.' Suppl. Reply") 2 (citing Trailer Marine Transport Corp., 977 F.2d at 12), ECF No. 71. While the Court agrees with Defendants' representation of this legal principle, the federal statute at issue in Trailer Marine sweeps much more broadly than the limited authorization in ISTEA. See Trailer Marine, 977 F.2d at 12-13 (citing 15 U.S.C. §§ 1011-15).

5

"excessiveness limit focuses on the amount [of tolls] collected," fair approximation "focuses on the method used by the state to impose the charge." Id. at 5 (emphasis in original). For this reason, Plaintiffs argue, a tolling scheme could violate the Commerce Clause "even if, under ISTEA, a state may use the tolls collected for purposes that do not benefit the taxpayer at all." Id. The Court agrees; it does not read the congressional authorization in ISTEA to completely displace the fair approximation element of the Commerce Clause analysis. Therefore, at trial, the parties may introduce evidence related to discriminatory purpose, discriminatory effect, and fair approximation.[3]

B. Evidentiary Rulings

Plaintiffs have expressed an intent to introduce at trial several statements made by state officials in support of the argument that the RhodeWorks Act was enacted with discriminatory purpose or intent.[4] See Pls.' Suppl. Br. 3, ECF No. 69. Many of

---

[3] Significant issues remain to be sorted out at trial regarding all three of these elements, some of which the parties have addressed in their briefing. For example, is proof of discriminatory purpose alone enough to establish a Commerce Clause violation? And, what are the outer limits of "fair approximation"? These issues will be reserved for another day.

[4] In the Complaint, Plaintiffs point to statements made by Governor Gina Raimondo, Speaker Nicholas Mattiello, two of the Governor's spokespersons, Rhode Island Department of Transportation Director Peter Alviti, and Representative Stephen Ucci. See Compl. ¶¶ 79-83, 87-88, 92, 99.

6

these statements are contained within press reports in the Providence Journal or other news publications. See Compl. ¶¶ 79-83, 87-88, 92, 99. Defendants challenge the admissibility of these statements on relevance and hearsay grounds. See Defs.' Suppl. Mem. 11-19.

1. Relevance

Defendants proffer several reasons why the statements by Rhode Island officials are not relevant to the determination of legislative purpose. Specifically, they contend that (1) the words of the statute and legislative findings provide clear evidence that the statute was not enacted with a discriminatory purpose; (2) many of the statements were published prior to the introduction of the bill that became law; and (3) statements by individual legislators or officials have no probative value where the legislature has clearly expressed a purpose within the text of the statute. Defs.' Suppl. Mem. 14-17.

True, "[t]he words of a legislative body itself, written or spoken contemporaneously with the passage of a statute, are usually the most authoritative guide to legislative purpose." Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 13 (1st Cir. 2007). However, in the context of dormant Commerce Clause challenges, courts have considered circumstantial evidence offered as proof of discriminatory purpose, so long as the party offering it "show[s] the relationship between the proffered evidence and

7

the challenged statue." Alliance of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 39 (1st Cir. 2005). Here, Plaintiffs point to statements made by certain state officials who were allegedly key players in the crafting and/or passing of this legislation. These statements clearly could be relevant to the issue of discriminatory intent and therefore admissible, if not excluded for other reasons. Importantly, however, should this evidence be introduced at trial, the Court will need to decide how much weight to afford it in relation to the text of the statute, which offers the best evidence of the legislature's intent. See Wine & Spirits Retailers, 481 F.3d at 13. The Court takes no position on this question at this juncture.

2. Hearsay

Defendants argue that both the press reports and the statements contained therein constitute inadmissible hearsay. Defs.' Suppl. Mem. 17. Newspaper articles quite often contain multiple levels of hearsay. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993); see Brooks v. Miller, 158 F.3d 1230, 1242 (11th Cir. 1998). In order for this evidence to be admissible, both the statements and the press reports must fall under an exception to

the hearsay rule or classify as non-hearsay. See Fed. R. Evid. 805; Fed. R. Evid. 801(c).

    a. Statements

Plaintiffs contend that the statements made by Director Alviti, Speaker Mattiello, and Representative Ucci are not hearsay because they will be offered to show intent and not the truth of the matter asserted; namely, Plaintiffs say they will be offered to show "what the officials believed" or "the ground on which they advocated for enactment."[5] Pls.' Suppl. Br. 7, 9. The Court agrees. To the extent that Plaintiffs offer statements for this purpose and not to prove the underlying factual assertion, the statements are not hearsay and are admissible. See Staniewicz v. Beecham, Inc., 687 F.2d 526, 530 (1st Cir. 1982).

