UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                          )
AMERICAN TRUCKING ASSOCIATIONS,           )
INC.; CUMBERLAND FARMS, INC.;             )
M&M TRANSPORT SERVICES, INC.; and         )
NEW ENGLAND MOTOR FREIGHT, INC.,          )
                                          )
        Plaintiffs,                       )
                                          )
            v.                            )   C.A. No. 18-378-WES
                                          )
PETER ALVITI, JR., in his official        )
capacity as Director of the Rhode         )
Island Department of Transportation;      )
and RHODE ISLAND TURNPIKE AND             )
BRIDGE AUTHORITY,                         )
                                          )
        Defendants.                       )
_____ )
```

**OPINION AND ORDER**

WILLIAM E. SMITH, District Judge.

Before the Court are Motions to Quash Subpoenas Duces Tecum and Subpoenas for Deposition Testimony, ECF Nos. 85, 87, and 89, filed by three non-parties, Governor Gina M. Raimondo, Speaker Nicholas Mattiello, and Representative Stephen R. Ucci, as well as Defendants' Motion to Quash Subpoena Duces Tecum and Subpoena for Deposition Testimony from CDM Smith, Inc., ECF No. 120.  For the reasons explained herein, the Motions are DENIED.

I.   Background[1]

In 2016, the Rhode Island General Assembly passed "The Rhode Island Bridge Replacement, Reconstruction, and Maintenance Fund Act of 2016", R.I. Gen. Laws § 42-13.1-1 et seq. ("RhodeWorks"). This statutory scheme permits tolling of certain "large commercial trucks only," limiting the daily maximum toll charge per individual truck to forty dollars ($40.00) and the maximum toll for a single "border-to-border through trip on Route 95" to twenty dollars ($20.00). R.I. Gen. Laws § 42-13.1-4(c)-(d). Additionally, an individual truck is subject to only one toll "per toll facility, per day in each direction, or an equivalent frequency use program[.]" Id. § 42-13.1-4(b).

Shortly after tolling under RhodeWorks began in June 2018, Plaintiffs, various trucking and transport companies, brought suit alleging that RhodeWorks violates the Commerce Clause of the United States Constitution because it discriminates against interstate commerce and out-of-state truckers in both intent and effect; the tolls do not reflect a fair approximation of the use of the tolled facility; and the tolls are excessive in relation to the benefits conferred. Compl. ¶¶ 1, 3-10, ECF No. 1. Plaintiffs' allegation of discriminatory intent relied in part on a study commissioned by

---

[1] The facts and procedural history of this case are covered in greater detail in the Court's September 10, 2020 Memorandum and Order, ECF No. 105.

the Rhode Island Department of Transportation ("RIDOT") and completed by CDM Smith, Inc. ("CDM Smith") prior to the enactment of RhodeWorks:

> [The study] found that, absent the toll caps for multiple trips in Rhode Island, trucks with Rhode Island-issued license plates would pay approximately 45% of the RhodeWorks tolls, while trucks with out-of-state license plates would pay approximately 55%. But "after adjusting for the multi-trip discounts, about 60 percent of truck tolls would be charged to out of state trucks, while about 40 percent would be [charged to] Rhode Island [trucks]."

Compl. ¶ 85 (quoting CDM Smith, Truck Traffic Count Summary Report 1-4 (Oct. 2015)). Plaintiffs also pointed to statements attributed to the Governor, Speaker, and Representative prior to the passage of RhodeWorks. For example, Governor Raimondo reportedly said, "The reason I prefer the tolling proposal is because the majority of the burden is on out-of-state truckers and out-of-state companies who are using — and I would say abusing — our roads." Compl. ¶ 80 (quoting Patrick Anderson & Katherine Gregg, Raimondo: Plan shifts burden off R.I., Providence Journal (Oct. 29, 2015)). Likewise, Speaker Mattiello is quoted as stating that "a lot of the burden for the repair of our bridges, overpasses and infrastructure is passed on to out-of-state truckers" and that "[a] lot of the cost gets shifted to out-of-state truckers[.]" Compl. ¶ 80 (quoting Mary MacDonald, Improved business climate positions R.I. for growth, Providence Business News (Dec. 23, 2015)). A similar statement is attributed to Representative Ucci:

"The tolling relies on 60 percent revenue from out of state trucks who would have never paid to come through this state."  Compl. ¶ 87 (quoting Patrick Anderson, R.I. House passes Raimondo's truck-toll plan, The Providence Journal (Feb. 11, 2016)).

In the first go-around, the Court dismissed the case for lack of jurisdiction, but the case returned after Plaintiffs successfully appealed to the United States Court of Appeals for the First Circuit.  See Mandate, ECF No. 37; Mar. 19, 2019 Opinion and Order, ECF No. 33.  The Court subsequently denied Defendants' Motion for Judgment on the Pleadings, as well as Plaintiffs' Motion for a Preliminary Injunction.  See July 20, 2020 Order, ECF No. 72; Sept. 10, 2020 Mem. and Order, ECF No. 105.

In July 2020, Plaintiffs issued subpoenas seeking deposition testimony from Governor Raimondo, Speaker Mattiello, and Representative Ucci, as well as subpoenas duces tecum seeking (a) documents or communications regarding efforts to mitigate economic impact on Rhode Island citizens; (b) documents regarding the expected or actual impact of the toll caps on in-state vs. out-of-state truckers; (c) documents regarding the expected or actual impact of tolling only certain classes of trucks on in-state vs. out-of-state truckers; (d) documents regarding the potential impact on interstate commerce; (e) documents regarding alternative methods for raising funds; (f) drafts of RhodeWorks and related, failed bills, including mark-ups, comments, red-

4

lines, revisions, etc.; (g) communications between the Governor and legislators regarding RhodeWorks or other methods of raising funds; and (h) documents regarding the public statements made by the movants and others.   See Governor Raimondo's Mot. to Quash ("Gov.'s Mot."), Ex. B, ECF No. 85; Speaker Mattiello's Mot. to Quash ("Spkr.'s Mot."), Ex. B, ECF No. 87; Representative Ucci's Mot. to Quash ("Rep.'s Mot."), Ex. B, ECF No. 89; ECF Nos. 75, 76, 77, 78, 80, 81.[2]  The three non-parties, represented by Defendants' counsel, each filed a Motion to Quash the subpoenas.   Following extensive briefing, the Court held a hearing on September 25, 2020.

