# United States Court of Appeals
## For the First Circuit

───────────────

Nos. 22-1795, 22-1796

AMERICAN TRUCKING ASSOCIATIONS, INC; CUMBERLAND FARMS, INC.;
M&M TRANSPORT SERVICES, INC.,

Plaintiffs, Appellees,

NEW ENGLAND MOTOR FREIGHT, INC.,

Plaintiff,

v.

RHODE ISLAND TURNPIKE AND BRIDGE AUTHORITY,

Defendant, Appellant,

PETER ALVITI, JR., in his official capacity as Director of the
Rhode Island Department of Transportation,

Defendant, Appellant.

───────────────

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

───────────────

Before

Rikelman, Lipez, and Kayatta,
Circuit Judges.

───────────────

Ian Heath Gershengorn, with whom Adam G. Unikowsky, Michelle
S. Kallen, Elizabeth B. Deutsch, Maura E. Smyles, and Jenner &
Block LLP were on brief, for appellants.
Peter F. Neronha, Attorney General of Rhode Island, Michael
W. Field, Assistant Attorney General of Rhode Island, and Keith

Hoffmann, Special Assistant Attorney General of Rhode Island, on brief for appellant Peter Alviti, Jr.

John A. Tarantino, R. Bart Totten, Nicole J. Benjamin, and Adler Pollock & Sheehan PC on brief for appellant Rhode Island Turnpike and Bridge Authority.

David S. Coale and Lynn Pinker Hurst & Schwegmann LLP on brief for International Bridge, Tunnel and Turnpike Association, amicus curiae.

Charles A. Rothfeld, with whom Evan M. Tager, Reginald R. Goeke, Eric A. White, Mayer Brown LLP, Richard Pianka, and ATA Litigation Center were on brief, for appellees.

Tyler S. Badgley, Jonathan D. Urick, U.S. Chamber of Commerce Litigation Center, Mark C. Fleming, Sharon K. Hogue, and Wilmer Cutler Pickering Hale and Dorr LLP on brief for the U.S. Chamber of Commerce, amicus curiae.

Prasad Sharma and Scopelitis, Garvin, Light, Hanson & Feary, P.C. on brief for the American Highway Users Alliance, Intermodal Association of North America, NATSO, Truckload Carriers Association, TRALA, Rhode Island Trucking Association, Inc., Maine Motor Transport Association, Inc., Maryland Motor Truck Association, Inc., Trucking Association of Massachusetts, Motor Transport Association of CT, Inc., New Hampshire Motor Transport Association, Trucking Association of New York, Pennsylvania Motor Truck Association, Vermont Truck and Bus Association, Alabama Trucking Association, Inc., Georgia Motor Trucking Association, Inc., Arkansas Trucking Association, Florida Trucking Association, Inc., Louisiana Motor Transport Association, Inc., North Carolina Trucking Assoc., Inc., South Carolina Trucking Assoc., Inc., Mississippi Trucking Association, Virginia Trucking Association, Tennessee Trucking Association, Kentucky Trucking Association, Inc., West Virginia Trucking Association, Inc., Idaho Trucking Association, Nevada Trucking Associations, Inc., South Dakota Trucking Association, Washington Trucking Associations, Arizona Trucking Association, Hawaii Transportation Association, New Mexico Trucking Association, North Dakota Motor Carriers Assoc., Inc., Colorado Motor Carriers Association, Montana Trucking Association, Oregon Trucking Associations, Inc., Indiana Motor Truck Association, Inc., California Trucking Association, Utah Trucking Association, Alaska Trucking Association, Inc., Ohio Trucking Association, Illinois Trucking Association, Inc., Missouri Trucking Association, Minnesota Trucking Association, Texas Trucking Association, Michigan Trucking Association, Inc., Iowa Motor Truck Association, Inc., Nebraska Trucking Association, Oklahoma Trucking Association, Wisconsin Motor Carriers Association, Wyoming Trucking Association, Inc., and New Jersey Motor Truck Association, amici curiae.

December 6, 2024

      **KAYATTA**, <u>**Circuit Judge**</u>.   In 2016, Rhode Island passed the Rhode Island Bridge Replacement, Reconstruction, and Maintenance Fund Act ("RhodeWorks").   Under RhodeWorks, tractor-trailers and larger trucks (collectively, "tractor-trailers") pay a toll when they cross any one of thirteen bridges within Rhode Island.   The state uses the toll revenue to replace, reconstruct, operate, and maintain its bridges on the National Highway System. The RhodeWorks tolls are subject to three statutory caps.   A truck cannot pay a toll more than once in each direction, cannot pay more than $40 per day, and cannot pay more than $20 for making a single "through trip" from Connecticut to Massachusetts.

      In this lawsuit brought by the American Trucking Associations and several trucking companies (collectively, "ATA"), the district court permanently enjoined the imposition of tolls under RhodeWorks.   In so doing, it concluded that the collection of tolls from only tractor-trailers and the capping of the tolls each caused the tolls to run afoul of the dormant Commerce Clause. For the following reasons, we agree that the caps render the tolls unlawful, but hold that the statute's application to only tractor-trailers does not.   We also hold that the unlawful caps are severable from the rest of the statute.

**I.**

**A.**

In 2008, the Rhode Island Department of Transportation ("RIDOT") began to consider new sources of revenue for repairing the state's transportation system.  Rhode Island has historically underinvested in its transportation infrastructure, with one estimate by a state blue-ribbon commission placing its annual funding gap at $285 million.

One option was to convert interstate highway bridges to tolled bridges.  Generally, states may not toll interstate highways.  23 U.S.C. § 301.  But Congress carved out an exception in the Intermodal Surface Transportation Efficiency Act of 1991 ("ISTEA"):  A state may "reconstruct[]" or "replace[]" a toll-free bridge and then convert that bridge to a toll facility.  Id. § 129(a)(1)(E).  The state may use the resulting funds to maintain and improve the bridge.  Id. § 129(a)(3)(A)(iii).  It may also divert any excess funds to "any other purpose for which [f]ederal funds may be obligated by a [s]tate" under Title 23 of the U.S. Code.  Id. § 129(a)(3)(A)(v).

By 2015, RIDOT had decided to use the ISTEA exception to implement a truck-tolling program.  As initially proposed, the tolling program applied to both what we are calling tractor-trailers (vehicles in Classes 8 and above of the Federal Highway Administration's ("FHWA's") vehicle-classification scheme) and the

smaller vehicles in Classes 6-7 (which, for ease of reference, we define as "single-unit" trucks).  The program did not seek to toll smaller trucks, vans, pick-ups, buses, automobiles, and the like, which fall under Classes 1-5 of the federal vehicle-classification scheme.

The Rhode Island General Assembly converted the truck-tolling proposal into draft legislation.  In June of 2015, then-Governor Gina Raimondo asked the legislature to revise the draft legislation so that it also exempted single-unit trucks.  A collection of so-called "equivalent single-axle load" studies compiled by RIDOT suggested that tractor-trailers were responsible for between seventy-two percent and ninety-one percent of highway damage.  RIDOT also pointed to a Government Accountability Office ("GAO") study from 1979, which concluded that a five-axle tractor-trailer weighing 80,000 pounds "has the same impact on an interstate highway as at least 9,600 automobiles."  The governor also requested an amendment that would place caps on the tolls paid by frequent users of the tolled facilities.  In public statements, then-Senate Majority Leader Dominick Ruggerio stated that the proposed amendments reflected "the concerns of the local trucking industry," while RIDOT Director Peter Alviti said they "came as a result of us listening to the various stakeholders and transportation industries in Rhode Island."

After the proposed amendments exempting single-unit trucks and adding the three statutory caps were incorporated into the statute, RhodeWorks took effect in 2016. Among other things, the legislative findings credited RIDOT's "estimate[] that tractor trailers cause in excess of seventy percent (70%) of the damage to the state's transportation infrastructure, including Rhode Island bridges, on an annual basis," while contributing less than twenty percent of the state's annual transportation-maintenance revenues.

In its final form, RhodeWorks covers thirteen bridges on interstate highways in Rhode Island. None of those bridges cross the border into an adjoining state.[1] The statute applies only to tractor-trailers, and exempts all vehicles in lower vehicle classes, including single-unit trucks. R.I. Gen. Laws § 42-13.1-5 (2024). Given these exemptions, ninety-seven percent of the vehicles that cross RhodeWorks bridges do not pay tolls. Out of the tolled vehicles, nineteen percent are registered in Rhode Island.