Some of the statements in Plaintiff's Complaint, however, purport to specifically describe the intent of the declarant —

---

[5] Plaintiffs highlight statements made by these officials in the Providence Journal, Providence Business News, and The Hummel Report. See, e.g., Compl. ¶ 80 (quoting Mary MacDonald, Improved business climate positions R.I. for growth, Providence Business News, Dec. 23, 2015 (citing Speaker Mattiello: "a lot of the burden for the repair of our bridges, overpasses and infrastructure is passed on to out-of-state truckers"; "a lot of the cost gets shifted to out-of-state truckers")); id. ¶ 83 (quoting Jim Hummel, Taking a Toll, The Hummel Report, Mar. 19, 2018 (purporting to quote Director Alviti as stating "the majority of tolls that are going to be paid here are from out of state trucks")); id. ¶ 87 (quoting Patrick Anderson, R.I. House passes Raimondo's truck-toll plan, The Providence Journal, Feb. 11, 2016, (citing Rep. Stephen Ucci: "[t]he tolling relies on 60 percent revenue from out of state trucks who would have never paid to come through this state")).

9

Governor Raimondo.[6]  To the extent that statements attributed to Governor Raimondo are introduced for the truth of the matter asserted — the Governor's intent — the statements would not be hearsay because they are admissions of an opposing party.  See Fed. R. Evid. 801(d)(2)(D).  As Plaintiffs note, the state is effectively the party in interest in this case, and Governor Raimondo is clearly an agent of the state.  See Pls.' Suppl. Br. 7; see also Bennet v. Yoshina, 98 F. Supp. 2d 1139, 1154 (D. Haw. 2000) (finding that where several state officials were "sued in his or her official capacity, the suit can properly be seen as an action against the state itself").[7]  Accordingly, such statements are admissible.

Additionally, to the extent that statements made by the Governor's spokespersons are offered for the truth of the matters

---

[6] For example, it is possible Plaintiffs would introduce the following statement by the Governor for the truth of the matter asserted: "The reason I prefer the tolling proposal is because the majority of the burden is on out-of-state truckers and out-of-state companies who are using—and I would say abusing—our roads . . . ."  Compl. ¶ 80 (quoting Patrick Anderson & Katherine Gregg, Raimondo: Plan shifts burden off R.I., Providence Journal, Oct. 29, 2015). There are several things asserted in the statement, one of which is the reason why the Governor preferred the "tolling proposal", and Plaintiffs would be introducing this for its truth.

[7] Certainly, Rule 801(d)(2) should not be extended to every statement made by any state employee.  See Bennett v. Yoshina, 98 F. Supp. 2d 1139, 1154 (D. Haw. 2000) ("This does not mean, however, that every state employee therefore speaks for the state.")  But that is not the case here.  Unlike the individual legislators in Bennett, Governor Raimondo does speak for the state through her role as chief executive official.

asserted, this evidence may be admissible under Rule 801(d)(2)(C); however, this evidence would likely be cumulative should Plaintiffs introduce the Governor's statements.

    b. Newspaper Articles

The second layer of hearsay (the newspaper article hearsay) is less straightforward. Plaintiffs argue that the press reports within which the statements are reproduced are admissible under the residual exception to hearsay, Federal Rule of Evidence 807. Pls.' Suppl. Br. 11. In order for a statement to be admissible under this exception, it must be (1) "supported by sufficient guarantees of trustworthiness" and (2) "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807. The First Circuit has instructed that "Congress meant for trial courts to admit evidence under the residual exception 'very rarely, and only in exceptional circumstances.'" Bradley v. Sugarbaker, 891 F.3d 29, 34 (1st Cir. 2018) (quoting United States v. Benavente Gomez, 921 F.2d 378, 384 (1st Cir. 1990)).

The Court finds that Plaintiffs have met the trustworthiness requirement. However, so long as the state officials are available to testify in a deposition or at trial, the press reports are not the most probative evidence on the subjects and are inadmissible.[8]

---

[8] Importantly, if the declarants are not available to testify - whether due to the assertion of privilege or other basis for

11

See Planned Parenthood Se., Inc. v. Strange, 33 F. Supp. 3d 1381, 1385 (M.D. Ala. 2014) (rejecting the plaintiffs' request to introduce newspaper articles under the residual exception where the party could have elicited testimony from the legislators or reporters as to the statements at issue).