Shortly before the hearing, Plaintiffs issued subpoenas to CDM Smith seeking deposition testimony and documents regarding the contractual relationship between the Rhode Island Department of Transportation ("RIDOT") and CDM Smith, the data and analysis collected and produced by CDM Smith, and communications with CDM Smith.   See CDM Smith Mot. to Quash ("CDM Mot."), Exs. A, B, ECF No. 120.   While the three initial Motions to Quash were under advisement, Defendants filed a Motion to Quash the CDM Smith subpoenas "[f]or the same reasons articulated" in the motions of the Governor, Speaker, and Representative.   CDM Mot. 6.   The Court now addresses the four Motions to Quash.

_____

[2] For the sake of brevity, the minor differences between the three subpoenas duces tecum are not explained here.

II.  Discussion

A party may serve a subpoena to obtain documents or deposition testimony.  See Fed. R. Civ. P. 45(a)(1).  Upon the timely motion of the recipient of a subpoena, the Court must quash any subpoena that "requires disclosure of privileged or other protected matter" or that "subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3)(A).[3]

The Governor, Speaker, and Representative argue that their subpoenas should be quashed based on legislative privilege and undue burden.  See Gov.'s Mot. 3, 38-39; Spkr.'s Mot. 3, 32-33; Rep.'s Mot. 3, 32-33.  Additionally, the Governor argues that she is protected by the deliberative process privilege.  See Gov.'s Mot. 5-8.  Lastly, Defendants contend that the CDM Smith subpoena should be quashed based on legislative privilege and deliberative process privilege.  See CDM Mot. 5.  For the following reasons, the Court concludes that the interests at play require breaching

---

[3]  A subpoena recipient asserting a privilege "must[] (i) expressly make the claim; and (ii) describe the nature of the withheld documents . . . in a manner that . . . will enable the parties to assess the claim."  Fed. R. Civ. P. 45(e)(2)(A).  Here, the State argues that any responsive documents would be covered by privilege.  The State therefore does not provide any description of relevant documents in its possession; nor does it even state whether any such documents exist.  As discussed, infra Section II(A)(2)(a), the Court agrees that any responsive documents would fall within the ambit of the asserted privileges, so a privilege log is unnecessary.

6

the privileges, and that compliance with the subpoenas would not be unduly burdensome.

A.   Legislative Privilege

Federal legislative privilege for state legislators derives from the Speech and Debate Clause of the U.S. Constitution, which provides absolute immunity in civil and criminal cases for members of Congress.  Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 630 (1st Cir. 1995).[4]  This immunity protects legislators from liability for "speech and debate [in the halls of Congress,] voting, . . . circulation of information to other legislators, . . . participation in the work of legislative committees, . . . and a host of kindred activities."  Id. (citations omitted).  To safeguard this absolute immunity, the clause also entails absolute evidentiary and testimonial privileges.  See In re Grand Jury, 821 F.2d 946, 953 (3d Cir. 1987).

By its terms, the Speech and Debate Clause does not apply to state legislators.  See U.S. Const. art. I, § 6, cl. 1.  The Supreme Court, however, has determined that the basic protections embodied in the Clause, which have "taproots in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries," are part of

---

[4] Because Plaintiffs' claims are based on federal law, privilege protections contained within state law are inapposite. See In re Admin. Subpoena Blue Cross Blue Shield of Massachusetts, Inc., 400 F. Supp. 2d 386, 389 (D. Mass. 2005) (citing Fed. R. Evid. 501).

federal common law.  Tenney v. Brandhove, 341 U.S. 367, 372–75
(1951).  In civil cases – but not criminal cases – this immunity
is absolute.  See Acevedo-Cordero v. Cordero-Santiago, 958 F.2d
20, 22 (1st Cir. 1992).  Here, the movants were not named as
defendants, so the question is not one of immunity; rather, at
issue is immunity's close cousin, privilege.

The Supreme Court first addressed the topic of state
legislative privilege in United States v. Gillock, 445 U.S. 360
(1980).  There, a state legislator had been charged with crimes
based on non-legislative activities, so immunity was not relevant.
Id. at 362.  But the government sought to introduce evidence of
his legislative activities, squarely raising the issue of
privilege.  Id.  Examining the two underpinnings of the Speech and
Debate Clause, the Court determined that the first rationale –
separation of powers – was inapplicable because of the federal
government's supremacy over the states.  See id. at 369-71.  The
Court concluded, however, that the second rationale – avoiding
interference with the legislative process – did apply.  See id. at
371-73.  The Court thus held that a state legislative privilege
exists, at least in some circumstances, but that "where important
federal interests are at stake, as in the enforcement of federal
criminal statutes, comity yields."  Id. at 373.

1.   Absolute vs. Qualified

Since Gillock, the Supreme Court has offered scant guidance as to the contours of the state legislative privilege.   See Corporacion Insular de Seguros v. Garcia, 709 F. Supp. 288, 294 (D.P.R. 1989) (citing Hutchinson v. Proxmire, 443 U.S. 111, 124 (1979)).   Lower courts have generally followed one of two paths. The first, advocated here by the State, maintains that, apart from certain discrete categories of cases, legislative privilege is absolute.   See Gov.'s Mot. 13.   The second path, endorsed by Plaintiffs, interprets Gillock and related cases to signify that state legislative privilege is inherently qualified and requires a case-specific balancing of interests.   See Pls.' Opp'n 3-9, ECF No. 103.   For the following reasons, the Court concludes that a qualified privilege finds better support in the case law.