---

[1] Though ATA makes a glancing reference to Rhode Island's choice "to impose tolls only on highway corridors that carry substantial volumes of interstate traffic," it does not develop any argument that this fact bears on the question of whether RhodeWorks violates the dormant Commerce Clause. We thus find any such argument waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

**B.**

In July 2018, ATA filed this lawsuit in the U.S. District Court for the District of Rhode Island.  Alleging that RhodeWorks violates the dormant Commerce Clause, ATA requested that the court enjoin the statute's enforcement.  ATA argued that the tolling system contravenes the dormant Commerce Clause because it (1) intentionally discriminates against interstate commerce, (2) effectively discriminates against interstate commerce, and (3) violates the "fair-approximation" test by only tolling tractor-trailers, even though other vehicle classes also use Rhode Island's bridges.

Rhode Island moved to dismiss, arguing that the district court lacked subject matter jurisdiction under the Tax Injunction Act, which deprives federal courts of jurisdiction to hear certain cases related to state taxes.  The district court agreed, and ATA appealed.  This court reversed, concluding that the RhodeWorks tolls were not "taxes" within the meaning of the Tax Injunction Act.  Am. Trucking Ass'ns v. Alviti, 944 F.3d 45, 46-47 (1st Cir. 2019) (ATA I).  The district court subsequently denied a motion for a preliminary injunction.

Discovery commenced.  ATA issued subpoenas requesting documents and testimony from several Rhode Island officials, as well as from an engineering consulting firm (CDM Smith).  The district court declined a motion to quash, and Rhode Island

appealed.    This court refused to quash the subpoena to the consultant, but we concluded that legislative privilege barred discovery from the state officials.  <u>Am. Trucking Ass'ns</u> v. <u>Alviti</u>, 14 F.4th 76, 80–81 (1st Cir. 2021) (<u>ATA II</u>).

After a bench trial, the district court concluded that RhodeWorks violates the dormant Commerce Clause, agreeing with ATA on all three of its stated grounds.  <u>Am. Trucking Ass'ns</u> v. <u>Alviti</u>, 630 F. Supp. 3d 357, 399–400 (D.R.I. 2022) (<u>ATA</u>).   The district court permanently enjoined Rhode Island from collecting tolls under RhodeWorks.  <u>Id.</u>  This appeal followed.

**II.**

The Commerce Clause empowers Congress to "regulate Commerce . . . among the several [s]tates."  U.S. Const. art. I, § 8, cl. 3.  The Supreme Court has also read "a further, negative command" into the Commerce Clause.  <u>Okla. Tax Comm'n</u> v. <u>Jefferson Lines, Inc.</u>, 514 U.S. 175, 179 (1995).  States may not pass laws that "discriminate[] against or unduly burden[] interstate commerce."  <u>Gen. Motors Corp.</u> v. <u>Tracy</u>, 519 U.S. 278, 287 (1997); <u>see also</u> <u>South Dakota</u> v. <u>Wayfair</u>, 585 U.S. 162, 173 (2018).  Absent such a prohibition, states could erect barriers against interstate commerce to protect local industries, triggering a spiral "into economic isolation."  <u>Jefferson Lines</u>, 514 U.S. at 179–80.

In furtherance of these principles, the Supreme Court has crafted a three-part test to determine if a public-facility

user fee comports with the dormant Commerce Clause.  See Nw. Airlines, Inc. v. County of Kent, 510 U.S. 355, 369 (1994) (citing Evansville-Vanderburgh Airport Auth. Dist. v. Delta Airlines, Inc., 405 U.S. 707, 716-17 (1972)).  That Evansville/Northwest Airlines test applies to highway toll programs.  See Doran v. Mass. Tpk. Auth., 348 F.3d 315, 320-21 (1st Cir. 2003).  Under the test, a tolling system survives dormant Commerce Clause review if it (1) is based on "some fair approximation of use" of the tolled facility, (2) "is not excessive in relation to the [governmental] benefits conferred," and (3) "does not discriminate against interstate commerce."  Nw. Airlines, 510 U.S. at 369.

The parties agree that, in this case, the second prong of the Evansville/Northwest Airlines test (i.e., excessiveness) has been statutorily displaced.  As already discussed, ISTEA allows states to reallocate excess toll revenues to "any other purpose for which [f]ederal funds may be obligated by a [s]tate under [Title 23 of the U.S. Code]."  23 U.S.C. § 129(a)(3)(A)(v).  Thus, no toll for an ISTEA-authorized bridge can be stricken merely because it exceeds the benefits conferred on the users, because Congress "contemplated that tolls exceeding the amount needed to fund a toll road would be collected and spent on non-toll road projects."  See Owner Operator Indep. Drivers Ass'n v. Pa. Tpk. Comm'n, 934 F.3d 283, 293 (3d Cir. 2019).

- 10 -

So, our analysis of RhodeWorks revolves around two questions. First, does the statute discriminate against interstate commerce? And second, is the burden imposed by the tolls based on "some fair approximation" of use of the Rhode Island bridges?

### III.

### A.

A state discriminates against interstate commerce when it enacts "economic protectionism" by imposing "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 273 (1988). A court can identify "economic protectionism" by looking to "either discriminatory purpose or discriminatory effect." Bacchus Imps., Ltd. v. Dias, 468 U.S. 263, 270 (1984) (citations omitted). "[B]oth inquiries present questions of fact." Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 334 (4th Cir. 2001).

The Supreme Court has nevertheless warned that the Commerce Clause primarily "regulates effects, not motives." Comptroller of the Treasury of Md. v. Wynne, 575 U.S. 542, 561 n.4 (2015). Indeed, the Court's dormant Commerce Clause jurisprudence has consistently focused on "whether a challenged scheme is discriminatory in 'effect.'" Associated Indus. of Mo. v. Lohman, 511 U.S. 641, 654 (1994); see also Gregg Dyeing Co. v. Query, 286

U.S. 472, 481 (1932) ("Discrimination, like interstate commerce itself, is a practical conception.  We must deal in this matter, as in others, with substantial distinctions and real injuries."); Commonwealth Edison Co. v. Montana, 453 U.S. 609, 615 (1981) (noting that review of challenges to state taxes under the Commerce Clause focuses on the "practical effect of a challenged tax" (citation omitted)).  Moreover, in its most recent dormant Commerce Clause case, the Court emphasized that in cases applying the balancing test from Pike v. Bruce Church, Inc., 397 U.S. 137 (1970), "the presence or absence of discrimination in practice [has] proved decisive." Nat'l Pork Producers Council v. Ross, 598 U.S. 356, 378 (2023) (emphasis added); see also id. (noting the conceptual "congruity" between cases applying Pike and the Court's "core dormant Commerce Clause precedents").

        Our own dormant Commerce Clause cases have made the same point.  In deciding a prior appeal arising from this litigation, we noted that it was "difficult to conceive of a case in which a toll that does not discriminate in effect could be struck down based on discriminatory purpose." ATA II, 14 F.4th at 89.  An even earlier case made the same point.  See All. of Auto. Mfrs. v. Gwadosky, 430 F.3d 30, 36 n.3 (1st Cir. 2005) (questioning whether a sole showing of discriminatory intent would "invariably suffice" to invalidate a statute under the Commerce Clause).  Were the law otherwise, it would invalidate many more state statutes, given

that many legislators routinely claim to have crafted statutes to accommodate local interests. The dormant Commerce Clause exists to eradicate economic protectionism among the states. A statute that erects no barrier against interstate commerce -- despite the state legislature's best efforts -- does not threaten such protectionism. For that reason, "[w]e will not invalidate a state statute under the [Commerce] Clause merely because some legislators [or officials] sought to obtain votes for the measure on the basis of its beneficial side effects on state industry." Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 463 n.7, 471 n.15 (1981) (first making this point in the context of the Equal Protection Clause, and then reiterating it in the context of the Commerce Clause).