C. Privilege

In their Supplemental Memorandum, Defendants assert that should the Court admit statements made by the Governor, the Speaker, and Representative Ucci, certain state and federal privileges may apply to preclude questioning of these officials as to the context of the statements. Defs.' Suppl. Mem. 20. Assertions of privilege are not yet before the Court in this matter, so it is unclear if and when such claims of privilege may be asserted and for what purpose. Nonetheless, Defendants request a pretrial ruling on the legal framework that would apply in order to inform the scope of discovery and related matters.[9]  Id. at 20-21.

In this litigation – a federal constitutional challenge to state law, in federal court – federal common law principles control

---

unavailability - the Court would be inclined to admit the press reports under the residual exception.

[9] Defendants argue that an evidentiary ruling admitting the statements may raise ethical issues for Defendants' counsel because the Rhode Island "speech in debate" clause, see R.I. Const. art. VI, § 5, and an implied executive privilege might forbid counsel from questioning the state legislators and the Governor

12

on the question of privilege. See McDonough v. City of Portland, No. 2:15-cv-153-JDL, 2015 WL 12683663, at *1 (D. Me. Dec. 31, 2015) ("[W]hen a state or municipal legislator seeks to invoke legislative privilege in federal court with respect to a federal claim, '[t]he common law – as interpreted by United States courts in the light of reason and experience – governs [the] claim of privilege[.]'") (quoting Fed. R. Civ. P. 501) (emphasis added)(alternations in original). Rooted in the Speech or Debate Clause of the United States Constitution, state legislators and non-legislators performing legislative acts enjoy a parallel privilege similar in scope to that afforded to federal legislators.[10] Nat'l Ass'n. of Social Workers v. Hardwood, 69 F.3d 622, 629-30 (1st Cir. 1995).

However, courts have held that the evidentiary privilege afforded to state legislators under common law is limited. McDonough, 2015 WL 12683663, at *2 (quoting ACORN (N.Y. Ass'n of Comty. Orgs. For Reform Now) v. Cnty of Nassau, No. CV 05-2301(JFB)(WDW), 2007 WL 2815810, at *2 (E.D.N.Y. Sept. 25, 2007))

---

about their public statements. Defs.' Suppl. Mem. 24. Defendants' counsel has indicated that he may seek a state ethics advisory opinion on this question.

[10] Legislative privilege may extend to state executive officials where those officials "perform legislative functions." See Bogan v. Scott-Harris, 523 U.S. 44, 55 (1998) (finding that legislative immunity extended to the Governor because "introduction of a budget and signing into law an ordinance . . . were integral steps in the legislative process").

13

("The Supreme Court has. . . rejected the notion that the common law immunity of state legislators gives rise to a general evidentiary privilege."). Should state officials assert an evidentiary privilege, "the court must balance the extent to which the production of the disputed evidence would have a chilling effect on the [state official] against those factors favoring disclosure." Id. (internal citations omitted). In making this determination, the Court would look to the following factors:

> (i) the relevance of the evidence sought to be protected;
> (ii) the availability of other evidence; (iii) the seriousness of the litigation and the issues involved;
> (iv) the role of the government in the litigation; and
> (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.

Id. Accordingly, even if similar state privileges afford a broader protection for state officials in the context of state law claims, federal common law dictates the bounds of privilege in this case, and will guide the Court's rulings on any claims of privilege here.

III. Conclusion

For the foregoing reasons, Defendants' Motion for Judgment on the Pleadings, ECF No. 41, is DENIED. Furthermore, as to the press reports quoting state officials which Plaintiffs intend to introduce as evidence of discriminatory purpose, the Court finds: (1) the statements are relevant, but if admitted into evidence will be afforded proper weight; (2) the statements within the press reports are not hearsay (the first level of hearsay analysis); but

14

(3) the residual exception does not apply to the press reports so long as the state officials are available to testify, and therefore the statements would be inadmissible under the hearsay rules; however, if such officials are unavailable, for whatever reason, the residual exception would apply and the statements would be admissible.  Finally, the Court finds that federal common law would apply to any assertions of privilege from state officials.

IT IS SO ORDERED.

/s/ William E. Smith
_____
William E. Smith
District Judge
Date: July 20, 2020

15