Legislative immunity for federal legislators, along with the corresponding privilege protection, is absolute.   See In re Grand Jury, 821 F.2d at 953.   As for its state counterpart, the Supreme Court has stated that state legislative immunity "is similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause."   Supreme Court of Virginia v. Consumers Union of U. S., Inc., 446 U.S. 719, 732 (1980); see Harwood, 69 F.3d at 629 (state legislative immunity is "essentially coterminous" with absolute immunity for members of Congress).   Because state legislative immunity bears close resemblance to federal

9

legislative immunity, and because privilege derives from immunity, some courts reason that state legislative privilege must also be absolute, at least in most types of cases.  See Greater Birmingham Ministries v. Merrill, No. 2:15-cv-02193-LSC, slip op. at 16 (N.D. Ala. Mar. 13, 2017).[5]

But this line of reasoning can only be stretched so far. Lacking the constitutional backing of the Speech and Debate Clause, the common law privilege for state legislators is undeniably weaker than that given to federal lawmakers.  See United States v. DiCarlo, 565 F.2d 802, 806 n.5 (1st Cir. 1977) (state legislative privilege is not "on a full parity with that of Congress"); Corporacion Insular de Seguros, 709 F. Supp. at 294 (citations omitted) (Gillock "signifies a retreat from the original concern for the independence of state legislators expressed in Tenney[], and reinforces the conservative stance of the Court regarding privileges in general."). Courts adopting the absolutist approach must somehow account for the fact that state legislative privilege, unlike federal privilege, yields "where

_____

[5] See also Clayland Farm Enterprises, LLC v. Talbot Cty., Maryland, No. CV GLR-14-03412, 2018 WL 4700191, at *2 (D. Md. Oct. 1, 2018); Pulte Home Corp. v. Montgomery Cty., Maryland, No. GJH-14-3955, 2017 WL 2361167, at *3 (D. Md. May 31, 2017); Lee v. Virginia State Bd. of Elections, No. 3:15CV357 (HEH-RCY), 2015 WL 9461505, at *6 n.9 (E.D. Va. Dec. 23, 2015); Miles-Un-Ltd., Inc. v. Town of New Shoreham, R.I., 917 F. Supp. 91, 98 (D.N.H. 1996); 2BD Associates Ltd. Partnership v. County Com'rs for Queen Anne's County, 896 F. Supp. 528, 531 (D. Md. 1995); Small v. Hunt, 152 F.R.D. 509, 512-13 (E.D.N.C. 1994).

important federal interests are at stake." <u>Gillock</u>, 445 U.S. at 373.

Two categories of cases are commonly exempted from a purportedly absolute privilege. First, state legislators charged with crimes are given <u>no</u> privilege, absolute or otherwise. <u>See Corporacion Insular de Seguros</u>, 709 F. Supp. at 294 (citing <u>In re Grand Jury</u>, 821 F.2d 946). In addition, it is widely accepted that the shield of privilege can sometimes be pierced in cases involving voter redistricting. <u>See, e.g.</u>, <u>Marylanders for Fair Representation, Inc. v. Schaefer</u>, 144 F.R.D. 292, 304 (D. Md. 1992). Courts adopting an absolutist approach have reasoned that such cases represent the only exceptions to absolute privilege because they are the only circumstances in which the political process is insufficient to rectify legislative malfeasance. <u>See Pulte Home Corp. v. Montgomery Cty., Maryland</u>, No. GJH-14-3955, 2017 WL 2361167, at *6 n.11 (D. Md. May 31, 2017). In all other cases, these courts have concluded, the privilege is absolute, and no inquiry can be made. <u>See id.</u>

In this vein, the State relies heavily on two cases, one from this Court and one from the District of New Hampshire. <u>See</u> Gov.'s Mot. 16-18. Neither is convincing. The first case is largely inapposite because it dealt exclusively with questions of immunity, not privilege. <u>See Healey v. Bendick</u>, 628 F. Supp. 681, 697-99 (D.R.I. 1986).

The second case, Miles-Un-Ltd., Inc. v. Town of New Shoreham, R.I., 917 F. Supp. 91 (D.N.H. 1996), dealt with privilege, but the court's discussion inexplicably focused on the question of immunity.   See id. at 98.   The court identified a tightly circumscribed range of legislative actions for which legislative immunity can be breached:  those taken "in bad faith, because of corruption, or primarily in furtherance of personal instead of public interests."   Id. at 100 (emphasis in original) (quoting Haskell v. Washington Tp., 864 F.2d 1266, 1278 (6th Cir. 1988) (discussing immunity, not privilege)).  To make relevant this broad definition of immunity – in a decision about privilege – the court had to treat immunity and privilege as equivalent.  See Miles-Un-Ltd., 917 F. Supp. at 98 ("rationale for affording state, regional, and local legislators a testimonial privilege is as compelling as the rationale for providing immunity from civil liability.").

But this equivalence is false.  "The Supreme Court has . . . rejected the notion that the common law immunity of state legislators gives rise to a general evidentiary privilege." McDonough v. City of Portland, No. 2:15-CV-153-JDL, 2015 WL 12683663, at *2 (D. Me. Dec. 31, 2015) (citation omitted).  See Favors v. Cuomo, 285 F.R.D. 187, 209 (E.D.N.Y. 2012); Rodriguez v. Pataki, 280 F. Supp. 2d 89, 95-96 (S.D.N.Y. 2003), aff'd, 293 F.