For the most part, the district court's analysis adhered to the foregoing principles. The court recognized the primacy of discriminatory effects in the dormant Commerce Clause analysis of facially neutral legislation, as well as the role of effects in "smok[ing] out" discriminatory intent. See Nat'l Pork Producers Council, 598 U.S. at 379 (quoting Richard H. Fallon, Jr., The Dynamic Constitution 311 (2d ed. 2013)); see also id. at 393 (Barrett, J., concurring in part) ("Where there's smoke, there's fire."). A discriminatory effect necessarily colors our analysis because it "strengthens the inference that [a] statute was discriminatory by design." Fam. Winemakers of Cal. v. Jenkins,

- 13 -

592 F.3d 1, 14 (1st Cir. 2010).  According to the district court, the "data" on RhodeWorks' "discriminatory effects" are some of the "most important evidence" buttressing a finding of discriminatory intent.  ATA, 630 F. Supp. 3d at 392.  In essence, the district court's analysis, like ours, ultimately rises or falls with an assessment of RhodeWorks' effects.[2]

With these principles in mind, we turn to the facts of this case.  Following the lead of the parties and the district court, we divide our discrimination inquiry into two parts.  First, we consider whether RhodeWorks' exemption for single-unit trucks discriminates against interstate commerce.  Second, we consider whether the tolling caps discriminate against interstate commerce.

**B.**

ATA claims that RhodeWorks effectively discriminates against interstate commerce by exempting single-unit trucks from its tolls.  As we explain below, we disagree.

**1.**

The threshold question for courts considering this type of discrimination claim under the dormant Commerce Clause is not whether a statute discriminates at all, but whether it

---

[2]  The district court's approach also aligned with our guidance from ATA II, where we stressed that evidence about the "discriminatory effects . . . of RhodeWorks toll collections is more probative" of discriminatory intent than legislative maneuvers by Rhode Island representatives.  14 F.4th at 90.

discriminates between "substantially similar entities . . . in a single market." Tracy, 519 U.S. at 298-300. Indeed, "the principle that any notion of discrimination assumes a comparison of substantially similar entities" is "a fundamental element of dormant Commerce Clause jurisprudence." Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 342 (2008) (cleaned up).

In Tracy, a purchaser of natural gas challenged Ohio's grant of a tax exemption to local gas distributors but not out-of-state gas distributors, arguing that this differential treatment unlawfully favored in-state entities. 519 U.S. at 282-83, 285. Because the in-state and out-of-state gas distributors sold different products to different consumer markets, however, the Court found that they were not competitors.[3] Id. at 310. And "in the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market[,] there can be no local preference, whether by express discrimination against interstate commerce or undue burden upon it, to which the dormant Commerce Clause may apply." Id. at 300; see also Alaska v. Arctic Maid, 366 U.S. 199, 204-05 (1961) (holding that higher

---

[3] The Tracy Court did suggest that out-of-state gas sellers may compete with in-state gas sellers in a more limited, noncaptive market. See 519 U.S. at 303. But the record "reveal[ed] virtually nothing about the details of that competitive market," and the Court ultimately upheld the differential tax scheme due to its "traditional recognition of the need to accommodate state health and safety regulation in applying dormant Commerce Clause principles." Id. at 302, 306.

taxes imposed by the state on freezer ships, which sold fish out of state, compared to onshore storage facilities, which sold fish in state, did not violate the dormant Commerce Clause because the two entities did not compete).

A hypothetical further illustrates the difference. Imagine that a state legislature proposes a toll on all motor vehicles and bicyclists using a new roadway in the countryside. Local voters who frequently bike on the roadway object to the proposed legislation.  So, the legislature passes a revised bill that applies only to motor vehicles, which are more likely than bicyclists to come from outside the state.  Clearly, the legislature discriminated in some fashion:  It tolled motorists and not bicyclists.  No one, though, would seriously argue that motorists and bicyclists are "substantially similar entities . . . in a single market." Tracy, 519 U.S. at 298–300.  In the absence of competition between similar entities, the amended statute would impose "no local preference . . . to which the dormant Commerce Clause [could] apply."  Id. at 300.

ATA charges RhodeWorks with discriminating against out-of-state tractor-trailers in favor of smaller in-state single-unit trucks.  So, the "threshold question" is whether out-of-state tractor-trailers and smaller in-state single-unit trucks "are indeed similarly situated for constitutional purposes."  Id. at 299.  If they are not, then eliminating the RhodeWorks tolling

disparity "would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages conferred by a [s]tate upon its residents or resident competitors."  Id.

Were there at least one market in which out-of-state tractor-trailers competed with in-state single-unit trucks, certainly Plaintiffs could easily prove it.  ATA is a national trade association of truck owners; Cumberland Farms is a business founded in Rhode Island that, among other things, transports goods throughout New England.  Nevertheless, as the district court found in no uncertain terms, there is simply no "concrete evidence demonstrating an increase in Rhode Island-based companies' use of un-tolled trucks, changes in vehicle fleets, diversion, or any other data demonstrating that [smaller] trucks compete in the same market as [tractor-trailers]."[4]  ATA, 630 F. Supp. 3d at 398 (footnote omitted).  The district court also concluded that the exemption for smaller trucks provided no "competitive advantage [to in-state competitors] at the expense of out-of-state competitors that use [tractor-trailers]."  Id. at 399.

---

[4]  In a separate portion of its opinion, the district court seemed to suggest that Classes 4-7 trucks and Class 8+ trucks compete in an "undifferentiated market of businesses that transport goods on interstate highways using trucks of varying types."  ATA, 630 F. Supp. 3d at 397.  But the district court did not identify any record evidence suggesting that this market is, in fact, "undifferentiated."  See id.

Pushing back on these findings, ATA argues that the record contains evidence that out-of-state tractor-trailers compete with in-state single-unit trucks. As support for this contention, ATA points to testimony of one of its experts that ATA says "demonstrates that, at least some of the time, either a straight truck or a tractor-trailer may be used for deliveries, and in these circumstances the tolling exclusion gives the predominantly Rhode Island-owned straight trucks a competitive advantage." But as factfinder, the district court found the cited testimony "mostly speculative." Id. at 398. We have squarely held that "[c]onjecture . . . cannot take the place of proof" in a dormant Commerce Clause analysis. Cherry Hill Vineyard, LLC v. Baldacci, 505 F.3d 28, 39 (1st Cir. 2007). And we have rejected dormant Commerce Clause challenges where "the district court found no compelling evidence of discriminatory effect." Wine & Spirits Retailers, Inc. v. Rhode Island, 481 F.3d 1, 14 (1st Cir. 2007). For all its conjecture, ATA simply offers no actual evidence that tractor-trailers compete with single-unit trucks in Rhode Island, let alone that out-of-state tractor-trailers compete with in-state single-unit trucks in Rhode Island. "The absence of any such evidence is telling." Id.

ATA next points to case law holding that two parties can be similarly situated for dormant Commerce Clause purposes if they indirectly compete. See Bacchus, 468 U.S. at 269 (noting that two

products can compete even if one does not pose a clear and present "competitive threat" to the other); Trailer Marine Transport Corp. v. Rivera Vazquez, 977 F.2d 1, 11 (1st Cir. 1992) (noting that discrimination can occur between two "similarly situated" entities that are not "direct business rivals"). True enough. But here there is no finding of even indirect competition between out-of-state tractor-trailers and in-state single-unit trucks.

Even were we to assume that a few Rhode Island single-unit trucks compete in some manner with a few out-of-state tractor-trailers, ATA's argument would still fall short. The dormant Commerce Clause is not an atomic fly swatter to be wielded against any and all trivial effects on commerce. A party challenging a facially neutral statute under the dormant Commerce Clause must prove that the statute has a substantial (i.e., beyond de minimis) competitive effect on nonstate interests. See Exxon Corp. v. Governor of Md., 437 U.S. 117, 126 (1978) ("The fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce."); Cherry Hill, 505 F.3d at 38-39 ("[A] de minimis advantage to in-state [companies] . . . [is] insufficient to establish a discriminatory effect." (quoting Brown & Williamson Tobacco Corp. v. Pataki, 320 F.3d 200, 216 (2d Cir. 2003)) (second alteration and omission in original)).

In arguing otherwise, ATA points to no case in which a facially neutral statute was struck down without a finding of more than a de minimis impact on interstate commerce. Instead, it points only to cases involving facially discriminatory legislation[5] or legislation from which a substantial discriminatory impact could be easily inferred.[6] Here, there is no claim that RhodeWorks is facially discriminatory or that a substantial discriminatory impact could be inferred from its exemption of single-unit trucks. This is especially true given the district court's finding that out-of-state tractor-trailers and in-state single-unit trucks do not compete.