Supp. 2d 302 (S.D.N.Y. 2003).  Thus, the reasoning in <u>Miles-Un-Ltd.</u> is unconvincing.[6]

Moreover, the quasi-absolutist approach has undeniable weaknesses.  First, it is rather strange to say the privilege is absolute <u>except for</u> situations where federal interests control.  By definition, that is a qualified privilege.  Second, the quasi-absolutist approach purports to draw a bright line circumscribing cases which entail a qualified privilege, but no such rule is delineated in Supreme Court or First Circuit precedent.  Rather, the guiding principle is that "the public . . . has a right to every man's evidence." <u>Trammel v. United States</u>, 445 U.S. 40, 50 (1980) (quotations and citation omitted).  Thus, the Supreme Court has warned that testimonial and evidentiary privileges should apply "only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." <u>Id.</u> (quotations and

---

[6] The State argues that <u>Miles-Un-Ltd.</u> is particularly on point because it involves the dormant Commerce Clause. <u>See</u> Gov.'s Mot. 16-18.  However, as Plaintiffs point out, the opinion does not make clear whether the testimony was sought to support the dormant Commerce Clause or another cause of action. <u>See</u> Pls.' Opp'n. 8, ECF No. 103 (citing <u>Miles-Un-Ltd.</u>, 917 F. Supp. at 101).  Additionally, the court noted that while "[m]ere speculation [of] improper motives" will not suffice, immunity can be breached where "infringement of the immunity rises to a level of public need," suggesting a qualified immunity (and therefore privilege) in approach, if not by name. <u>Miles-Un-Ltd.</u>, 917 F. Supp. at 100 (citations omitted).

citation omitted).  To this end, the Federal Rules of Civil Procedure were designed to "provide the courts with . . . flexibility in developing rules of privilege on a case-by-case basis."  Gillock, 445 U.S. at 367; see also United States v. Pineda-Mateo, 905 F.3d 13, 21 (1st Cir. 2018) (quotations and citation omitted) ("privilege should only apply in a particular case if it promotes sufficiently important interests").  A blanket rule in favor of privilege would contravene the preference for a case-by-case development.

Heeding these warnings, most courts to address the issue have determined that the privilege is qualified in all cases, requiring a "balancing of the legitimate interests on both sides."[7]

---

[7] See, e.g., Jefferson Cmty. Health Care Centers, Inc. v. Jefferson Par. Gov't, 849 F.3d 615, 624 (5th Cir. 2017) (citation and quotation omitted) ("While the common-law legislative immunity for state legislators is absolute, the legislative privilege for state lawmakers is, at best, one which is qualified."); In re Grand Jury, 821 F.2d 946, 957 (3d Cir. 1987); Plain Local Sch. Dist. Bd. of Educ. v. DeWine, No. 2:19-CV-5086, 2020 WL 4679015, at *3 n.6 (S.D. Ohio June 2, 2020); Michigan State A. Philip Randolph Inst. v. Johnson, No. 16-CV-11844, 2018 WL 1465767, at *4 (E.D. Mich. Jan. 4, 2018); Citizens Union of City of New York v. Attorney Gen. of New York, 269 F. Supp. 3d 124, 154-55 (S.D.N.Y. 2017); N. Carolina State Conference of the NAACP v. McCrory, No. 1:13CV658, 2014 WL 12526799, at *2 (M.D.N.C. Nov. 20, 2014); Perez v. Perry, No. SA-11-CA-360, 2014 WL 106927, at *2 (W.D. Tex. Jan. 8, 2014); Favors v. Cuomo, 285 F.R.D. 187, 211 (E.D.N.Y. 2012); Florida v. United States, 886 F. Supp. 2d 1301, 1303-04 (N.D. Fla. 2012) ("legislator's privilege is qualified, not absolute"); Texas v. Holder, No. CV12128DSTRMCRLW, 2012 WL 13070060, at *1 (D.D.C. June 5, 2012); Doe v. Nebraska, 788 F. Supp. 2d 975, 985 (D. Neb. 2011); Hobart v. City of Stafford, 784 F. Supp. 2d 732, 764-65 (S.D. Tex. 2011); Comm. for a Fair & Balanced Map v. Ill. State Bd. of Elections, No. 11 C 5065, 2011 WL 4837508, at *7 (N.D. Ill., Oct.

McDonough, No. 2:15-CV-153-JDL, 2015 WL 12683663, at *2 (citation omitted).  Contrary to the assertions of the State, these inquiries are regularly conducted in cases not involving criminal prosecutions or voter redistricting.  See Plain Local Sch. Dist. Bd. of Educ. v. DeWine, No. 2:19-CV-5086, 2020 WL 4679015, at *3 n.6 (S.D. Ohio June 2, 2020) ("courts have routinely found the privilege to be a qualified one — regardless of the claim brought"); see, e.g., Citizens Union of City of New York v. Attorney Gen. of New York, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017) (challenging statute on First Amendment grounds).  Furthermore, a qualified privilege does not equal a feeble one; rather, courts adhere to the warning that the privilege may be breached only in "extraordinary instances . . . ."  Rodriguez, 280 F. Supp. 2d at 95-96 (quoting Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 268 (1977)).

In light of the Supreme Court's preference for case-by-case development of privilege law and the clear trend among lower courts, it is evident that "the cases applying a qualified

---

12, 2011); ACORN (N.Y. Ass'n of Comty. Orgs. for Reform Now) v. County of Nassau, No. CV 05-2301(JFB)(WDW), 2007 WL 2815810, at *2 (E.D.N.Y. Sept. 25, 2007); Rodriguez v. Pataki, 280 F. Supp. 2d 89, 95-96 (S.D.N.Y.), aff'd, 293 F. Supp. 2d 302 (S.D.N.Y. 2003); Manzi v. DiCarlo, 982 F. Supp. 125, 129 (E.D.N.Y. 1997); Fla. Ass'n of Rehab. Facs. v. Fla. Dep't of Health & Rehab. Servs., 164 F.R.D. 257, 266-68 (N.D. Fla. 1995); Corporacion Insular de Seguros, 709 F. Supp. at 294.

privilege represent the better, and controlling, legal rule." Kay v. City of Rancho Palos Verdes, No. CV 02-03922 MMM RZ, 2003 WL 25294710, at *12-14 (C.D. Cal. Oct. 10, 2003).

> 2.   Applying the Qualified Privilege

To determine whether legislative privilege will block disclosure, a court must first determine whether the documents or testimony at issue lie within the ambit of the privilege. See Puente Arizona v. Arpaio, 314 F.R.D. 664, 670 (D. Ariz. 2016). In other words, is the evidence legislative in nature? If so, the court balances the interests at stake to determine whether an exception should be made to the default rule of privilege. See id. at 671-72. Although the privilege clearly applies here, the relevant interests necessitate its breach.