**2.**

The district court nevertheless concluded that, for two reasons, "none of this matters." ATA, 630 F. Supp. 3d at 399.

---

[5] See, e.g., Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 575-76 (1997) ("It is not necessary to look beyond the text of this statute to determine that it discriminates against interstate commerce."); Maryland v. Louisiana, 451 U.S. 725, 756 (1981) ("In this case, the Louisiana First-Use Tax unquestionably discriminates against interstate commerce in favor of local interests as the necessary result of various tax credits and exclusions. No further hearings are necessary to sustain this conclusion."). Once a court finds that a statute is discriminatory, it need not inquire into the extent of that discrimination to conclude that the statute is unconstitutional.

[6] See, e.g., Trailer Marine, 977 F.2d at 10 (noting that, despite the "absence of firm statistics," "the inference [of substantial disparate impact] is so compelling that only the amount of the discrimination, and not its fact, can be plausibly contested").

**a.**

First, the district court cited <u>Trailer Marine</u>, 977 F.2d
at 11, to conclude that, given the "overtly protectionist" effects
of exempting single-unit trucks, it did not need evidence "of a
specific market impact" to find discriminatory effect. <u>Id.</u> (citing
<u>Trailer Marine</u>, 977 F.2d at 11). But as <u>Trailer Marine</u> implied,
and as <u>Tracy</u> subsequently made clear, the threshold question in
this type of dormant Commerce Clause case is whether the statute
discriminates between similarly situated competitors. See <u>Trailer
Marine</u>, 977 F.2d at 11 ("Such an imbalance in favor of local
interests (here local trailers) over similarly situated non-
resident interests (transitory trailers) is a proper concern of
the [dormant] Commerce Clause whether or not the market
participants are direct business rivals.")[7]; <u>Tracy</u>, 519 U.S. at
298-99 ("[A]ny notion of discrimination assumes a comparison of
substantially similar entities." (footnote omitted)). And here,
unlike in <u>Trailer Marine</u>, the in-state and out-of-state entities
are not similarly situated given "the absence of actual or
prospective competition . . . in a single market." <u>Tracy</u>, 519
U.S. at 300.

---

[7] We do not read the reference to "direct business rivals"
as exhausting the relevant universe of competition between
similarly situated tractor-trailers and thus do not read <u>Trailer
Marine</u> as contrary to <u>Tracy</u>.

Nor does <u>Trailer Marine</u> otherwise provide the support claimed by ATA.  <u>Trailer Marine</u>'s analysis began with the apt observation that "whether discrimination exists is heavily dependent upon the facts." 977 F.2d at 10.  The court then pointed to the case's most salient fact -- the challenged fee was in substance a flat fee imposed on "all classes of motor vehicles including trailers." <u>Id.</u>  The flat fee -- like the flat fee in <u>American Trucking Ass'ns</u> v. <u>Scheiner</u>, 483 U.S. 266 (1987) -- was "clearly discriminatory in impact," imposing a per-accident cost on nonresident trailers that was between five and six times the per-accident cost on "similarly situated" resident trailers. <u>Trailer Marine</u>, 977 F.2d at 10-11.

Here, by contrast, but for the caps (which we discuss below), there is no evidence that RhodeWorks discriminates between similarly situated entities to begin with.  RhodeWorks does not, for example, impose a per-mile (or per-bridge) fee on out-of-state tractor-trailers that exceeds the fee charged to similarly situated in-state tractor-trailers.  Instead, the challenged differential here is the fee charged to all tractor-trailers as compared to no fee charged to smaller trucks that do not compete with tractor-trailers.

**b.**

Second, in discussing discriminatory intent, the district court noted that "[t]here is no question that the

- 22 -

RhodeWorks legislation excluded lower-classed trucks to reduce the financial burden on in-state businesses." ATA, 630 F. Supp. 3d at 399.

In public statements during the drafting process, RIDOT Director Alviti and then-Senate Majority Leader Ruggerio acknowledged that the "local trucking industry" advocated for the caps and the small-truck exemption. But neither man claimed that the exemption would privilege in-state truckers over out-of-state truckers. Cf. ATA II, 14 F.4th at 89 n.7 (noting that similar public statements by other Rhode Island officials "[did] not admit that the [tolling burden on out-of-staters was] disproportionate to the relevant use of the bridges by out-of-staters"). And the statements were certainly not as nakedly protectionist as the ones on which this court has previously relied to find discriminatory intent. See Fam. Winemakers of Cal., 592 F.3d at 7 (pointing to legislator statements that a Massachusetts statute would "inherent[ly] advantage" in-state wineries).

In any event, we need not strike a facially neutral state tolling statute that exempts both local and out-of-state similarly situated entities merely because the statute responded to local businesses' concerns.[8] Moreover, as the district court explained,

---

[8]  Indeed, in this instance, most of the exempted vehicles in Classes 4-7 bear out-of-state plates, ATA, 630 F. Supp. 3d at 392, and there is no reason to suspect that the out-of-state percentage of single-unit trucks in Classes 6-7 differs.

its finding of an intent to discriminate against interstate commerce rested principally on its finding that the legislation had discriminatory effects. ATA, 630 F. Supp. 3d at 392. A finding of intent so inferred cannot survive absent discriminatory effect.

Nor does the amendment of the broader proposed legislation move the dial. Generally speaking, "statutory interpretation cannot safely . . . rest upon inferences drawn from intermediate legislative maneuvers." All. of Auto. Mfrs., 430 F.3d at 39. This is especially true when a party relies on a statutory amendment, because "there are countless reasons why the state legislature may have altered its position." Id. That general rule applies here.

Much state regulation contains exemptions for smaller employers, and smaller employers are more likely to be local than are larger employers. In Rhode Island, for example, state anti-discrimination laws apply only to employers that have four or more employees. R.I. Gen. Laws § 28-5-6(9)(i) (2024). That is to say, many exemptions in state legislation effectively and foreseeably reduce the regulatory burden imposed on local companies as compared to the burden imposed on out-of-state companies. So, if such a disparate impact were sufficient to strike down a statute in the absence of facial discrimination or a substantial impact on

competition, the dormant Commerce Clause would assume a role that exceeds our understanding of its purpose.

In sum, the record provides insufficient support for ATA's contention that exempting all single-unit trucks from the RhodeWorks tolling structure transgresses the dormant Commerce Clause.

### C.

We now turn our discrimination inquiry to the tolling caps.

To reiterate, RhodeWorks imposes three statutory caps that reset daily. See id. § 42-13.1-4(b)-(d). The first cap prevents any truck from paying more than once in each direction at a given gantry. The second cap prevents a truck from paying more than $20 in tolls on a "through trip" from Connecticut to Massachusetts (or vice versa). And the third cap prevents any truck from paying more than $40 per day. The district court found that the second cap is "irrelevant," because a truck making such a "through trip" would -- under current prices -- only pay around $18 in tolls anyway. ATA, 630 F. Supp. 3d at 394 n.50. Neither party argues otherwise. So, like the district court, we focus on our analysis on the remaining two caps.

There is no question that in-state tractor-trailers compete in overlapping markets with out-of-state tractor-trailers. Not even the state argues otherwise. So, we focus on whether the

caps in their effect provide a competitive advantage to in-state tractor-trailers as compared to out-of-state tractor-trailers.

We begin with two points on which the law is clear. First, a flat tax on the right to "mak[e] commercial entrances into [a state's] territory" would run afoul of the dormant Commerce Clause. Scheiner, 483 U.S. at 284. Such a tax would not correlate with road usage, and it would have "plainly" discriminatory effects because it would impose a higher per-mile cost on out-of-state vehicles relative to in-state vehicles. Id. at 286. Second, and conversely, a toll that is "directly apportioned to . . . mileage traveled" would not offend the dormant Commerce Clause, because it would "maintain state boundaries as a neutral factor in economic decisionmaking." Id. at 283. Under a usage-based tolling system, a driver is "simply pay[ing] for traveling a certain distance that happens to be within [a given state]." Id.