> a.   Legitimate Legislative Activity

Legislative immunity and privilege apply only to conduct "within the sphere of legitimate legislative activity." Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 28-29 (1st Cir. 1996) (citation and quotation marks omitted). Despite being called a "legislative" privilege, this protection can apply to the Governor. "[I]t is the nature of the particular act rather than the title of the office which governs[.]" Acevedo-Cordero, 958 F.2d at 21. See Bogan v. Scott-Harris, 523 U.S. 44, 55 (1998).[8]

---

[8] Because the interests here require that the privilege give way, it is unnecessary to address whether state legislative

Here, Plaintiffs seek documents and testimony regarding the internal planning and development of the RhodeWorks legislation, with the goal of proving that the Governor, who proposed RhodeWorks, and the Speaker and Representative, who guided its passage and sponsored the legislation, had discriminatory intentions. See Gov.'s Mot. Ex. B; Spkr.'s Mot. Ex. B; Rep.'s Mot. Ex. B; see generally Compl. These pieces of evidence deal with quintessential legislative activities, see Citizens Union of New York, 269 F. Supp. 3d at 160 (citations omitted), and Plaintiffs wisely do not argue that the information at issue falls outside of the sphere of legitimate legislative activity. See generally Pls.' Opp'n. Nevertheless, they contend that disclosure is warranted. See id.

        b.   Balancing Test

Without Supreme Court guidance, lower courts have been tasked with determining when "important federal interests" tip the scale. See Gillock, 445 U.S. at 373. This inquiry involves "balanc[ing] the extent to which the production of the disputed evidence would

---

privilege properly applies to documents in the possession of third parties such as CDM Smith. Compare Michigan State A. Philip Randolph Inst., 2018 WL 1465767, at *7 ("communications between legislators or their staff and any third party are not protected") with Bethune-Hill v. Virginia State Bd. of Elections, 114 F. Supp. 3d 323, 338-39 (E.D. Va. 2015) (question whether privilege applies to communications with third parties should be "addressed within the qualified balancing analysis rather than with any kind of 'per se' rule").

have a chilling effect on the [state official] against those
factors favoring disclosure." McDonough, No. 2:15-CV-153-JDL,
2015 WL 12683663, at *2 (quoting ACORN (N.Y. Ass'n of Comty. Orgs.
for Reform Now) v. County of Nassau, No. CV 05-2301(JFB)(WDW),
2007 WL 2815810, at *2 (E.D.N.Y. Sept. 25, 2007)).  To strike the
proper balance, courts most often weigh the five factors from
Rodriguez, 280 F. Supp. 2d at 89:

> (i) the relevance of the evidence sought to be protected;
> (ii) the availability of other evidence; (iii) the
> 'seriousness' of the litigation and the issues involved; (iv)
> the role of the government in the litigation; and (v) the
> possibility of future timidity by government employees who
> will be forced to recognize that their secrets are violable.

Id. at 100-01 (citation and quotation omitted).[9]

### i.   Relevance

The best evidence of legislative intent comes from the text
of the statute.  Wine & Spirits Retailers, Inc. v. Rhode Island,
481 F.3d 1, 13 (1st Cir. 2007);  see also John Does 1-4 v. Snyder,

---

[9] See, e.g., Michigan State A. Philip Randolph Inst., 2018 WL
1465767, at *5; Citizens Union of City of New York, 269 F. Supp.
3d at 155; Nashville Student Organizing Comm. v. Hargett, 123 F.
Supp. 3d 967, 969-70 (M.D. Tenn. 2015); Jackson Mun. Airport Auth.
v. Bryant, No. 3:16-CV-246-CWR-FKB, 2017 WL 6520967, at *6 (S.D.
Miss. Dec. 19, 2017); Bethune-Hill, 114 F. Supp. 3d at 337-38;
Veasey v. Perry, No. 2:13-CV-193, 2014 WL 1340077, at *2 (S.D.
Tex. Apr. 3, 2014); Perry, 2014 WL 106927, at *2; Favors, 285
F.R.D. at 209-210; Page v. Viriginia State Bd. Of Elections, 15 F.
Supp. 3d 657, 666 (E.D. Va. 2014); Comm. for a Fair & Balanced Map,
2011 WL 4837508, at *7; ACORN (N.Y. Ass'n of Comty. Orgs. For
Reform Now) v. County of Nassau, No. 05CV2301 (JFB) (WDW), 2009 WL
2923435, at *2 (E.D.N.Y. Sept. 10, 2009).

932 F. Supp. 2d 803, 810 (E.D. Mich. 2013) (citation omitted) ("[C]ourts are wary of considering the almost always cacophonous comments of individual legislators in determining legislative intent.").[10] Nonetheless, "circumstantial evidence of an allegedly discriminatory purpose" is relevant in dormant Commerce Clause cases if the party offering it "show[s] the relationship between the proffered evidence and the challenged statute." <u>Alliance of Auto. Mfrs. v. Gwadosky</u>, 430 F.3d 30, 39 (1st Cir. 2005); <u>see</u> <u>Bacchus Imports, Ltd. v. Dias</u>, 468 U.S. 263, 270 (1984) (citations omitted) ("A finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose . . . or discriminatory effect[.]").[11] Thus, if Plaintiffs

---

[10] Moreover, "there is some reason to question whether a showing of discriminatory purpose alone will invariably suffice to support a finding of constitutional invalidity under the dormant Commerce Clause." <u>Alliance of Auto Mfs. v. Gwadosky</u>, 430 F.3d 30, 36 n.3 (1st Cir. 2005) (citation omitted). This consideration, however, speaks more to the weight of the potential evidence than to its relevance.