Here, though, we are dealing with a hybrid model: a usage-based toll that is capped after a certain number of gantries are passed, and then reset daily. One can imagine contrasting scenarios in which such a capped toll resembles either a flat tax or a usage-based toll. For instance, if all drivers will easily reach the caps, then the toll is effectively a flat tax because everyone will ultimately pay the capped amount for the privilege of using a state's roads. By contrast, if drivers will never reach the cap -- as is presently the case with the RhodeWorks toll on

"through trips" -- then the toll functions as a nondiscriminatory usage-based toll.

It is more difficult to categorize tolls like the ones before us: tolls with caps that are only sometimes reachable, more likely by in-state tractor-trailers than by out-of-state tractor-trailers, and that reset daily. In such circumstances, we consider practical burdens that the caps place on out-of-state vehicles but not on similarly situated in-state vehicles. If the RhodeWorks caps were facially discriminatory, even a de minimis burden on out-of-state vehicles might be enough to invalidate them. See Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564, 581 & n.15 (1997). But they are not. Accordingly, we look to see whether the caps' burden on interstate commerce is more than merely de minimis. See Cherry Hill, 505 F.3d at 38.

The evidence demonstrated, and the district court found, that local tractor-trailers disproportionately benefited from the caps as compared to out-of-state tractor-trailers, thereby reducing the per-mile tolls paid on average by in-state tractor-trailers, and in nontrivial amounts. For example, 39.9% of the reductions in what the tolls would have been but for the caps went to Rhode Island vehicles even though they accounted for only 18.6% of the transactions. ATA, 630 F. Supp. 3d at 395. This means that in-state tractor-trailers pay, on average, substantially less

- 27 -

than out-of-state tractor-trailers pay for each pass through a RhodeWorks gantry.

The state argues that the out-of-state vehicles are more likely to get at least some benefit from the caps, but does not dispute the district court finding that in-state vehicles receive a disproportionate share of the cap benefits. As Scheiner made clear, our primary concern is whether "[i]n the general average of instances, the [challenged] privilege is [less] valuable to the interstate [carrier than to the] intrastate carrier." 483 U.S. at 291 (quoting Capitol Greyhound Lines v. Brice, 339 U.S. 542, 557 (1950) (Frankfurter, J., dissenting)). Even if out-of-state trucks are more likely to receive at least some benefit from the caps, the evidence from trial shows that discounts disproportionately flow to in-state trucks. ATA, 630 F. Supp. 3d at 395. In other words, out-of-state tractor-trailers receive substantially less of a discount per bridge crossing than do in-state tractor-trailers. Therefore, the privilege of toll capping is considerably more valuable for intrastate carriers than it is for interstate carriers.

Given this disparate impact on similarly situated tractor-trailers, the caps are discriminatory under the logic of Scheiner and Trailer Marine. Even though out-of-state and in-state tractor-trailers can both benefit from the statutory caps, the caps still create "a privilege that is several times more

- 28 -

valuable to a local business than to its out-of-state competitors." Scheiner, 483 U.S. at 296. Because the disparity between the discounts received by in-state and out-of-state tractor-trailers is so pronounced in favor of locals, "the inference [of discrimination] is so compelling that only the amount of the discrimination, and not its fact, can be plausibly contested." Trailer Marine, 977 F.2d at 10. And because even the state does not contest that out-of-state tractor-trailers compete with in-state tractor-trailers, no basis exists for treating this discrimination as permissible.

In resisting the conclusion that RhodeWorks' caps unlawfully interfere with interstate commerce, Rhode Island relies heavily on our 2003 decision in Doran, which involved an option to obtain discounted tolls by purchasing a transponder. 348 F.3d at 317. But in Doran, there was no evidence that by offering the option to buy a transponder and get discounted rates, the state in any way affected competition between in-state and out-of-state interests in any market. Rather, "the incremental burden of the undiscounted toll for the infrequent traveler" who did not make use of the transponder program was "de minim[i]s," and the mere fact that nonparticipants paid higher tolls did not mean "that interstate commerce [would] be burdened, much less that it [would] suffer discrimination." Id. at 321. Put simply, in Doran, there was neither proof of competitive harm nor the type of disparate

treatment that would make such a competitive impact obvious.  So, eliminating the state's transponder program would not have served the "fundamental objective" of the dormant Commerce Clause -- to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a [s]tate upon its residents or resident competitors."  Tracy, 519 U.S. at 299.  RhodeWorks' caps, by contrast, directly bear on competition between in-state and out-of-state tractor-trailers.  The record shows that the caps disproportionately benefit in-state tractor-trailers over out-of-state tractor-trailers, and to a nonnegligible extent.  As such, the caps resemble more closely the flat taxes struck down in Scheiner.

This resemblance finds support in Scheiner's internal-consistency test for identifying problematic tolls.  To apply that test, we ask what would happen if each state adopted an identical toll regime.  See Scheiner, 483 U.S. at 284.  As in Scheiner, the toll regime here would mean that tractor-trailers staying within state borders would pay on average substantially less per mile than those engaged in interstate travel.

The state insists that the RhodeWorks caps are not "flat fees"; rather, they are per-use fees with retroactive "frequency-based discounts."  To understand this framing, consider a highly simplified version of the $40-per-day cap.  Imagine that a truck pays $10 per toll and hits the $40 cap after paying four tolls.

Because the truck has hit the cap, the fifth toll is free.  At this point, the truck's effective per-toll payment is no longer $10 per toll -- it is $8 per toll.  Thus, on Rhode Island's view, RhodeWorks is simply a garden-variety per-use toll with a retroactive discounting mechanism.  And per-use tolling systems satisfy Scheiner because the fees depend on use, not states entered.  See id. at 283 (explaining that a fee that is "directly apportioned to the mileage traveled in" a given state does not violate the internal-consistency test because the fee is simply "for traveling a certain distance that happens to be within" that state); see also Doran, 348 F.3d at 320 (making the same point).

But that same logic could apply to a flat-fee system.  Imagine that Rhode Island required an upfront fee of $40 to use its roads.  Under Rhode Island's view, the flat fee is still correlated with road usage because trucks that drive more will pay a lower effective per-mile fee.  The more miles a truck drives, the greater its retroactive "frequency-based" discount.  Yet, under Scheiner, that flat fee would clearly fail to pass muster.[9]

Rhode Island protests that the Supreme Court "pared back" Scheiner in American Trucking Ass'ns v. Michigan Public Service Commission, 545 U.S. 429 (2005).  But there is no language

---

[9]    ATA contends that the caps fail the internal-consistency test but develops no argument that RhodeWorks' exemption of single-unit trucks would also be problematic under the internal-consistency test.  Thus, we consider that argument waived.

in that case so stating, nor has the Supreme Court subsequently so suggested. Instead, that case, like Scheiner, rested on a finding that "neither record evidence nor abstract logic" suggest that the challenged fee penalizes any trucks. Wynne, 575 U.S. at 563 n.7 (cleaned up) (describing Michigan Public Service Commission).

Rhode Island also seeks to distinguish Scheiner based on the fact that the flat fee in Scheiner was not applied equally to all trucks; rather, in-state trucks effectively received a rebate for the fee, paying nothing net. See 483 U.S. at 274-75. But this argument overlooks Trailer Marine. That case involved a flat fee of $35 assessed on trailers in Puerto Rico, which the commonwealth used to fund an accident-compensation plan. 977 F.2d at 10. Unlike the fee in Scheiner, the Puerto Rico fee was even-handed. Id. It applied to in-state trailers, as well as out-of-state "transitory trailers" so long as they remained in Puerto Rico for more than a month. Id. at 3-4, 10. Applying Scheiner, we nevertheless concluded that the fee violated the dormant Commerce Clause. Id. at 10-12. Transitory trailers spent far less time on Puerto Rico's roads. They were therefore likely responsible for only a small fraction of accidents in the territory. Id. at 10. But because Puerto Rico assessed flat fees depending on whether the trailer stayed in Puerto Rico for thirty days or fewer, even an out-of-state transitory trailer that qualified for the reduced $15 fee would "effectively pay[] five or

six times as much per accident" on average compared to the in-state trailer staying in Puerto Rico year-round.  Id.  The fee was therefore invalid.  Id. at 12.