[11] As the State notes, <u>Apel v. Murphy</u>, 70 F.R.D. 651 (D.R.I. 1976), arguably conflicts with this principle. <u>See</u> Gov.'s Mot. 26-28. The plaintiffs, who alleged that a statute violated the dormant Commerce Clause case, sought discovery for the purpose of showing invidious intent on the part of individual legislators. <u>See</u> <u>Apel</u>, 70 F.R.D. at 654. This Court refused, stating that "[i]t serves no purpose . . . for the plaintiffs to prove that officials and legislators also had in mind an illegitimate reason for desiring the enactment of said laws." <u>Id.</u> at 655. Nonetheless, as Plaintiffs point out, this holding is inconsistent with more recent Supreme Court and First Circuit precedent. <u>See</u> Pl. Aug. 17, 2020 Letter Br. 2-3 n.3,4, ECF No. 95 (citing <u>Bacchus Imports</u>, 468 U.S. at 270, and <u>Alliance of Auto. Mfrs.</u>, 430 F.3d at 37).

can show a sufficient link between evidence of legislative intent obtained through these subpoenas and the resulting RhodeWorks legislation – a high bar to meet - the evidence will be relevant.

In its attempt to render irrelevant any such evidence, the State cites to cases in which legislative intent was held to be immaterial.  See United States v. O'Brien, 391 U.S. 367, 382-83 (1968) ("the purpose of Congress . . . is not a basis for declaring this legislation unconstitutional" on First Amendment grounds); South Carolina Educ. Ass'n. v. Campbell, 883 F.2d 1251, 1259 (4th Cir. 1989) (holding breach of privilege to be impermissible in First Amendment inquiry, and distinguishing constitutional inquiries in which "Courts have expressly deemed [motive] a substantive element").  These cases do not control here because, as stated, the Supreme Court has held that intent is relevant to the dormant Commerce Clause.

Of course, the mere possibility of relevance is clearly insufficient to overcome the state legislative privilege. Instead, the party seeking discovery must point to a "chain of events or objective evidence from the outset supporting invidious intent behind the legislative action." Miles-Un-Ltd., Inc., 917 F. Supp. at 100 (citing Village of Arlington Heights, 429 U.S. at 267-68).  Otherwise, discovery inquiries into the motives of individual legislators amount to "fishing expedition[s] into non-public information[.]" Citizens Union of City of New York, 269 F.

Supp. 3d at 141.  Here, based on the public statements of the individual movants, the discovery requests are not fishing expeditions; rather, they are legitimate attempts to fully examine and contextualize what appear to be patent statements of discriminatory intent.

Moreover, Plaintiffs do not allege that the individual movants simply voted for or signed the RhodeWorks bill.  Rather, they contend that the Governor spearheaded the drafting of the legislation, and that the Governor, Speaker, and Representative shepherded its passage with the assistance of CDM Smith's report. See Compl. ¶¶ 5, 71, 80, 85, 87, 91, 93, 99.  Common sense dictates that the intent of such individuals has greater relevance than that of other legislative actors.  See Circle Import-Export Co. v. United States, 320 F. Supp. 1400, 1404 (Cust. Ct. 1970) ("intent of the drafters of the legislation is of great significance"); Marathon Oil Co. v. State, Dep't of Nat. Res., 254 P.3d 1078, 1082 (Alaska 2011) (quotation marks and citation omitted) ("We interpret statutes . . . taking into account . . . the intent of the drafters"); cf. Alliance of Auto. Mfrs., 430 F.3d at 39 (citation omitted) ("statements by a law's private-sector proponents sometimes can shed light on its purpose"); Davidson v. Sandstrom, 83 P.3d 648, 657 (Colo. 2004) (quotation marks and citation omitted) ("history of an amendment's drafting . . . provides important insight into the electorate's understanding of

the amendment").[12]  Thus, Plaintiffs have articulated a plausible theory of how discriminatory intent on the part of individual legislative actors may have infected the legislative body at a greater scale.  This factor weighs strongly towards disclosure.

## ii.  Availability of Other Evidence

Where non-privileged evidence could easily take the place of privileged evidence, a bid for discovery is weakened.  See Rodriguez, 280 F. Supp. 2d at 100-01.  Without further clues as to contents of potential disclosures, though, this factor is not particularly instructive.  Plaintiffs already have the individual movants' public comments regarding their interest in placing the tolling burden on out-of-staters, which this Court is inclined to admit absent testimony from the movants.  See July 20, 2020 Order 8-12, ECF No. 72 (provisionally dispensing with hearsay objections).  To the extent that documents and testimony would simply reiterate the motivations expressed in the public statements, these hypothetical pieces of evidence might be cumulative.  But the public statements are presented without context.  See Compl. ¶¶ 80, 87.  Isolated quotes in newspapers,

---

[12] These considerations apply equally to the Governor when she acts in her legislative capacity.  See, e.g., State v. Rizzo, 303 Conn. 71, 200 (2011) ("governor's approval of legislation may provide evidence of the motivations underlying that legislation"); Perez v. Rent-A-Ctr., Inc., 186 N.J. 188, 215 (2006) (quotation marks and citation omitted) ("action of the governor upon a bill may be considered in determining legislative intent"); State v. Reis, 183 Wash. 2d 197, 213 (2015) (same).

presumably taken from longer statements or conversations, have inherently limited import. Thus, given the lack of legislative history, the requested discovery could help to illuminate the public statements, either to the benefit or the detriment of Plaintiffs' case. See Nashville Student Organizing Comm. v. Hargett, 123 F. Supp. 3d 967, 971 (M.D. Tenn. 2015) ("[G]iven the dearth of available documentary evidence outside of the legislative history, additional relevant information may come from the legislators themselves.").

Plaintiffs also have access to CDM Smith's report on the potential impacts of the legislation. Presumably the basis for some or all of the above-mentioned public statements, this report contains the estimates that 60 percent of the RhodeWorks burden would fall on out-of-staters, and that absent the toll caps, only 55 percent would be borne by visitors to the Ocean State. See Compl. ¶ 85 (citing CDM Smith, Truck Traffic Count Summary Report 1-4 (Oct. 2015)). Discovery may provide either helpful context or cumulative material. This factor does not clearly point in either direction.