Rhode Island also notes that in Scheiner, the "disparate impact of the flat tax on in-state versus out-of-state interests was much more dramatic [than the impact in this case]."  To be sure, the fee in Scheiner resulted in a cost-per-mile on out-of-state trucks that was around five times greater than the one imposed on in-state trucks.  483 U.S. at 286.  But Scheiner did not suggest that the Pennsylvania axle fee would have survived if its disparate impact on out-of-state trucks were smaller but still substantial.  And for good reason.  At least when, as here, the impact is clearly substantial, any attempt to identify how much disparate impact is "too much" would result in a purely arbitrary rule.  That is why, in Trailer Marine, we refused to endorse a "specific figure" for the "cumulative disparity" that would justify invalidating a fee as effectively discriminatory.  977 F.2d at 11.  Instead, we simply noted that the challenged fee's disparate impact was sufficiently substantial and onerous for out-of-state interests that it could not "be brushed aside as incidental."  Id.  That logic applies here.  Even if RhodeWorks does not result in a disparate impact as large as the ones in Scheiner or Trailer Marine, we cannot "brush[] [it] aside as incidental."  Id.

Rhode Island next stresses that no record evidence clearly demonstrates that the toll caps deter interstate commerce. But as discussed above, when a fee disproportionately burdens similarly situated out-of-state competitors, a court may -- as in Scheiner and Trailer Marine -- infer discriminatory effect from the non-incidental burden on out-of-state interests. See Scheiner, 483 U.S. at 286-87; Trailer Marine, 977 F.2d at 10-11. Neither Scheiner nor Trailer Marine involved precise evidence about the extent to which the challenged fee limited interstate commerce. But in each case, the fee was presumptively invalid because it disparately burdened similarly situated out-of-state entities so much that the fee was "clearly discriminatory in impact," such that "only the amount of the discrimination, and not its fact, [could] be plausibly contested." Trailer Marine, 977 F.2d at 10; see also Scheiner, 483 U.S. at 286-87.

For the foregoing reasons, we agree with the district court that the RhodeWorks caps effectively discriminate against interstate commerce and are therefore unconstitutional.

**D.**

**1.**

Having concluded that the small-truck exemption survives the discrimination inquiry, but the caps do not, we turn to the district court's conclusion that RhodeWorks' small-truck exemption

violates the fair-approximation test.[10]   ATA, 630 F. Supp. 3d at 380.  This is the first prong of the Evansville/Northwest Airlines analysis.

Evansville's fair-approximation test poses "essentially a question of allocation; we ask whether the government is charging each individual entity a fee that is reasonably proportional to the entity's use, and whether the government has reasonably drawn a line between those it is charging and those it is not." Industria y Distribucion de Alimentos v. Trailer Bridge, 797 F.3d 141, 145 (1st Cir. 2015).  With one possible exception,[11] this inquiry is distinct from the tests used to assess the other two prongs under Evansville -- i.e., whether a tolling program discriminates against interstate commerce or is excessive.   Id.   The discrimination prong is concerned with user fees that unfairly advantage in-state entities over similarly situated out-of-state competitors, while the excessiveness prong (statutorily displaced in this case) asks whether the fee imposed on users of a public facility is reasonable compared to the costs incurred by the state

---

[10]  Because we have already concluded that the RhodeWorks caps discriminate against interstate commerce (and thereby violate the third prong of the Evansville/Northwest Airlines test), we need not subject them to (or even consider if they fall within) the fair-approximation test.

[11]  It is not clear whether absolute excessiveness can doom a fee in the context of an ISTEA waiver, or whether such an inquiry might bear on a fair-approximation analysis.  Because this issue was not developed on appeal, we do not address it.

to improve or maintain that public facility.  Id. at 146.  By contrast, the fair-approximation inquiry concerns whether the fee imposed on an entity "reflect[s] a fair, if imperfect, approximation of the use of facilities for whose benefit they are imposed." Evansville, 405 U.S. at 717.  The standard here is a lenient one:  We will strike down a public facility fee as not fairly approximated only if the legislature allocated it in a "wholly unreasonable" manner.  Id. at 718; see also N.H. Motor Transp. Ass'n v. Flynn, 751 F.2d 43, 47 (1st Cir. 1984) ("[T]he Constitution requires not 'precision' but 'rough approximation' in matching fee and benefit." (cleaned up)); Selevan v. N.Y. Thruway Auth., 711 F.3d 253, 259 (2d Cir. 2013) (asking whether a distinction between paying and nonpaying motorists on Grand Island Bridge was "wholly unreasonable").

**2.**

At first blush, RhodeWorks (minus the caps) would seem to pass the fair-approximation test quite easily.  In ATA's own words to this court, the RhodeWorks toll is "a paradigmatic toll." Opening Brief for Plaintiffs-Appellants at 27, ATA I, 944 F.3d 45 (1st Cir. 2019) (No. 19-1316).  "It is paid only by the user of tolled bridges, for each use of the bridges; it is paid for the privilege of using those facilities," so that "there is a direct correlation between the fee . . . and the use of the property." Id. at 25-26.  Rhode Island's legislature "estimate[d] that tractor

trailers cause in excess of seventy percent (70%) of the damage to the state's transportation infrastructure . . . on an annual basis." R.I. Gen. Laws § 42-13.1-2(8) (2024). Having so found, the legislature granted RIDOT the "[a]uthority to collect tolls on large commercial trucks only," with the tolls to "be fixed after conducting a cost-benefit analysis." Id. § 42-13.1-4. The amount of the tolls was to be determined based on "the costs of replacement, reconstruction, maintenance, and operation of Rhode Island's system of bridges." Id. § 42-13.1-8. RIDOT's estimate that tractor-trailers cause over seventy percent of the damage to Rhode Island's bridges was principally based on its review of five studies employing "an equivalent single-axle load ('ESAL') methodology, which considers pavement thickness to measure the impact of vehicle load." And no party disputes that the tolls would have been allocated to fund roughly seventy percent of the repair costs. At trial, Rhode Island presented additional expert testimony using a different methodology (the "fatigue analysis"), which similarly concluded that tractor-trailers caused between seventy and eighty percent of bridge damage.[12]

---

[12] After RhodeWorks was enacted, RIDOT performed its own ESAL analysis, which likewise found that tractor-trailers accounted for around eighty percent of bridge damage. It is not clear to us that RIDOT's analysis is methodologically different from the ESAL studies on which the agency initially relied.

The district court nevertheless held that the tolls did not represent a fair approximation of tractor-trailers' use of the bridges. ATA, 630 F. Supp. 3d at 389. The district court seemed to view the fee as excessive because a tractor-trailer's "use" of a bridge is no different from a car's use of the bridge, which the district court defined as "to cross" the bridge. Id. at 384. Clearly, though, a state can charge users of a facility a fee that covers all or some portion of the damage that use does to the facility. See Cont'l Baking Co. v. Woodring, 286 U.S. 352, 373 (1932). For this reason, the Supreme Court has "sustained numerous tolls based on a variety of measures of actual use, including . . . [the] manufacturer's rated capacity and weight of trailers." Evansville, 405 U.S. at 715.

The district court relied alternatively on a review of expert testimony concerning how best to estimate the damage done to bridges by the different types of vehicles that cross them. ATA, 630 F. Supp. 3d at 385–87. The state's own expert (Dr. Small) stated that ESAL studies are generally used to measure pavement (not bridge) damage, and that he would not "use [them] to look at bridges." Id. at 386. The district court further credited expert testimony that the GAO study was only designed to analyze overweight and oversized vehicles' impact on pavement, not bridges. Id. Moreover, the district court rejected the state's fatigue analysis, noting that bridges on interstate highways "are

designed to withstand the flow of heavy trucks." Id. Instead, the court agreed with ATA that a fourth type of analysis -- called "highway cost allocation studies," or HCASs -- was the superior method for measuring bridge damage. Id. at 381. Under that method, the court noted, tractor-trailers are responsible for around twenty to forty percent of bridge damage. Id. at 388.

While the court found that the ESAL studies used by Rhode Island are "flawed" measures, it never found that it was "wholly unreasonable" for Rhode Island to rely on a vehicle's relative contribution to pavement damage as a proxy for estimating relative damage to the paved bridges. Id. at 386-87. Nor could it have so found. As noted earlier, the Supreme Court has blessed a broad "variety of measures of actual use," including "gross-ton mileage . . . and manufacturer's rated capacity and weight of trailers." Evansville, 405 U.S. at 715. In Evansville itself, the Court cited "aircraft weight" as an example of a permissible measure of use. Id. at 719. And in one case, the Court upheld a Kansas statute that taxed heavy trucks to fund highway maintenance, expressly holding that the legislature could allocate the tax to those trucks whose "character of use" tore up the state's highways and created the need for the maintenance tax. See Cont'l Baking Co., 286 U.S. at 373.