### iii. Seriousness of the Litigation

The "Commerce Clause . . . furthers strong federal interests in preventing economic Balkanization." Bacchus Imports, 468 U.S. at 276 (citation omitted). The State admits as much. See Gov.'s Mot. 35. This "overwhelming federal interest" is arguably "as

much a core attribute of the national government as the list of important state interests are attributes of state sovereignty." Harper v. Pub. Serv. Comm'n of W.VA., 396 F.3d 348, 356 (4th Cir. 2005).   Thus, the importance of the litigation provides moderate support for breaching the privilege.[13]

iv.   Role of the Government

"When the role of the legislators in the unlawful conduct is 'direct,' the fourth factor weighs in favor of disclosure." Citizens Union of City of New York, 269 F. Supp. 3d at 169 (citation omitted).   The State argues that the roles of the Governor, Speaker, and Representative, which it describes as simply voting for and signing the RhodeWorks legislation, were minimal and weigh in favor of applying the privilege.   See Gov.'s Mot. 36-37 (citing Citizens Union of New York, 269 F. Supp. 3d at 169 ("merely voting for a law or signing a bill does not render [an official's] role 'direct'")).   This argument regurgitates the State's relevance argument: the intent of an individual legislative actor is irrelevant to the intent of the legislature as a whole.   But here,

---

[13] Admittedly, most civil cases in which state legislative privilege has been set aside have involved allegations of racial gerrymandering or race-based disenfranchisement.   See, e.g., Nashville Student Organizing Comm. v. Hargett, 123 F. Supp. 3d 967, 972 (M.D. Tenn. 2015).   These allegations strike at the core constitutional tenet against invidious racial classifications, and "threaten[] to deprive . . . the electorate of the power of their vote to act as a check on legislators." Citizens Union of City of New York, 269 F. Supp. 3d at 168.   Dormant Commerce Clause violations do not implicate this sort of malignancy.

Plaintiffs allege that the movants played outsized roles in the development and passage of RhodeWorks. See Compl. ¶¶ 5, 71, 80, 87, 91, 93, 99.  The Court finds that their public statements emphasizing the burden placed on out-of-state truckers make their roles more "direct" than simply voting for or signing the bill. This factor favors Plaintiffs' argument against privilege.

> v.   Possibility of Future Timidity

Any disclosure of non-public legislative materials runs the risk of generating legislative fear of clear communication and distracting officials from their duties.  See Eastland v. United States Servicemen's Fund, 421 U.S. 491, 502 (1975); In re Hubbard, 803 F.3d 1298, 1310 (11th Cir. 2015).  But see Benford v. Am. Broad. Companies, Inc., 98 F.R.D. 42, 46 (D. Md. 1983) (privilege was "not designed to encourage confidences by maintaining secrecy[,] for the legislative process in a democracy has only a limited toleration for secrecy") (quoting In re Grand Jury Investigation, Etc., 587 F.2d 589, 596-97 (3d Cir. 1978). "[O]fficials seldom, if ever, announce that they are pursuing a course of action because of an invidious discriminatory intent . . . ."  Nashville Student Organizing Comm., 123 F. Supp. 3d at 970.  Normally cautious to avoid such statements in public, legislators may be assisted by the freedom to communicate candidly while in private.  Here, however, the movants clearly were not concerned with shielding their intentions from prying eyes; in

fact, they publicly emphasized their desire to burden out-of-staters. Thus, this factor lends only abstract support to the State.

### vi.  Balancing the Factors

In sum, three factors support Plaintiffs' position, and one arguably (but weakly) favors the State. Most notably, the relevance of the discovery sought is potentially significant, and the circumstances do not indicate a significant risk of future timidity. The Court therefore concludes that this is one of the extraordinary circumstances in which the privilege must yield, at least for the purposes of discovery. Of course, determinations regarding trial admissibility are left for later, when the details of the disputed evidence will be known.[14]

### B.  Deliberative Process Privilege

The State next argues that the subpoenas issued to the Governor and CDM Smith should be quashed based on the deliberative process privilege. See Gov.'s Mot. 5; CDM Mot. 6. Similar to the

---

[14] Some courts have held that state legislative privilege provides no bar against discovery because "legislative privilege is 'one of non-evidentiary use [of legislative acts against a legislator], not one of non-disclosure.'" E.E.O.C. v. Washington Suburban Sanitary Comm'n, 666 F. Supp. 2d 526, 532 (D. Md. 2009) (quoting In re Grand Jury, 821 F.2d at 958). This approach is clearly in the minority. See In re Hubbard, 803 F.3d 1298, 1310 (11th Cir. 2015) ("privilege extends to discovery requests"); E.E.O.C. v. Washington Suburban Sanitary Comm'n, 631 F.3d 174, 181 (4th Cir. 2011) (same). Nonetheless, the relevant interests at trial differ from those during discovery and could potentially yield a different outcome.

legislative privilege, "[t]he deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions . . . by protecting open and frank discussion among those who make them within the Government." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001) (citations omitted).  This privilege protects only executive branch officials, and therefore is inapplicable to the Speaker and Representative.  See N. L. R. B. v. Sears, Roebuck & Co., 421 U.S. 132, 150 (1975).

"[T]o qualify for the privilege, a document must be (1) predecisional, that is, antecedent to the adoption of agency policy, and (2) deliberative, that is, actually related to the process by which policies are formulated."  Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs, 60 F.3d 867, 884 (1st Cir. 1995) (citation and quotation omitted).  The State argues convincingly that all information sought in these subpoenas is necessarily predecisional, as the entire purpose of this line of discovery is to ascertain the intent that led to the passage of RhodeWorks. See generally Gov.'s Mot. 8-13.  Any post-decisional materials would fall outside the scope of the discovery requests.