Logically, if a bridge's pavement is impassable and potholed, a driver cannot use the bridge safely even if the

bridge's other components remain perfectly healthy. Pavement health is, therefore, at least somewhat correlated with the safety and utility of entire bridges, the maintenance of which is RhodeWorks' primary goal. For instance, under federal regulations for implementing the National Highway Performance Program, Rhode Island must measure a bridge's structural integrity under "the minimum of condition rating method."[13]   23 C.F.R. § 490.409(b) (2024).  Basically, a bridge's condition rating is the lowest of the condition ratings assigned to its component parts. See id. In other words, a bridge is only as strong as its weakest link. So, if a bridge's deck (which includes the pavement) is significantly degraded, federal law requires a state to assume that the entire bridge is significantly degraded. See id.

The state's reliance on the ESAL analyses also appears not wholly unreasonable given that its subsequent fatigue analysis also concluded that tractor-trailers cause around seventy to eighty percent of bridge damage. To be sure, the district court found flaws with the state's fatigue analysis, concluding that HCAS analyses are more reliable. ATA, 630 F. Supp. 3d at 386-88. For example, the district court noted that the fatigue analysis ignored "other ways vehicles impact bridges." Id. at 386.  The

---

[13]  We take judicial notice of regulations published in the Federal Register.  See 44 U.S.C. § 1507.

court also highlighted that most interstate highways "are designed to withstand the flow of heavy trucks," pointing to a statement by Rhode Island's fatigue-analysis expert (Dr. Nowak) that certain bridge components have a theoretically "infinite fatigue life."[14] Id.

These may be perfectly fair criticisms.  But they do not suggest that the fatigue analysis is so flawed that Rhode Island's initial estimate was wholly unreasonable.  Consider the district court's reference to Dr. Nowak's comment about "infinite fatigue life."  Id.  Elsewhere, Dr. Nowak testified that, while some bridge components are "over-designed," others "are designed exactly to the code requirements," and those "are the components which would wear out first."  Those "others" presumably include the pavement, which no one claims does not need to be repaired and replaced from time to time.  Moreover, Dr. Nowak noted that if a bridge is not well-maintained (as many Rhode Island bridges are not), certain components will fatigue even faster when subject to heavy vehicle loads.  So, while some bridge components are indeed "designed to withstand the flow of heavy trucks," others will fatigue much faster under the burden of heavy truck loads.  Id.

---

[14]  The district court noted several other potential flaws with the fatigue analysis, but then decided that it "need not interrogate them given its holdings."  ATA, 630 F. Supp. 3d at 386 n.39.  We therefore do not review them here.

Separately, Dr. Small offered some criticisms of the HCAS studies offered by ATA, noting that HCAS studies allocate maintenance costs to different vehicle classes based on the initial construction costs incurred to accommodate those vehicle classes. In other words, the assumed maintenance costs for a given classification of vehicles are a function of the money spent to make the bridge usable for that vehicle class. They are not a function of "what actually happens on the bridge over time[,] which might be quite different." The district court did not discredit this testimony.

We need not (and therefore do not) hold that the district court's factual findings were clear error. The question before us is not whether the district court correctly concluded that an HCAS analysis is more accurate than an ESAL or fatigue analysis for measuring bridge damage. Rather, the question is whether it was "wholly unreasonable" for Rhode Island to rely on the ESAL (and GAO) studies when concluding that the larger trucks as classified by the FHWA cause the most damage to RhodeWorks bridges. See Evansville, 405 U.S. at 717-18.

We cannot say that it was. At the most basic level, it does not strike us as wholly unreasonable to presume that bigger trucks will cause more damage to bridges, and smaller trucks, less. And Rhode Island's conclusion that tractor-trailers cause most of the damage to the pavement is consistent with that common sense.

We therefore do not substitute our own judgment for that of the Rhode Island legislature.

**3.**

Finally, the district court held that even if Rhode Island could equate bridge "use" with bridge "damage," and even if Rhode Island could rationally show that tractor-trailers caused most bridge damage, the state still could not impose tolls on tractor-trailers to recoup that cost unless it also imposed tolls on all "users having more than a 'negligible' impact on the tolled facilities." ATA, 630 F. Supp. 3d at 387.

The court's main authority on this point was Bridgeport & Port Jefferson Steamboat Co. v. Bridgeport Port Authority, 567 F.3d 79 (2d Cir. 2009). See ATA, 630 F. Supp. 3d at 387. In that case, the Second Circuit held that a municipal port authority could not fund most of its operating budget -- which covered ferry and nonferry programs -- via a flat tax on ferry passengers. 567 F.3d at 82-83, 88. Nonferry passengers also used the port authority's other facilities. Id. at 84. Therefore, fair approximation required that they have some skin in the game and contribute something to the port authority's operating budget. See id. at 88.

In response, Rhode Island argues that Evansville allows it to exempt a class of nonnegligible users from RhodeWorks

tolling.[15]  There, the Court upheld a flat fee on commercial airline passengers to fund airport maintenance.   405 U.S. at 720-21. Critically, that fee did not apply to noncommercial passengers, even though those passengers also used the airport's runways, navigational facilities, and aviation-related services.   Id. at 717-18.  The fee also did not apply to commercial passengers on nonscheduled flights, commercial passengers on light aircraft, military passengers, or nonpassenger airport users (e.g., people dining at airport restaurants).   Id.   Taken together, these exemptions covered most of the airport's users.   Id. at 717.

_____

[15]  Rhode Island cites several other cases for the proposition that a fee can pass fair approximation even when it exempts a class of nonnegligible users.  But none of those other cases meaningfully supports the state's argument.  Most of those cases held that a facility fee may target a specific class of payers when those payers are also the facility's only users.  See Nw. Airlines, 510 U.S. at 369 (upholding runway maintenance fee assessed on airlines and not on concessionaries, because only the airlines used the runways); Flynn, 751 F.2d at 49-50 (holding that New Hampshire could assess a fee for funding hazardous-waste programs solely on hazardous-waste truckers, because the supported programs existed entirely to benefit those truckers).  A fourth case discussed whether a fee could pass fair approximation if it was overinclusive (i.e., incidentally levied on non-users of a service), rather than underinclusive of nonnegligible users, as is the case here.  See Trailer Bridge, 797 F.3d at 145-46.  And a fifth case explored whether a facility fee may be assessed on "indirect" users, whose businesses rely on the existence of the public facility.  Alamo Rent-a-Car, Inc. v. Sarasota-Manatee Airport Auth., 906 F.2d 516, 519, 521 (11th Cir. 1990) (holding that an airport could assess a percentage-based fee on an off-site car-rental service, because the service still indirectly used the access roads to the airport and therefore benefitted from the facility's existence).

We cannot square the district court's conclusion with _Evansville_'s holding that a public authority may assess a fee on only the most significant group of facility users, even if other nonnegligible users of the facility are exempt, at least as long as its justification for doing so is not wholly unreasonable.[16] _Id._ at 717-18.  _Evansville_ made clear that assessing the maintenance fee only on commercial passengers made sense, because commercial travel "require[d] more elaborate navigation and terminal facilities, as well as longer and more costly runway systems, than [did] flights by smaller private planes."  _Id._ at 718.  Commercial aviation demanded more from the airport's facilities, so commercial passengers needed "to bear a larger share of the cost of facilities built primarily to meet [their] special needs."  _Id._ at 718-19.