The State may hit a snag, however, with the requirement that documents be deliberative.  A document is deliberative if it "(i)

27

formed an essential link in a specified consultative process, (ii) reflect[s] the personal opinions of the writer rather than the policy of the agency, and (iii) if released, would inaccurately reflect or prematurely disclose the views of the agency." Providence Journal Co. v. U.S. Dep't of Army, 981 F.2d 552, 559 (1st Cir. 1992) (citation and quotation omitted). Purely factual documents, "segregable factual portions" of documents, and any documents that would not inaccurately reflect the views of the Governor's office would not be covered. See id.; Bethune-Hill v. Virginia State Bd. of Elections, 114 F. Supp. 3d 323, 335-39 (E.D. Va. 2015). Without more information regarding the documents held by the Governor and CDM Smith, it is impossible to know if all responsive documents are deliberative.

This lack of information is immaterial, however, because the privilege should nevertheless be overcome. Documents that are predecisional and deliberative are not given blanket protection; rather, the court has discretion to block access to them. See Texaco Puerto Rico, Inc., 60 F.3d at 885. "[A]n inquiring court should consider, among other things, the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government." Id. This determination is quite similar to the legislative privilege inquiry. See Bethune-Hill, 114 F. Supp. 3d at 338. In fact, the five-factor test analyzed above was

28

originally borrowed from the deliberative process test.  See
Rodriguez, 280 F. Supp. 2d at 101 (quoting In re Franklin Nat'l
Bank Secs. Litig., 478 F. Supp. 577, 583 (E.D.N.Y. 1979)).  The
documents at issue are the same, the factors are similar, and the
goals of the doctrines are similar.  Thus, the deliberative process
privilege rises, and in this case falls, on the same
considerations.[15]  See In re Subpoena Duces Tecum Served on Off.
of Comptroller of Currency, 145 F.3d 1422, 1424 (D.C. Cir. 1998),
on reh'g in part, 156 F.3d 1279 (D.C. Cir. 1998) ("If the
plaintiff's cause of action is directed at the government's intent,
. . . it makes no sense to permit the government to use the
privilege as a shield."); Velazquez v. City of Chicopee, 226 F.R.D.
31, 34 (D. Mass. 2004) ("where the decision-making process itself
is the subject of the litigation, it is inappropriate to allow the
deliberative process privilege to preclude discovery of relevant
information" (citation and quotations omitted)).

C.   Undue Burden

Lastly, the State contends that compliance with the subpoenas
would place an undue burden on the Governor, Speaker, and
Representative.  See Gov.'s Mot. 39 (citing Fed. R. Civ. P.
45(d)(3)(A)(iv)); Spkr.'s Mot. 33; Rep.'s Mot. 33.  A "party

---

[15] Again, due to this conclusion, there is no need to address
whether and to what extent the privilege applies to documents held
by CDM Smith.  See supra note 8.

withholding discovery on the grounds of burden . . . bears the
burden of proving the discovery is in fact . . . unduly burdensome
and/or expensive." Citizens Union of City of New York, 269 F.
Supp. 3d at 139.

Regarding the subpoenas for deposition testimony, the State
notes that "the practice of calling high ranking government
officials as witnesses should be discouraged." Bogan v. City of
Bos., 489 F.3d 417, 423 (1st Cir. 2007) (citing United States v.
Morgan, 313 U.S. 409, 422 (1941)).[16]  However, "[d]epositions of
high ranking officials may be permitted where the official has
first-hand knowledge related to the claim being litigated [and]
other persons cannot provide the necessary information." Bogan,
489 F.3d at 423 (citations omitted).  Here, the relevant subject
matter is the intentions of the individual movants and the ways in
which those intentions may have influenced the drafting and passage
of RhodeWorks. See Gov.'s Mot. Ex. B; Spkr.'s Mot. Ex. B; Rep.'s
Mot. Ex. B.  These individuals clearly have first-hand knowledge
that cannot be fully supplied from anyone else.  Thus, the Governor
and Speaker's status as high ranking officials cannot alone create
an undue burden.

---

[16] The State maintains that the Governor and Speaker require
greater protection as high ranking officials; it does not make
this argument regarding the Representative. See Gov.'s Mot. 40;
Spkr.'s Mot. 33.

The State rightly notes that the individual movants and their staffers are busy dealing with matters of public importance, including the coronavirus pandemic and its economic fallout.  See Gov.'s Mot. 41-42; Spkr.'s Mot. 35-36; Rep.'s Mot. 35.  For this reason, the Court will carefully monitor and strictly enforce its directions that the depositions must be narrowly focused on the context of the public statements, the CDM Smith report, and any other documents obtained by Plaintiffs and specifically related to RhodeWorks and tied to the deponents and their offices.  The usual seven-hour time limit is likely far more than is needed.  See Fed. R. Civ. P. 26(d).

As for document production, the State contends that certain documents within the scope of the subpoenas are available from RIDOT, a party to this litigation.  See Gov.'s Mot. 41; Spkr.'s Mot. 35; Rep.'s Mot. 34.  Indeed, documents should be obtained from RIDOT in the first instance.  For any such documents, the movants may withhold production and direct Plaintiffs to obtain the documents from RIDOT.

Beyond these specific and reasonable objections, the State's assertions of undue burden are conclusory and largely dependent on its privilege arguments.  See Gov.'s Mot. 39-42; Spkr.'s Mot. 33-

36; Rep.'s Mot. 33-35.   Thus, the State has failed to show that compliance with the subpoenas will impose an undue burden.

III. Conclusion

    For the reasons stated herein, the Motions to Quash subpoenas duces tecum and subpoenas for deposition testimony, ECF Nos. 85, 87, 89, and 120, are DENIED.[17]


IT IS SO ORDERED.



_William E. Smith_
William E. Smith
District Judge
Date:  October 23, 2020

---

[17] In the CDM Smith Motion to Quash, the State requests that, if its motion is denied, the Court issue a certificate of appealability pursuant to 28 U.S.C. § 1292(b).  See CDM Mot. 15. Additionally, the State indicates that if the motions of the Governor, Speaker, and Representative are denied, they will make equivalent requests.  Id. at 15 n.1.  Due to the significant overlap between the four Motions to Quash, the Court will defer addressing the question of a certificate of appealability for the CDM Smith Motion until receiving the State's forthcoming motion regarding the Governor, Speaker, and Representative.