_Evansville_ further suggested that the state may exempt nonnegligible users for administrability reasons.  _See id._ at 716. Administrability is one of the reasons the fair-approximation standard exists.  It would be onerous and expensive to require a

---

[16] ATA attempts to distinguish _Evansville_ on the grounds that the exempted passenger classes in that case were "trivial." Nothing in the text of the opinion suggested this.  On the contrary, the fact that most airport users were exempt from the fee cuts against ATA's characterization of the exempt passengers as a negligible segment of overall users.  _See_ 405 U.S. at 717. To be sure, many exempt users were nonpassengers.  _See id._  But _Evansville_ simply did not say that the exempt passenger users were a "trivial" chunk of the overall user population.

state to assess "every factor affecting appropriate compensation for [facility] use" before constructing a tolling system.  Id. (quoting Capitol Greyhound Lines, 339 U.S. at 546).  Facility fee systems that reasonably exempt certain payer classes to minimize the "administrative burdens of enforcement" can comport with the fair-approximation test.  Id.  In Evansville, commercial airlines were responsible for collecting the maintenance fee.  Id. at 709. This was a more administrable approach than extracting a fee from each airport user, many of whom would have lacked billing relationships with associated airlines, making collection much harder.

Evansville's logic applies to RhodeWorks.  Just as the commercial passengers in Evansville were the most intensive users of airport facilities, Rhode Island concluded with at least some reason that tractor-trailers cause the most wear and tear to Rhode Island's bridges.  Thus, like the airport in Evansville, Rhode Island may collect a fee from the most intensive users without having to also collect a fee from lesser users.  Moreover, Rhode Island urges -- and ATA does not dispute -- that charging only the largest trucks is more administrable than charging each of the tens of thousands of smaller vehicles.  Furthermore, by relying on the preexisting federal vehicle classification system and focusing on a classification that corresponds to an observable physical

characteristic (i.e., the "gap" between tractor and trailer),[17] Rhode Island can reasonably point to a benefit from deciding to apply its toll to only tractor-trailers rather than to all the varied and much more numerous vehicles that cross its bridges.

While _Evansville_ is on point, _Bridgeport_ is distinguishable. In that case, fees on ferry passengers covered almost the entire port authority operating budget, which supported ferry and nonferry services. 567 F.3d at 83. So, the key fair-approximation problem there was that ferry passengers were supporting port facilities that they did not use at all and often could not even access. See _id._ at 84. Moreover, even where some port facilities did indirectly benefit ferry passengers, there was "nothing in the record to indicate how the portion of . . . costs borne by the ferry passengers compare[d] to the costs, if any, borne by large vessels" that were the primary beneficiaries of those services. _Id._ at 88. In other words, the Port Authority presented no discernable rationale behind how costs were apportioned between ferry passengers -- who benefitted minimally from those port facilities but bore the entirety of the fee -- and large vessels, which made extensive use of those same facilities but paid none of the fee. _Id._ That is not what is happening here.

---

[17] RhodeWorks gantries assess tolls with lasers that detect the "telltale gap between the tractor and trailer that marks a vehicle in Class[es] 8-13."

Tractor-trailers are not paying to maintain bridges that they do not (or cannot) use.  Instead, they are paying to maintain bridges that they use.  And there is a plainly discernible rationale behind how costs are apportioned under RhodeWorks:  The fee is levied only on vehicles that Rhode Island regards as inflicting the most damage to the bridges they use.  Nothing in Bridgeport suggests that this allocation scheme is impermissible under the fair-approximation test.

## IV.

We are not quite done.  Because we conclude that the RhodeWorks caps violate the dormant Commerce Clause, but the small-truck exemption does not, we must determine whether the caps are severable from the rest of RhodeWorks.  We hold that they are.

Severability is a matter of state law.  Leavitt v. Jane L., 518 U.S. 137, 139 (1996) (per curiam).  In Rhode Island, a court may sever an unconstitutional provision when it "is not indispensable to the rest of the statute and can be severed without destroying legislative purpose and intent." Landrigan v. McElroy, 457 A.2d 1056, 1061 (R.I. 1983).  Ultimately, "[t]he test for determining" severability "is 'whether, at the time the statute was enacted, the legislature would have passed it absent the constitutionally objectionable provision.'"  Id. (quoting Scheinberg v. Smith, 659 F.2d 476, 481 (5th Cir. 1981)).  A severability provision is "probative," but not dispositive, of

legislative intent.  R.I. Med. Soc'y v. Whitehouse, 239 F.3d 104, 106 (1st Cir. 2001) (citation omitted); see also Landrigan, 457 A.2d at 1061.

It is not difficult to discern the "purpose and intent" behind RhodeWorks.  The legislature told us when it passed the statute.  Specifically, the legislature found that there was "insufficient revenue available from all existing sources to" maintain Rhode Island's transportation infrastructure.  R.I. Gen. Laws § 42-13.1-2(4) (2024).  It wanted to ameliorate this "funding gap" by creating "recurring" revenue sources that would "fund transportation infrastructure on a pay-as-you-go basis."  Id. § 42-13.1-2(7).  The legislature also included an express severability provision, which states that if any part of RhodeWorks is held unconstitutional, "all valid parts that are severable from the . . . unconstitutional part [should] remain in effect."  Id. § 42-13.1-14.

Given this language, it seems clear that severing the RhodeWorks caps would not "destroy[] legislative purpose and intent."  Landrigan, 457 A.2d at 1061.  Rather, invalidating RhodeWorks based on nothing more than the unconstitutionality of the caps would cut against the legislature's resolve to raise funds for its bridges and its stated preference for -- wherever possible -- only excising the statute's defective provisions.

- 49 -

ATA counters by pointing to legislative history.  It
notes that the legislature -- at the request of then-Governor
Raimondo -- added the caps to assuage "vociferous local opposition
to the tolls."  Thus, ATA argues, it is unlikely that the
legislature would have passed RhodeWorks without the caps, which
ensured that the local trucking industry fell in line behind the
bill.  We see several problems here.

First, ATA points to no evidence reasonably
demonstrating that RhodeWorks would not have passed without the
caps. At most, it shows that as between RhodeWorks without both
a small-truck exemption and the caps, and RhodeWorks with both the
exemption and the caps, the legislature preferred the latter.  The
but-for scenario posed by our severance inquiry is markedly
different:  It asks whether the legislature would have foregone
RhodeWorks and its revenues altogether without the caps.  ATA
points to nothing that would allow us confidently to discern an
answer to that question.  Put slightly differently, ATA has not
shown that the caps were "indispensable" to RhodeWorks' passage.
Id.; cf. All. of Auto. Mfrs., 430 F.3d at 39 ("[S]tatutory
interpretation cannot safely be made to rest upon inferences drawn
from intermediate legislative maneuvers.").

Second, this case is unlike those in which Rhode Island
courts have refused to sever unconstitutional provisions.  For
instance, ATA cites In re Advisory Opinion to the Governor, 856

A.2d 320 (R.I. 2004).  But that case is clearly distinguishable. There, the Rhode Island Supreme Court examined a statute governing the establishment and operation of a casino in West Warwick, Rhode Island.  See id. at 323.  Among other things, that statute required voter approval of the casino in a public referendum.  Id.  The court held this referendum unconstitutional.  Id.  And because "[t]he whole casino [was] dependent on voter approval [via] the referendum," the rest of the statute had to fall as well.  Id. at 333.  The referendum provision was the linchpin of the entire statute because "[a]ll the provisions of the [statute were] subsumed by the referendum question."  Id.  That is not the case with RhodeWorks.  The statute's remaining provisions can function perfectly well without the caps provision, meaning the caps are not "indispensable to the rest of the statute."  Landrigan, 457 A.2d at 1061.

The other major example here is Bouchard v. Price, 694 A.2d 670 (R.I. 1997).  There, Rhode Island passed a statute saying that when a felon tried to "commercial[ly] exploit[]" a crime (e.g., by receiving royalties from a movie about the crime), the money owed to the felon would instead flow into "a criminal royalties fund from which victims of the crime may claim reimbursement for damages."  Id. at 673.  The court held that this structure violated the First Amendment because it was an overinclusive restraint on free speech.  Id. at 677.  Thus, the

provision redirecting funds from "commercial exploitation" into a "criminal royalties fund" was unconstitutional. Id. at 674, 677. The court held that this provision could not be severed because it was "indispensable" to the act's purpose "of compensating victims by utilizing the proceeds that a criminal has derived from the criminal activity." Id. at 676-78. Again, the caps provision in RhodeWorks does not play the same kind of central role.

We therefore conclude that although the RhodeWorks caps are unconstitutional, they are severable from the rest of the statute. Thus, RhodeWorks may go into effect (absent the caps) without offending the dormant Commerce Clause.

## V.

For the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part. Each party shall bear its own costs, and the case is remanded for the entry of judgment in accord with this opinion.